USDC SCAN INDEX SHEET

















SMV   1/12/06   10:47

3:04-CV-01968   NORTEL NETWORKS LTD V. PLATINUM NETWORKS

*48*

*NTCF.*

SCOTT J. FERRELL, Bar No. 202091
DAVID R. SUGDEN, Bar No. 218465
CALL, JENSEN & FERRELL
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
Phone: (949) 717-3000
Fax: (949) 717-3100
sferrell@calljensen.com
dsugden@calljensen.com

MICHAEL J. WEAVER, Bar No. 58581
LATHAM & WATKINS, LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375
Phone: (619) 238-3012
Fax: (619) 696-7419
mike.weaver@lw.com

Attorneys for Plaintiff
    NORTEL NETWORKS LIMITED

FILED

JAN 11 2006

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTEL NETWORKS LIMITED, a Canadian corporation <br><br> Plaintiff, <br><br> vs. <br><br> PLATINUM NETWORKS, INCORPORATED, a California corporation; GERALD MEDINA, an individual <br><br> Defendant. | Case No.  04 CV 1968L (LSP) <br><br> **PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)** <br><br><br><br><br> Complaint Filed:  September 29, 2004 <br> Trial Date:        None Set |

48

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

NOR02-01:179394:1-11-06

PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

Plaintiff Nortel Networks Limited ("Nortel" or "Plaintiff"), through its attorneys of record hereby make the following initial disclosures as required under Federal Rule of Civil Procedure 26(A)(1):

**(A)   RULE 26(a)(3)(A) WITNESSES:**

1.   Nortel hereby discloses the following individuals expected to testify at trial:

A.   David Ahumada
Platinum Networks, Inc.
11211 Sorrento Valley Road, Suite N
San Diego, CA 92121
Telephone: (866) 208-7707

B.   Vernilda Ang
Platinum Networks, Inc.
11211 Sorrento Valley Road, Suite N
San Diego, CA 92121
Telephone: (866) 208-7707

C.   Thomas Dailey
Dailey Investigations
111 Pacifica, Suite 250
Irvine, CA  92618
Telephone: (714) 731-4533

D.   Monica Desai
Platinum Networks, Inc.
11211 Sorrento Valley Road, Suite N
San Diego, CA 92121
Telephone: (866) 208-7707

E.   Francis Graf
Suite 210-612 View St.
Victoria, BC Canada V8W 1J5
Telephone: (250) 382-9700

F.   Russ Gambrel
2515 Front Street
San Diego, CA 92103
Telephone: (619) 838-4303

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

NOR02-01:179394_1:1-11-06                                    - 1 -

PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

G.   Bruce Jensen
     52 Dartmouth Lane
     Coto de Caza, CA 92679
     Telephone: (949) 307-9119

     Mr. Jensen's counsel's contact information is as follows:
     George & Shields, LLP
     30 Corporate Park, Suite 300
     Irvine, California 92606-5133
     Telephone: (949) 263-1085

H.   Mario Juarez
     Platinum Networks, Inc.
     11211 Sorrento Valley Road, Suite N
     San Diego, CA 92121
     Telephone: (866) 208-7707

I.   Kevin McGuire
     Nortel Networks Limited
     23 Kinalea Cres
     Stittsville, Ontario  K2S 1K9
     Telephone: (613) 763-5553

J.   Gerald Medina
     Platinum Networks, Inc.
     11211 Sorrento Valley Road, Suite N
     San Diego, CA 92121
     Telephone: (866) 208-7707

K.   David Perrin
     14102 110A Avenue
     Surrey, British Columbia
     V3R 2B3
     Telephone: (604) 454-1727

L.   Emily Rodriguez
     Platinum Networks, Inc.
     11211 Sorrento Valley Road, Suite N
     San Diego, CA 92121
     Telephone: (866) 208-7707

M.   Rick Santos
     Platinum Networks, Inc.
     11211 Sorrento Valley Road, Suite N
     San Diego, CA 92121
     Telephone: (866) 208-7707

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

NOR02-01:179394_1:1-11-06                    - 2 -
PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

N.   James Skorheim
     Skorheim & Associates
     28202 Cabot Road, Suite 300
     Laguna Niguel, CA 92677
     Telephone: (949) 365-5680

O.   Zenon Slodki
     Nortel Networks Limited
     23 Kinalea Cres
     Stittsville, Ontario  K2S 1K9
     Telephone: (613) 763-5553

2.   Nortel hereby discloses the following individuals whom Nortel may call if the need arises:

A.   George Auger
     2741 Vista Way, Suite 209
     Oceanside, CA 92054
     Telephone.: (760) 758-7500

B.   Kristen Rayder
     9974 Scripps Ranch Blvd., # 294
     San Diego, CA  92131

     Telephone (858) 695-3234

Nortel will supplement this list in the event that additional individuals are discovered.

**(B)   RULE   26(a)(3)(B)   WITNESSES   BY   MEANS   OF   DEPOSITION TESTIMONY:**

1.   Nortel hereby discloses the following witnesses whose testimony is expected to be presented by means of deposition transcript if the witnesses are not available to testify at trial:

A.   David Perrin: A transcript of the pertinent portions of the deposition testimony is attached hereto as Exhibit "A."

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

B.   Bruce Jensen (*if unavailable*):  A transcript of the pertinent portions of the deposition testimony is attached hereto as Exhibit "B."

C.   Russ Gambrel (*if unavailable*):  A transcript of the pertinent portions of the deposition testimony is attached hereto as Exhibit "C."

Nortel reserves the right to present any additional witnesses affiliated with Defendants by way of deposition testimony in the event of witness unavailability.

## (C) RULE 26(a)(3)(C) DOCUMENTS AND OTHER EXHIBITS/EVIDENCE:

1.    Nortel hereby discloses the following documents, exhibits and other evidence[1] that Nortel expects to offer or may offer if the need arises:

| Exhibit No. | Document |
| --- | --- |
| 1 | Documents and evidence recovered by Nortel's private investigators |
| 2 | Platinum Networks website pages |
| 3 | Nortel Networks website pages |
| 4 | Nortel Networks Agreement Relating to Intellectual Property and Confidentiality |
| 5 | Nortel Networks Technology Corporation Agreement Relating to Intellectual Property and Confidentiality |
| 6 | Deposition Transcript of David Ahumada (including video transcript) |
| 7 | Deposition Transcript of Vernilda Ang (including video transcript) |
| 8 | Deposition Transcript of Russ Gambrel (including video transcript) |
| 9 | Deposition Transcript of Bruce Jensen (AAA) |
| 10 | Deposition Transcript Bruce Jensen (including video transcript) |
| 11 | Deposition Transcript of Mario Juarez (including video transcript) |
| 12 | Deposition Transcript of Gerald Medina (AAA) |

[1] Pursuant to an agreement between the parties, each party may supplement its exhibit list after reviewing each others list.

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

NOR02-01:179394_1:1-11-06                                     - 4 -
PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

| 13 | Deposition Transcript of Gerald Medina (including video transcript) |
| 14 | Deposition Transcript of Emily Rodriguez (including video transcript) |
| 15 | Deposition Transcript Rick Santos (including video transcript) |
| 16 | Deposition Transcript of David Perrin (including video transcript) |
| 17 | Deposition Transcript George Auger (including video transcript) |
| 18 | Deposition Transcript of Kristin Rayder (including video transcript) |
| 19 | *Nortel Networks v. David S. Perrin* Pleadings: Affidavit of David S. Perrin |
| 20 | Curriculum Vitae James Skorheim |
| 21 | Curriculum Vitae Francis Graf |
| 22 | Expert Report James Skorheim |
| 23 | Expert Report Francis Graf |
| 24 | Francis Graf Report |
| 25 | GenKey Copyright Registration |
| 26 | GenKey Software Documents |
| 27 | Platinum's MAS200 Software general ledger accounting system as of 11/17/04 with user name GM access rights |
| 28 | Nortel Product Lists |
| 29 | Photographs of Nortel Products |
| 30 | Platinum Networks Tax Returns |
| 31 | Gerald Medina Tax Returns |
| 32 | Documents Produced by George Auger |
| 33 | Documents Produced by Kristen Rayder |
| 34 | Platinum American Express Documents |
| 35 | Gerald Medina American Express Documents |
| 36 | Global Knowledge Attendance Form For David Ahumada Regarding Nortel's Meridian 1 Options 11-81C Familiarization Release 25.40 |
| 37 | DSD Business Systems Certification For David Ahumada Regarding |

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

| | | Training for MAS90 and MAS 200 Inventory Management |
|---|---|---|
| | 38 | Memorandum Regarding Accounting Problems |
| | 39 | Responsibility Waiver and Release of Liability (signed by Gerald Medina) |
| | 40 | Stock Option Purchase Agreement between Torrey Ventures and Platinum Networks |
| | 41 | Promissory Note between Gerald Medina and Torrey Ventures |
| | 42 | Loan to Stock Options Conversion Agreement between Torrey Ventures and Platinum Networks |
| | 43 | Gerald Medina Handwritten Notes |
| | 44 | David Ahumada Handwritten Notes |
| | 45 | Torrey Pines Insurance Agency |
| | 46 | Handwritten Notes Regarding Inventory Valuations |
| | 47 | Installed Keys File |
| | 48 | Letter from Gerald Medina to Julia Mahmood (California Bank & Trust) |
| | 49 | Torrey Ventures Employee Stock Ownership Plan And Trust Agreement |
| | 50 | Torrey Ventures, Inc. Profit Sharing Plan |
| | 51 | Trust Agreement Under Torrey Ventures, Inc. Profit Sharing Plan |
| | 52 | Keycode Retrieval System pages |
| | 53 | Authorization Codes |
| | 54 | Keycode Invoices with no Product Code |
| | 55 | Upgradeable Product Codes |
| | 56 | Sales Records of Potentially Infringing Products |
| | 57 | Sales Listing of Potentially Infringing Products |
| | 58 | Email from Russ Gambrel to Gerald Medina (8/12/04) |
| | 59 | One sided journal entry (i.e., credit only, no matching debit) |
| | 60 | Email from David Perrin to Gerald Medina (2/12/04) |
| | 61 | Email from Gerald Medina to Monica Desai (4/20/04) |

PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

CALL, JENSEN & FERRELL
A PROFESSIONAL CORPORATION

| 62 | Invoice #0069668 from Platinum to David Perrin (2/16/04) |
| 63 | Email from Monica Desai to Gerald Medina (11/17/04) |
| 64 | Statutory Damages Calculation |
| 65 | Account Analysis – Shareholder Distributions |
| 66 | Gerald Medina Expenses Paid by Platinum |
| 67 | Platinum's Payments to IRS |
| 68 | Platinum's Payments to Mercedes-Benz Credit Corp. |
| 69 | Cash Receipts posted to shareholder distributions account |
| 70 | Manual Journal Entry with credit to shareholder distributions account and debit to inventory |
| 71 | Transaction reducing loan payable to Torrey Ventures by $200,000.00 |
| 72 | 1/31/03 Balance Sheet |
| 73 | 2/29/04 Balance Sheet |
| 74 | September 30, 2004 Balance Sheet |
| 75 | Capital Transaction with Torrey Ventures |
| 76 | Email from Russ Gambrel to Gerald Medina |
| 77 | Transfer of $42,448 of Gerald Medina's personal liabilities to Platinum |
| 78 | Email from Gerry Medina to David Ahumada (7/29/03) |
| 79 | Email from David Ahumada to Jeremy Sloan (12/2/03) |
| 80 | Email from David Ahumada to Jeremy Sloan (12/2/03) |
| 81 | Email from David Ahumada to Gerry Medina (9/20/04) |
| 82 | Email from David Ahumada to Gerry Medina (10/11/04) |
| 83 | Email from David Ahumada to Steve Valencia (3/16/04) |
| 84 | Email from David Ahumada to Mario Juarez (4/7/04) |
| 85 | Email from David Ahumada to Steve Valencia (3/11/03) |
| 86 | Email from David Ahumada to kenz@comselonline.com (12/17/03) |
| 87 | Email from David Ahumada to Rick Santos (4/15/04) |

PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

| 88 | Email from David Ahumada to Walter Alum (6/10/04) |
| 89 | Email from Monica Desai to David Perrin (4/28/04) |
| 90 | Email from Monica Desai to Gerry Medina (11/17/04) |
| 91 | Email from Jeremy Sloan to Monica Desai (10/21/04) |
| 92 | Email from Jeremy Sloan to Monica Desai (11/2/04) |
| 93 | Email from Jeremy Sloan to Monica Desai (10/29/04) |
| 94 | Email from Monica Desai to "aj@bluechiptelecom.com" |
| 95 | Email from Gerry Medina (5/6/04) |
| 96 | Memo from Monica Desai |
| 97 | Email from Russ Gambrel to Gerry Medina with proposed release (8/17/04) |
| 98 | Russ Gambrel Release signed by G. Medina |
| 99 | Email from David Perrin to Gerry Medina (7/18/03) |
| 100 | Email from David Perrin to Gerry Medina (3/5/03) |
| 101 | Email from Gerald Medina to Randy Joyce (4/28/04) |
| 102 | Invoice from Tech 1 Communications to Platinum Networks (7/15/03) |
| 103 | Email from David Ahumada to Mario Juarez (4/20/04) |
| 104 | Dunn and Bradstreet Report – Platinum Networks (6/30/04) |
| 105 | Email from David Perrin to Gerry Medina (3/5/03) |
| 106 | Email from Gerry Medina to David Perrin (3/5/03) |
| 107 | Email from Gerry Medina to David Ahumada (7/29/03) |
| 108 | California Secretary of State Business Portal (Torrey Ventures) |
| 109 | Westlaw Corporate Records and Business Registration (Torrey Ventures) |
| 110 | State of California Statement by Domestic Stock Corporation (Torrey Ventures) |
| 111 | California Secretary of State Business Portal (Richard Martin Corporation) |
| 112 | Sales Pay Plan Between Platinum Networks, Inc. and Rick Santos |
| 113 | Email from Gerry Medina to Shaan Sloan (1/30/04) |

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

NOR02-01:179394_1:1-11-06                                  - 8 -
PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

| 114 | Email from Gerry Medina to Shaan Sloan (8/26/04) |
| 115 | Email from Gerry Medina to Jeremy Sloan (undated) |
| 116 | Sales Order Gross Profit Journal (7/20/04) |
| 117 | Daily Sales Recap (3/17/03) |
| 118 | Email from Adrian Rich to Nortel@platinumnetworksinc.com |
| 119 | Photographs of Gerald Medina |
| 120 | Email from Gerry Medina to David Ahumada (12/11/03) |
| 121 | Email from David Ahumada to Rick Santos (4/15/04) |
| 122 | Answer by Platinum Networks and Gerald Medina |
| 123 | Cheque History – Platinum Networks – Selected Vendors |
| 124 | Email from Emily Rodriguez to Gerry Medina (6/02/04) |
| 125 | Email from Emily Rodriguez to Russ Gambrel (5/18/04) |
| 126 | Email from Russ Gambrel to Emily Rodriguez (6/11/04) |
| 127 | Collection information |
| 128 | Summons and Complaint for Copyright Infringement; Unfair Competition; Misappropriation of Trade Secrets; Conversion; Demand for Jury Trial |
| 129 | *Ex Parte* Application of Nortel Networks Limited For a Temporary Restraining Order and Order to Show Cause RE: Preliminary Injunction; *Ex Parte* Application of Nortel Networks Limited for an Order Temporarily Sealing its Application for Temporary Restraining Order and Order to Show Cause RE: Preliminary Injunction (Filed Under Seal) with supporting Declarations of Scott J. Ferrell, Lawrence Wiist, Gordon Leaf, Daniel S. Drapeau, Kevin McGuire, Zenon Slodki, Jonathan Tweedie |
| 130 | Order Granting Plaintiff's *Ex Parte* Application for a Temporary Restraining Order and Order to Show Case RE: Preliminary Injunction |
| 131 | Answer by Platinum Networks, Inc. and Gerald Medina, Individually – Demand for Jury Trial |

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

| 132 | Stipulation and Order on TRO |
| 133 | Letter from Scott J. Ferrell and J. Aliberti to Dean Krenz dated 12/06/04 |

Dated:  January 11, 2006

CALL, JENSEN & FERRELL
A Professional Corporation
DAVID R. SUGDEN

By: _____
      DAVID R. SUGDEN

Attorneys for Plaintiff
NORTEL NETWORKS LIMITED

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

NOR02-01:179394_1:1-11-06                     - 10 -
PLAINTIFF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26 (A)(3)

1        UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF CALIFORNIA

3

4

5   NORTEL NETWORKS LIMITED, a              )
    Canadian corporation,                   )
6                                           )
                        Plaintiff           )
7                                           )
                    vs.                     )     Case No.
8                                           )     04 CV 1968L (LSP)
    PLATINUM NETWORKS, INCORPORATED, a      )
9   California corporation; GERALD          )
    MEDINA, an individual,                  )
10                                          )
                        Defendants          )
11   _____       )

12

13

14

15

16

17       DEPOSITION OF DAVID STANLEY PERRIN

18      Surrey, British Columbia, Canada

19        Monday, August 29, 2005

20

21

22

23

24

25

                                        **EXHIBIT A**

1    MR. BARKER: Good morning, everybody.  We're on the record.

2    The videographer is Terence Barker of Terence J. Barker Ltd.;

3    address 15482, 109th Avenue, Surrey, BC, Canada, postal code

4    V3R 0X5.

5           In the matter before the United States District

6    Court Southern District of California.  The plaintiffs in

7    this matter are Nortel Networks Limited.  The plaintiffs are

8    represented in this deposition by Dave R.  Sugden.  Mr.

9    Sugden is -- has accompanying him Mr. Kevin McGuire.

10          The defendants in this matter, Platinum Networks

11   Incorporated and Gerald Medina.  The defendants in this

12   matter are represented in this matter by Joseph M.  Aliberti.

13          This is the video deposition of Mr. David

14   Perrin as being recorded at 9:55 a.m. this Monday, the 29th

15   day of August, the year 2005, in Surrey, B.C., Canada.

16   I would now ask that the court reporter please swear the

17   witness.

18                   **DAVID STANLEY PERRIN,**

19   **having first been duly sworn, testified as follows:**

20

21          MR. BARKER:   Thank you.  Counsel, you may proceed.

22

23                      **EXAMINATION**

24   BY MR. SUGDEN:

25      Q.   Good morning.

1    A.   Good morning.

2    Q.   Again, my name is David Sugden.  I'm the lawyer for

3  the plaintiff in this case.  Would you please state your full

4  name for the record?

5    A.   David Stanley Perrin.

6    Q.   Mr. Perrin, have you ever gone by any other names?

7    A.   Dave.

8    Q.   Mr. Perrin, have you ever had your deposition taken

9  before?

10    A.   No, I haven't.

11    Q.   Have you ever been a witness in trial before?

12    A.   No, I haven't.

13    Q.   Because this is your first deposition I will go

14  over some of the guidelines and rules so you understand what

15  this exercise is all about.

16         The oath that you have just taken is the same oath

17  that would be given in a court of law, and therefore you have

18  an obligation to tell the truth.  Do you understand?

19    A.   Yes, I do.

20    Q.   And even though we have a person taking the video

21  of you today, the court reporter, the woman on your left, can

22  only take down what is being said today.  She can't record

23  things like the nodding of a head or answers like "mm-hmm" or

24  "mm-hmm".  Will you do your best to provide an audible

25  response?

1   be articulated today.  Is that consistent with your

2   understanding of our agreement, Mr. Aliberti?

3            MR. ALIBERTI:  Yes, sir.

4   BY MR. SUGDEN:

5       Q.   Finally, Mr. Perrin, today's exercise is not an

6   inquisition.  If at any point you need to take a break,

7   please let me know or let Mr. Aliberti know and we'll

8   accommodate that.  Do you understand?

9       A.   Yes.  Yes, I do.

10      Q.   Mr.  Perrin, what do you do for a living?

11      A.   Currently nothing.

12      Q.   Okay.  What did you previously do for a living?

13      A.   I resold Nortel equipment.

14      Q.   What type of Nortel equipment did you resell?

15      A.   Modular ICS's, compact ICS's, Call Pilot

16  voicemails, business communication manager units.

17      Q.   Did you also buy Nortel equipment?

18      A.   Yes, I did.

19      Q.   For how long did you buy and sell Nortel equipment?

20      A.   Cumulatively?  Like from the total period of time?

21      Q.   Correct.

22      A.   I would say probably five -- five years total.

23      Q.   And can you identify which five years those were?

24      A.   I don't recall the actual year dates but ...

25      Q.   Can you give me -- one of the admonitions I should

1   have given you earlier is that memories are generally not

2   perfect.

3        A.   Okay.

4        Q.   However, we're entitled to your best recollection,

5   and therefore if you can provide me your best estimate we're

6   entitled to get that.  But we don't want you to guess today,

7   and just so you're clear, if I were to ask you to give me

8   your best estimate as to the length of this table, assuming

9   you can understand units of measure, you could give me your

10  best estimate.

11       A.   Okay.

12       Q.   However, if I were to ask you to give me the --

13  your best estimate of the size of the kitchen table in my

14  house --

15       A.   I wouldn't have a clue.

16       Q.   -- you would be guessing, so I don't want you to

17  guess, but I want you to estimate if you're able to do so.

18            Can you give me your best estimate as to what years

19  you bought and sold Nortel equipment?

20       A.   My best estimate would be '97 onward until 2003, I

21  believe.

22       Q.   In those five years of buying and selling Nortel

23  products did you gain a familiarity with how the Nortel

24  products worked?

25       A.   Yes.

1     Q.   When you bought and sold Nortel products were you

2   an employee for a company?

3     A.   At first, yes.

4     Q.   What was the name of the company that you worked

5   for?

6     A.   Condor Communications.

7     Q.   Could you please spell that for the court reporter?

8     A.   C-O-N-D-O-R, C-O-M-M-U-N-I-CA-T-I-O-N-S.

9     Q.   And for how long did you work for Condor

10   Communications?

11     A.   I would estimate about three years.

12     Q.   And after that did you buy and sell Nortel products

13   for a different company?

14     A.   My own company, yes.

15     Q.   What was the name of that company?

16     A.   Tech 1 Communications.

17     Q.   And what was your position with Tech 1

18   Communications?

19     A.   Owner.

20     Q.   Did you have any other employees?

21     A.   No.

22     Q.   Did you have anyone else that worked with you at

23   Tech 1 Communications?

24     A.   No.

25     Q.   What types of Nortel products did you sell in your

1    five years of selling Nortel products?

2          A.    Call Pilots, business communication managers,

3    modular ICS's, key systems, compact ICS key systems, LSDS

4    cards for the KSU's, caller I.D. cards for the KSU's, Norstar

5    application modules.

6          Q.    And in your five years of selling these types of

7    Nortel products did you gain a familiarity as to how these

8    types of products worked?

9          A.    Yes.

10         Q.    Do any of Nortel products have a feature called

11   voice mail-boxes?

12         A.    Yes.

13         Q.    What type of Nortel products have voice mail-boxes?

14         A.    Norstar applications module, Call Pilot voicemail

15   and the business communication manager.

16         Q.    Does business communications manager also go by

17   BCM?

18         A.    Yes.

19         Q.    Could you explain what a voice mail-box feature is?

20         A.    A voice mail-box feature is a feature that is being

21   utilized by the business communication manager to store voice

22   recordings for people calling into your place of business or

23   wherever that unit might have been installed.

24         Q.    Do the number of voice mail-boxes on a Nortel

25   system vary in any way?

1      A.   Yes, they do.

2      Q.   Can you explain how the number of voice mail-boxes

3   can vary from system to system?

4      A.   Depends on the number of authorized voice

5   mail-boxes that particular piece of hardware has authorized

6   from Nortel Networks.

7      Q.   Can a person who purchases a Nortel phone system

8   increase the number of voicemail-boxes on that Nortel system?

9      A.   Yes.

10      Q.   How does a person who purchased a Nortel phone

11   system increase the number of voice mail-boxes on that

12   system?

13      A.   I would like to clarify, if I could, just one

14   degree here.  There is two ways to authorize a Call Pilot

15   voicemail, as you're referring to it.  The one is by

16   purchasing keycodes or authorization sheets from Nortel

17   Networks at a certain cost, and the other is by using another

18   program that you shouldn't have.

19      Q.   What's the name of the program that you shouldn't

20   have?

21      A.   KeyGen.

22      Q.   Let's talk first about the first method that you

23   just identified as to increasing the number of voice

24   mail-boxes.  I believe you testified that a user can purchase

25   codes; is that correct?

1      A.    That's correct.

2      Q.    Can you explain the codes that the person

3   purchases?

4      A.    When you purchase a Call Pilot system or a business

5   communication manager system or any system that Nortel sells

6   with respect to voice mail-boxes, what you have the option of

7   is you have the option of purchasing additional

8   authorizations from the authorized distributor, or in some

9   cases, grey market distributor who's selling the product.

10   These codes are sold at a set price based on the upgrades

11   that you have requested for that particular product.

12      Q.    And you -- did you testify that they had purchased

13   authorization codes?

14      A.    What they do is they actually purchase -- sorry, I

15   don't have anything to show you -- but what they do is they

16   purchase a little sheet that's sealed in the piece of plastic

17   from Nortel or the distributor that has an NT number

18   identifying it as a Nortel product.

19      Q.    Was Tech 1 an authorized Nortel distributor?

20      A.    No.

21      Q.    Once the consumer obtains this plastic form with

22   the code on it what is done with that form?

23      A.    Normally what happens after they purchase it, you

24   have the purchase of the key code in front of you.  It's

25   either the interconnect installer of the product or somebody

1   who sold the product associated to the product would get

2   ahold of another authorized dealer to authorize these codes

3   and come back with what is referred to as a key code.

4       Q.   And what is done with the keycode in order to

5   increase the number of voice mail-boxes on the Nortel phone

6   system?

7       A.   The keycode is entered into the system in the same

8   order that it was given from Nortel, and that keycode

9   authorizes that particular function that you purchased.

10      Q.   You testified a moment ago there's a second method

11  of increasing the number of voice mail-boxes on a Nortel

12  system?

13          MR. ALIBERTI:  Pertaining to your previous answer

14  I'm just making an objection, sir.  I'm going to move to

15  strike for lack of foundation as an expert.  My understanding

16  is it would be admissible for his personal experiences, but

17  as an expert I would move to strike.  I'm just making that

18  for the record.

19          MR. SUGDEN:  I misheard you, I'm sorry.

20          MR. ALIBERTI:  He's talking -- my understanding

21  he's talking personally to what he knows.  Do you want to go

22  off the record so we don't mess up the record or do you want

23  to stay on?

24          MR. SUGDEN:  I don't think so.  I think I am with

25  you.  I just want to make sure I understand your objection.

1           MR. ALIBERTI:  I just don't want these personal

2    opinions to come in as expert opinions.  My understanding is

3    this is his personal knowledge.  This is what he does on a

4    daily basis, so for that it would be admissible.  But as far

5    as an expert in the industry or how it applies to other

6    businesses, I would move to strike as not -- lack of

7    foundation.

8           MR. SUGDEN:  Okay, thank you.

9           MR. ALIBERTI:  Sorry, sir.

10   BY MR. SUGDEN:

11      Q.   You testified there's a -- strike that.

12           You testified that in your experience there's a

13   second method of increasing the number of voice mail-boxes on

14   a Nortel phone system?

15      A.   Yes.

16      Q.   Do you recall that?

17      A.   Yes.

18      Q.   And I believe you mentioned something called

19   KeyGen; is that correct?

20      A.   Yes.

21      Q.   Can you explain to me what KeyGen is?

22      A.   KeyGen is an acronym for key generation.  The

23   program, from my recollection, is about 70 kilobytes big.

24   What it does is the KeyGen program generates the keycode off

25   the product I.D. or internal I.D. of the Norstar product that

1   you are attempting to upgrade, and it generates the keycode

2   based on what you enter as its parameters.

3        Q.   Can KeyGen generate a keycode to increase the

4   number of voicemail-boxes on a Nortel phone system?

5        A.   Absolutely.

6        Q.   Is KeyGen a software?

7        A.   Yes.

8        Q.   Is KeyGen a software that can be purchased in a

9   store?

10       A.   No.

11       Q.   Do you know who owns KeyGen?

12       A.   Now, Nortel Networks.

13       Q.   Do you recall when you first heard of KeyGen?

14       A.   Yes.

15       Q.   Can you tell me the first time you heard of KeyGen?

16       A.   When you -- referring to heard of KeyGen, are you

17   talking about heard about the software, or heard about

18   somebody having the software?

19       Q.   Let's take them one by one.

20       A.   Okay.

21       Q.   When was the first time you heard of the KeyGen

22   software?

23       A.   About two years ago, two and a half years ago, I

24   guess.

25       Q.   And can you tell me what it was that you heard

1    about KeyGen two years ago?

2        A.    That it generates keycodes, circumvents the Nortel

3    product and enters keycodes and at zero dollar value.

4        Q.    Can KeyGen be used to generate keycodes without

5    having to purchase keycodes from Nortel?

6        A.    Yes, absolutely.

7        Q.    Do you recall who it was that informed you about

8    what KeyGen was two years ago?

9            MR. ALIBERTI:  Objection, hearsay.

10   BY MR. SUGDEN:

11       Q.    Go ahead.

12       A.    I initially heard it from Gerry Medina.

13       Q.    Who is Gerry Medina?

14       A.    I believe he's the owner of Platinum.

15       Q.    And how is it that you believe he's the owner of

16   Platinum?

17       A.    I've called there before, and the phone has been

18   answered, "Platinum."

19       Q.    Do you know what Platinum is?

20       A.    It's a reseller of Nortel goods.

21       Q.    How do you know that Platinum is a reseller of

22   Nortel goods?

23       A.    Because I had dealings with them for Nortel

24   equipment prior to what happened to me.

25       Q.    Okay.  You testified a moment ago that you also

1    heard of one having KeyGen; is that correct?

2        A.   Yes.

3        Q.   How did you learn that someone had KeyGen?

4             MR. ALIBERTI:  Objection, hearsay.

5             THE WITNESS:  From my communication with Gerry

6    Medina personally.

7    BY MR. SUGDEN:

8        Q.   And do you recall approximately when this

9    communication took place?

10       A.   I would say about two years ago, two and a half

11   years ago.

12       Q.   And was this communication with Mr. Medina in

13   person?

14       A.   Yeah, on the telephone.

15       Q.   And can you tell me everything you recall being

16   said in that telephone conversation with Mr. Medina?

17            MR. ALIBERTI:  Objection, hearsay.

18            THE WITNESS:  Mr. Medina -- I was talking to Mr.

19   Medina and Mr. Medina kind of laughed and said, well, I have

20   a KeyGen program of sorts.  And I says yeah, okay, and he

21   indicated to me that he had bought this program and asked me

22   if I would like to purchase it.  After that Mr. Medina -- I

23   said well, how did you get ahold of it, is what I asked him.

24   I said, where did you get it from?  He indicated to me that

25   he got it from a gentleman in Florida and that he had flown

1    them in.

2    BY MR. SUGDEN:

3         Q.   Had Mr.  Medina flown the individuals from Florida

4    in?

5         A.   Yes.

6              MR. ALIBERTI:  Objection, hearsay.

7    BY MR. SUGDEN:

8         Q.   Did Mr.  Medina tell you who it was from Florida

9    that he acquired a KeyGen from?

10        A.   No, he did not.

11             MR. ALIBERTI:  Objection, hearsay.

12   BY MR. SUGDEN:

13        Q.   Did Mr.  Medina tell you how many individuals in

14   Florida had KeyGen?

15             MR. ALIBERTI:  Objection, hearsay.

16             THE WITNESS:  No, he did not.

17   BY MR. SUGDEN:

18        Q.   Do you recall Mr.  Medina telling you anything else

19   in that telephone conversation about him being in possession

20   of the KeyGen software?

21             MR. ALIBERTI:  Objection, hearsay.

22             THE WITNESS:  Yes

23   BY MR. SUGDEN:

24        Q.   Can you please tell me what else you recall about

25   Mr.  Medina being in possession of the -- strike that.

1    Can you please tell me what else you can recall about that

2    conversation where Mr.  Medina told you that he was in

3    position of the KeyGen software?

4             MR. ALIBERTI:  Objection, hearsay.

5             THE WITNESS:  Mr.  Medina indicated to me that he

6    was in position of the KeyGen software, and I asked Mr.

7    Medina at that time because I didn't believe him, so I asked

8    Mr. Medina to prove it.

9             MR. SUGDEN:

10       Q.   Did Mr. Medina prove to you that he was in position

11   of the KeyGen software?

12       A.   Yes, he did.

13            MR. ALIBERTI:  Objection hearsay, lacks foundation.

14   Go ahead.

15            MR. SUGDEN:

16       Q.   How did -- how did Mr.  Medina prove to you that he

17   was in position of the KeyGen software?

18            MR. ALIBERTI:  Objection, lacks foundation,

19   hearsay.

20            THE WITNESS:  At that time I recall having a Call

21   Pilot in my possession and I asked him to generate a keycode

22   based on the system ID.

23            MR. SUGDEN:

24       Q.   Did you -- did you provide the system ID of that

25   call pilot to Mr.  Medina?

1      A.   Yes, I did.

2      Q.   Did Mr.  Medina generate a keycode after you

3   provided the Call Pilot ID?

4           MR. ALIBERTI:  Objection, lacks foundation.

5           THE WITNESS:  Yes, he did.

6           MR. SUGDEN: Did Mr. Medina generate the keycode

7   after you provided him the Call Pilot system ID in that same

8   telephone conversation.

9           MR. ALIBERTI:  Objection, lacks foundation.

10          THE WITNESS:  Yes, he did.

11          MR. SUGDEN:

12     Q.   How long was that telephone conversation, do you

13   recall?

14     A.   I would estimate probably 20, 25 minutes.

15     Q.   After you provided Mr.  Medina with the Call Pilot

16   system ID, how long did it take him to provide you with the

17   keycode?

18          MR. ALIBERTI:  Objection, leading, lacks

19   foundation, calls for hearsay.

20          THE WITNESS:  Five minutes, not even.

21          MR. SUGDEN:

22     Q.   Did you do anything with the keycode that Mr.

23   Medina provided you with?

24     A.   Yes, I did.

25          MR. ALIBERTI:  Objection, calls for hearsay, lacks

1    foundation, compound question.

2              MR. SUGDEN:

3        Q.    Can you please tell me what you did with the

4    keycode that Mr. Medina provided to you?

5        A.    I entered it into the web interface of the Call

6    Pilot.

7        Q.    What's the web interface for a Call Pilot?

8        A.    The web interface is a -- it's built^ by Go Ahead

9    Web Server which is a freeware program that Nortel utilizes,

10   and what you do is you enter the keycode into a system

11   management area that when you want to enable other functions

12   you enter a keycode in, sequentially eight numbers times

13   three.

14       Q.    Was the keycode that you requested from

15   Mr. Medina -- strike that.

16             What was the keycode that Mr. Medina provided you

17   with supposed to do for the Call Pilot?

18             MR. ALIBERTI:  Objection, lacks foundation.  Calls

19   for speculation, calls for hearsay.

20             THE WITNESS:  Enables functionality in the Call

21   Pilot.

22             MR. SUGDEN:

23       Q.    What functionalities were to be enabled, do you

24   recall?

25       A.    For that specific keycode?

24

1      Q.   Correct.

2      A.   Voicemail.

3      Q.   Did you enter the keycode that Mr. Medina provided

4  you with in the Call Pilot?

5      A.   Yes, I did.

6           MR. ALIBERTI:  Objection.  Lacks foundation; calls

7  for speculation; calls for hearsay.

8  BY MR. SUGDEN:

9      Q.   What did the keycode do to the Call Pilot?

10     A.   If I recall correctly, it enabled it to 200

11  mail-boxes.

12     Q.   Do you recall how many mail-boxes the Call Pilot

13  had before you entered in the keycode that Mr. Medina

14  provided you?

15     A.   20.

16     Q.   The keycode that you added entered an additional

17  180 voice mail-boxes; is that correct?

18     A.   That's correct.

19     Q.   Do you know what Nortel would charge for that

20  keycode that would add 180 voice mail-boxes to the Call

21  Pilot?

22          MR. ALIBERTI:  Calls for speculation, lacks

23  foundation.

24          THE WITNESS:  From what I recall I would suggest

25  that keycode would be considered what Nortel considers an

1   unlimited keycode because it's basically maximized the number

2   of voice mail-boxes used in a Call Pilot.  It's maximized it.

3   I would suggest the keycode for that time I -- I can only

4   speak for that time -- I would suggest the keycode is about

5   $4,000, $5,000 U.S.

6       Q.   And in your five years of buying and selling Nortel

7   products did you become familiar with what Nortel would

8   charge for keycodes?

9       A.   Yes, I did.

10      Q.   How did you become familiar with the price at which

11  Nortel would sell keycodes?

12      A.   By utilizing what's referred to as the pricing list

13  that Nortel sends out to our people getting the pricing list

14  with their NT numbers, which is their product identifier

15  numbers, and gives a description of it and then it tells you

16  what that function does and it tells you what the list price

17  or the cost of the product is.

18      Q.   Are you relying on that recollection to give your

19  best estimate that Nortel would have charged approximately

20  $4,000 for the keycode that Mr.  Medina provided you?

21      A.   Yes.

22      Q.   Mr.  Perrin, is there a name for that price list

23  that you just referred to?

24      A.   Yes, there is.

25      Q.   Do you recall the name of that price list?

1      A.    Would be WPP price list.

2      Q.    Do you recall what WPP stands for?

3      A.    I believe it's an acronym for "world product

4  pricing."

5      Q.    Thank you.  After Mr.  Medina provided you with a

6  keycode for that Call Pilot was it your belief that Mr.

7  Medina was in possession of KeyGen?

8      A.    Absolutely.

9      Q.    Do you recall Mr.  Medina telling you anything else

10  in that telephone conversation wherein he told you that he

11  was in position of the KeyGen program?

12            MR. ALIBERTI:  Objection, hearsay, leading.

13            THE WITNESS:  I'm unclear on the question, sorry .

14  BY MR. SUGDEN:

15      Q.    Sure.  Do you recall Mr.  Medina telling you

16  anything else other than what you've already told me today in

17  the telephone conversation where Mr.  Medina told you that he

18  had the KeyGen software?

19            MR. ALIBERTI:  Same objection.

20            THE WITNESS:  With respect to the KeyGen software

21  or in a different content in the telephone conversation?

22  That's what I'm not clear about, I'm sorry

23  BY MR. SUGDEN:

24      Q.    With respect to the KeyGen software?

25      A.    No.

1    Q.   Have you ever heard of KeyGen going by different

2  names?

3    A.   Yes.

4    Q.   What other names have you heard KeyGen be called?

5    A.   The Magic.  Kind of a funny one, Kicker, that's all

6  I --

7    Q.   Have you ever heard it be called GenKey?

8    A.   Yes.

9    Q.   Do you recall it going by any other names that you

10  haven't already told me about?

11    A.   No.

12    Q.   Who have you heard refer to the KeyGen as the

13  Magic?

14    A.   Gerry Medina.

15    Q.   Has Mr.  Medina used that term in telephone

16  conversations with you?

17         MR. ALIBERTI:  Objection, calls for hearsay.

18         THE WITNESS:  Oh, yes.

19  BY MR. SUGDEN:

20    Q.   How did you know -- strike that.

21  What caused you to believe that when Mr.  Medina referred to

22  the Magic he was referring to KeyGen?

23         MR. ALIBERTI:  Objection, lacks foundation.

24         THE WITNESS:  The only reference that I could

25  understand that the Magic would reflect to is if we used the

1   analogy of magician -- something you can do and give the

2   illusion of doing something.

3        Q.   Can you explain what you mean by -- please clarify

4   your answer?

5        A.   What it is, is magic is just referred to in the

6   sense of I have something -- I know something that you don't,

7   as most magicians would, sitting up there and confirm with

8   say -- I would make these cards disappear. And that's kind of

9   what I mean by that.  It's something that you have that you

10  can't do because you don't know the secret.  Does that

11  clarify it?

12       Q.   It does, thank you.  Do you recall how you first

13  met Gerry Medina?

14       A.   Yes.

15       Q.   Can you tell me how you first met Gerry Medina?

16       A.   Gerry Medina and one of his employees -- maybe I

17  should clarify the question; are we talking physically face

18  to face?

19       Q.   Why don't we just move chronologically.

20       A.   Okay.

21       Q.   Do you recall the first time you spoke with Gerry

22  Medina?

23       A.   Estimate?

24       Q.   Yes, please.

25       A.   Four years ago.

1    Q.   And do you recall how it was that you first got to
2    know Mr. Medina?

3    A.   Well, I bought some product from him.  I don't
4    recall what exact product I bought from him.  He seemed like
5    a nice guy.  I got to talking to him and talking to him and
6    some of his technicians that work in his facility or did  --
7    I don't know if they are --  whatever.  But I got to get a
8    pretty good rapport with him.

9    Q.   Would you conduct business transactions with Gerry
10   Medina?

11   A.   Yes.  Not many, but yes.

12   Q.   Can you recall the business transactions that you
13   engaged with Mr. Medina?

14   A.   I bought Nortel phones, purchased the odd Flash
15   voicemail, which is an older version of Flash voicemail,
16   stuff like that.

17   Q.   Can you recall any other types of transactions that
18   you and Mr. Medina entered into?

19   A.   I bought -- I bought -- the odd time I bought
20   dongles.

21   Q.   What are dongles?

22   A.   Dongles are devices that attached it to the LPT
23   port on a computer, or in any case, it's a security key that
24   works in connection with software.

25   Q.   Can you recall any other business transactions that

1   you've had with Mr. Medina?

2        A.   Well, when I had the -- I guess because I've

3   already said this in my original -- I had a transaction with

4   Mr. Medina inasmuch as he had asked me if I would be

5   interested in working with his technicians to work on some

6   Magic.

7        Q.   When was this?

8        A.   Two and a half years ago, I guess, two years.

9        Q.   Can you describe what this transaction was?

10       A.   Mr. Medina approached me and asked me if I would

11  be interested in working for him on a contractual basis, not

12  a basis of getting paycheques every month or I guess a set

13  job; he had asked me whether or not I could work his

14  technicians and see if we could determine between the two of

15  us if we could determine how to circumvent Nortel products.

16       Q.   And was this telephone -- was this conversation

17  wherein Mr. Medina approached you about working on a

18  contractual basis over the telephone?

19       A.   Yes, it was.

20       Q.   And did you ultimately work for Mr. Medina on a

21  contractual basis?

22       A.   Yes, I did.

23       Q.   And can you describe the work that you did for Mr.

24  Medina?

25       A.   It was a lot of back and forward transactions

1   between me and him as far as dongles, other software that he

2   had possession of that I could never get to work -- whatever,

3   but different things he wanted me to look at and see if I

4   could analyze, or I guess re-engineer, some of the software

5   and stuff for Nortel products.

6        Q.   What do you mean by, "circumvent?"

7        A.   Circumvent would mean bypass all the normal

8   check-in procedures, checks and balances that Nortel has with

9   their product in terms of verifying the product validity,

10  verifying the product as far as the codes entered are correct

11  and just circumventing all the software really, is what it

12  was.

13       Q.   You testified earlier that in a telephone

14  conversation Mr. Medina told you that he was in possession

15  of KeyGen.  Do you recall that testimony?

16       A.   Yes.

17       Q.   Did you and Mr. Medina ever speak again about him

18  being in possession of the KeyGen?

19       A.   Yes.

20       Q.   Do you recall when it was that you next spoke with

21  Mr. Medina about the KeyGen software?

22       A.   Mr. Medina offered me the ability to purchase the

23  KeyGen software from him.

24       Q.   Do you recall when he did that?

25       A.   As an estimate?

1    Q.   Please.

2    A.   I would say about two and a half years.

3    Q.   And when he offered to -- strike that.

4         When he offered that you could purchase KeyGen

5    software was that conversation in person?

6    A.   On telephone.

7    Q.   Okay.  Do you recall how long that telephone

8    conversation was?

9    A.   About 15 minutes.

10   Q.   Can you tell me what you recall Mr. Medina saying

11   in that telephone conversation?

12   A.   That he if was going to -- what he was wanting to

13   do is he wanted me to offer to buy the software from him, the

14   key generation program from him, because I had been working

15   for him all along.  So he said, look, Dave, I'll offer you

16   some software and sell it to you or whatever.

17   Q.   Did he identify the price at which he would sell

18   you the KeyGen software?

19   A.   Yes, he did.

20   Q.   What was the price that Mr. Medina identified?

21   A.   12,500 U.S.

22   Q.   When Mr. Medina offered to sell you this software

23   did he identify it to you by name?

24   A.   Yes, it was KeyGen.

25   Q.   Was it your understanding that Mr. Medina knew

1   that he was selling you KeyGen software?

2        A.   Absolutely.

3        Q.   Was it your understanding that Mr. Medina knew he

4   was offering to sell you the KeyGen software?

5        A.   Absolutely.

6        Q.   Do you recall Mr. Medina adding any conditions or

7   anything else when he offered to sell you the KeyGen software

8   for $12,500?

9        A.   Not to sell or disclose it to anyone else.

10        Q.   Did Mr. Medina provide a reason as to why he did

11   not want you to disclose or sell the software to anyone else?

12             MR. ALIBERTI:  Lacks foundation.

13             THE WITNESS:  Because he didn't want to get in

14   trouble.

15   BY MR. SUGDEN:

16        Q.   Did Mr. Medina explain what he meant by not

17   getting in trouble?

18             MR. ALIBERTI:  States as evidence.

19   BY MR. SUGDEN:

20        Q.   Strike that.  Did Mr. Medina explain to you what

21   he meant by not wanting to get in trouble?

22             MR. ALIBERTI:  Misstates his evidence.

23             THE WITNESS:  Yes.

24             MR. SUGDEN: Can you read back his previous answer

25   to me?

1    (REPORTER READS BACK).

2              MR. ALIBERTI: I think to help Mr. Sugden, can we

3    read the question.

4              MR. SUGDEN: Can we go off the record?

5              MR. BARKER: We are off the record.   The time is

6    10:34.

7              (PROCEEDINGS ADJOURNED)

8              (PROCEEDINGS RESUMED)

9              MR. BARKER: We're back on the record.   The time is

10   10:35.   You may proceed.

11   BY MR. SUGDEN:

12        Q.   Did Mr.  Medina explain why he did not want to get

13   in trouble?

14        A.   Yes, he did.

15        Q.   What did Mr. Medina say?

16        A.   If Nortel ever found out he would be in trouble.

17        Q.   Did Mr. Medina explain why he would be in trouble

18   with Nortel?

19        A.   Not specifically.

20        Q.   Did he explain generally what he meant by that

21   statement?

22        A.   Yes.

23        Q.   What did he mean by that statement?

24        A.   Basically he meant that if Nortel ever found out

25   that he had the software there could be some liability, or he

1    could be sued, or there could be some problems with Nortel

2    with him.

3              MR. ALIBERTI:  Calls for speculation. Move to

4    strike.

5    BY MR. SUGDEN:

6         Q.   Did Mr. Medina tell you that?

7         A.   Yes.  Not in that many -- not in those same words,

8    but as I recall.

9         Q.   Thank you.  Do you recall whether Mr. Medina added

10   any other terms or conditions to the offer wherein he offered

11   to sell you the GenKey software?

12        A.   He told me that he wanted me to pay for it right

13   away.

14        Q.   Were there any other terms or conditions added to

15   the offer?

16        A.   No.

17        Q.   Did you accept or reject Mr. Medina as offer to

18   purchase KeyGen software?

19        A.   I accepted it.

20        Q.   Did you accept that offer in that same conversation

21   with Mr. Medina?

22        A.   Yes.

23        Q.   Do you recall how you communicated your acceptance

24   to Mr. Medina?

25        A.   Yes, I gave him my Visa number.

1     Q.    What else did you do?

2     A.    Gave him my Visa number and I authorized him to

3  charge $6,000 U.S. to the Visa.

4     Q.    I thought that you testified that he offered to

5  sell you KeyGen for 12,500?

6     A.    Yes, he did, but I could only pay afford to pay him

7  at that time $6,000.  I had the remaining balance of 6,500

8  with him.

9     Q.    Do you have an understanding as to whether or not

10  Mr. Medina charged $6,000 to your Visa card?

11     A.    Yes, he did.

12     Q.    Did Mr. Medina at any point provide you with the

13  KeyGen software?

14     A.    After, yeah.

15     Q.    How long after your telephone conversation that you

16  just talked about did Mr. Medina provide you with the KeyGen

17  software?

18     A.    After the Visa cleared.

19     Q.    Do you recall how long it took, approximately?

20     A.    One day.

21     Q.    What was the method in which Mr. Medina sent you

22  the KeyGen software?

23     A.    Microsoft Internet Messenger.

24     Q.    I believe you testified that Mr. Medina acquired --

25  strike that.

1              I believe you testified that Mr. Medina told you

2    that he acquired the KeyGen software from an individual in

3    Florida; is that correct?

4         A.   Yes.

5         Q.   Did Mr. Medina ever tell you how much he paid for

6    the KeyGen software from the individual in Florida?

7         A.   He indicated to me at that time from my

8    recollection that it was about 30 or $35,000 US.

9         Q.   Did Mr. Medina ever tell you if he offered to sell

10   KeyGen to anyone else other than you?

11        A.   When you are saying selling this, selling to

12   somebody else, no.  He never mentioned anything like that.

13        Q.   Did Mr. Medina ever say anything to you about

14   making additional copies of the KeyGen software?

15        A.   Yes, he did.

16        Q.   What did Mr. Medina say about making additional

17   copies of the KeyGen software?

18        A.   He made five copies of it.

19        Q.   Did Mr. Medina tell you that?

20        A.   Yes, he did.

21        Q.   Did Mr. Medina tell you why -- strike that.

22     Go ahead, you have to qualify your answer.

23        A.   I would just like to clarify the answer.  The five

24   discs that were made -- Mr. Medina made, I heard it from Mr.

25   Medina, but I also heard it from one of his technicians in

**38**

1    the shop.

2        Q.   Do you recall the name of the technician in the

3    shop?

4        A.   Mario.

5        Q.   What did Mario tell you about copies of KeyGen?

6        A.   That he had made five copies for Gerry.

7        Q.   Did Mario tell you why he made five copies of the

8    KeyGen software for Gerry?

9        A.   No.

10       Q.   Did Mr. Medina also tell you that he had made five

11   copies of the KeyGen software?

12       A.   Yes, he did.

13       Q.   Did Mr. Medina ever tell you why he made five

14   copies of the KeyGen software?

15            MR. ALIBERTI:  Calls for speculation, lacks

16   foundation.

17            THE WITNESS:  Jokingly he said because I need lots

18   of back-ups.

19   BY MR. SUGDEN:

20       Q.   Did Mr. Medina provide you with other reasons as to

21   why he was making copies of the KeyGen software?

22       A.   No, he did not.

23            MR. SUGDEN; I'm going to have the court reporter

24   mark as Exhibit A a document that I will put in front of you.

25   We're going to call this document Exhibit 1 as opposed to

1   Exhibit A.

2              **EXHIBIT 1 FOR IDENTIFICATION:   E-mail dated**

3              **February 12, 2004**

4              **(OFF THE RECORD DISCUSSION)**

5              **(PROCEEDINGS ADJOURNED)**

6              **(PROCEEDINGS RESUMED)**

7              MR. BARKER: We are back on the record.  The time is

8   10:43.  You may proceed.

9   BY MR. SUGDEN:

10      Q.    Mr. Perrin, can you identify Exhibit 1?

11      A.    Yes, I can.

12      Q.    What is Exhibit 1?

13      A.    It's an e-mail from myself to Gerry at Platinum

14   Networks.

15      Q.    And what does this e-mail represent?

16      A.    That I agree to his price -- basically I agreed to

17   his price of 12,500 and we had -- I had a P.O. or a purchase

18   order from him for a bunch of equipment.

19      Q.    Does Exhibit 1 represent the transaction wherein

20   you agreed to purchase KeyGen from Gerry Medina?

21      A.    Yes, it does.

22      Q.    This is a true and correct copy of an e-mail that

23   you sent to Gerry Medina on February 12th, 2004; is that your

24   understanding?

25      A.    Yes, it is.

1      Q.    Would you please look at point 4) where it states,

2   "I agree NOT to resell this program to nobody..."

3   Can you explain what you meant by that sentence?

4      A.    That I wasn't going to jeopardize Gerry Medina in

5   selling the product to me by selling it to anybody else.

6      Q.    And under you agree, point 1) the last sentence

7   states:  "After all it's a joint venture."  Can you explain

8   to me what you meant by the statement, "after all it's a

9   joint venture"?

10     A.    Yes.  When -- are you referring to the e-mail

11  specifically or the term joint venture?

12     Q.    I'm referring to the e-mail specifically.

13     A.    The joint venture; we embarked on a joint venture

14  between us prior to the KeyGen and that the joint venture

15  meaning in this e-mail, the contention is that we're doing

16  this together.

17     Q.    Point number 3) says:  "Trust dave as he trusts

18  you, and not resell the program either, we need to maintain a

19  base function."

20  Can you explain what you meant by that sentence?

21     A.    Yeah, that we don't want to resell the program to

22  anybody because if too many people have the program it -- oh,

23  if too many people have the program it would basically

24  eliminate the benefit of the program.

25     Q.    Can you explain to me how the benefit of the

1  program would be eliminated if other people had KeyGen

2  software?

3      A.    You wouldn't pay anything for it.

4      Q.    Why not?

5      A.    Because you would use the KeyGen program to

6  generate the keycodes for Nortel products.

7      Q.    And when you state you wouldn't pay anything for

8  it, do you mean you wouldn't pay anything for keycodes or do

9  you mean something else?

10     A.    No, I mean you wouldn't pay anything for keycodes.

11     Q.    Why is that?

12     A.    Because you have the KeyGen you just generate your

13  own codes.

14     Q.    I see.  What was the prior joint venture that you

15  had with Mr. Medina before this transaction involving the

16  KeyGen software?

17     A.    I think I mentioned before that Mr. Medina, in my

18  earlier testimony, if I remember correctly, Mr. Medina and

19  myself had an agreement prior to the KeyGen inasmuch as

20  attempting to work -- I was working with Platinum, and

21  Platinum was working with me in trying to circumvent Nortel's

22  product.

23     Q.    Were you and Mr. Medina ever able to circumvent

24  Nortel products?

25     A.    Yes.

1    Q.   Can you explain to me how you and Mr. Medina were

2    able to circumvent Nortel products?

3    A.   I was working with one of his technicians at

4    Platinum Networks.

5    Q.   What was the name of that technician?

6    A.   Mario.

7    Q.   Do you recall Mario's last name?

8    A.   No, I'm sorry.

9    Q.   That's okay.  I'm sorry to interrupt.  Can you

10   explain what you and Mario were working on?

11   A.   We were working on -- at that time we were trying

12   to work on the Call Pilots and the business communication

13   managers.  Mr. Medina sent me a BCM to see if I could help

14   circumvent the software on the BCM because I'm familiar with

15   Windows NT.

16   Q.   Did Mr. Medina physically send you a BCM?

17   A.   Yes, he did.

18   Q.   And did you work on the BCM?

19   A.   Yes, I did.

20   Q.   You were trying to circumvent the BCM; is that

21   correct?

22   A.   Yes.

23   Q.   Were you able to circumvent the BCM?

24   A.   No.

25   Q.   I believe you also testified that you and Mario

1   were working to circumvent Call Pilots; is that correct?

2       A.   That's correct.

3       Q.   Did you have physical possession of a Call Pilot?

4       A.   Yes, I did.

5       Q.   Did Mr. Medina provide you with a Call Pilot?

6       A.   Yes, he did.

7       Q.   Were you able to circumvent the Call Pilot?

8       A.   Yes.

9       Q.   And by being able to circumvent the Call Pilot what

10  were you able to do?

11      A.   I was able to initialize different functions in the

12  Call Pilot and add mail-boxes and unified messaging to the

13  system.

14      Q.   And were you able to add these features to Call

15  Pilots without needing a keycode?

16      A.   Correct.

17      Q.   Were you able to add features to Call Pilots

18  without purchasing anything from Nortel?

19      A.   You had to purchase the Call Pilot.

20      Q.   Other than the Call Pilot, were you able to add

21  features to the Call Pilot that normally would be purchased

22  from Nortel?

23      A.   Yes.

24      Q.   Did you ever tell Mr. Medina that you were able to

25  -- strike that.

44

1   Did you ever tell anybody at Platinum that you were able to

2   circumvent the Call Pilots?

3       A.   Yes.

4       Q.   Who at Platinum did you tell?

5       A.   Gerry Medina originally and Mario, the technician

6   in the back room.

7       Q.   Did you share with them the procedure as to how

8   Call Pilots can be circumvented?

9       A.   Yes.

10      Q.   Did Mr. Medina ever tell you that he was able to

11  circumvent Call Pilots after you explained to him how that

12  could be done?

13      A.   Yes.

14      Q.   Did Mario ever tell you anything like that?

15      A.   Yes.

16      Q.   What did Mario say?

17      A.   Mario said to me when they order Call Pilots that

18  he has the ability to upgrade the Call Pilots now thanks to

19  me, I understand as a joint venture -- like we worked this

20  like together.

21      Q.   I believe you testified earlier that Mr. Medina

22  sent you the Call Pilot so that you could work on

23  circumventing the Call Pilot; is that correct?

24      A.   Yes.

25      Q.   Did you pay for the Call Pilot that Gerry Medina

1   sent you?

2        A.   No.

3        Q.   Did Mr. Medina explain to you why you didn't have

4   to pay for the Call Pilot that he was sending you?

5             MR. ALIBERTI:   Calls for speculation, lacks

6   foundation.

7             THE WITNESS:   Because he wanted me to work on it.

8   BY MR. SUGDEN:

9        Q.   After you explained to Mr. Medina and Mario as to

10  how Call Pilots can be circumvented -- strike that.

11  Did Mr. --  strike that.

12  Did anyone from Platinum ever pay you any compensation for

13  you sharing with them information to circumvent Call Pilots?

14       A.   Yes.

15       Q.   Did they pay you money?  Strike that.

16       A.   No.

17       Q.   Who was it at Platinum that compensated you for

18  sharing information as to how Call Pilots can be

19  circumvented?

20       A.   Gerry Medina.

21       Q.   How much did Mr. Medina pay you for sharing

22  information about how Call Pilots can be circumvented?

23       A.   A car.

24       Q.   Can you explain what you mean by that?

25       A.   Gerry Medina originally came to me and asked me if

1   I would work with his technicians on a joint venture to

2   circumvent Nortel products.  I said to him, yeah, but I says

3   I don't have the time, but in order for me to do it I would

4   have to be compensated for it.

5        Q.   What did Mr. Medina say in response?

6        A.   He said, "What do you want?"

7        Q.   What did you say?

8        A.   '54 Corvette.

9        Q.   What did Mr. Medina say in response?

10       A.   "Absolutely."

11       Q.   Did Mr. Medina provide you with a '54 Corvette?

12       A.   Yes, he did.

13       Q.   When did Mr. Medina provide you with a '54

14  Corvette?

15       A.   I'd say about two and a half years ago.

16       Q.   Why did Mr. Medina give you a '54 Corvette?

17       A.   As a cost compensation for working with his

18  technicians at Platinum.

19       Q.   Is that what Mr. Medina told you?

20       A.   Yes.

21       Q.   How was the '54 Corvette delivered to you?

22       A.   It was by shipping -- shipped.

23       Q.   Do you recall from where the '54 Corvette shipped?

24       A.   From where it was shipped?  It was shipped from Pro

25  Team Corvettes in Napoleon, Ohio.

47

1     Q.    Did Mr. Medina order the car for you?

2     A.    He paid for it.

3     Q.    Do you know if Mr. Medina ordered the car for you?

4     A.    No, I found the car.

5     Q.    How did you find the car?

6     A.    On the web.  I have a passion for Corvettes.

7   Sorry.

8     Q.    Can you explain how Mr. Medina paid for the '54

9   Corvette?

10    A.    He wire transferred money from his account to the

11  Pro Team account.  I remember talking to his controller at

12  Platinum giving him the information and told him who to call

13  at Pro Team.

14    Q.    Do you recall what the controller's name was?

15    A.    No.

16    Q.    Do you recall if it was Russ Gambrel?

17    A.    No, it wasn't Russ Gambrel.

18    Q.    Do you recall if it was Steve Valencia?

19    A.    No.

20    Q.    Do you know from which account Mr. Medina wired the

21  money from?

22    A.    No.

23    Q.    And the car was delivered to you here in British

24  Columbia; is that correct?

25    A.    Yes, it was.

1      Q.   Are you still in possession of the '54 Corvette?

2      A.   No, sorry.

3      Q.   Did you sell the '54 Corvette?

4      A.   Yeah.  In pieces, yeah.

5      Q.   How much did Mr. Medina pay for the '54 Corvette?

6            MR. ALIBERTI:  Calls for speculation, lacks

7 foundation.

8            THE WITNESS:  With taxes, 30,000 U.S.

9 BY MR. SUGDEN:

10     Q.   How do you believe that the price of the '54

11 Corvette was $30,000 U.S.?

12     A.   I have a copy of the bill of sale.

13     Q.   Do you have the copy of the bill of sale in your

14 possession?

15     A.   Not here, but yeah, I do have it.

16     Q.   Is it at your home?

17     A.   Yes.

18     Q.   Does that document articulate who was paying for

19 the automobile?

20     A.   No.

21     Q.   Do you have any other documents showing that Mr.

22 Medina purchased a '54 Corvette for you?

23     A.   Personally, no, I'm sorry.

24     Q.   Are there any e-mails that were exchanged between

25 you and Mr. Medina that articulated that he was purchasing a

1    '54 Corvette for you?

2        A.    Well, there wasn't any specific e-mails, but I

3    recall one e-mail, and I don't recall the date, that I

4    thanked him a whole bunch for buying the car for me.  But

5    other than that I don't know -- I just thanked him a whole

6    bunch and said this is what -- thanks, this is what you got

7    me.

8        MR. ALIBERTI:  Move to strike as non-responsive.

9    BY MR. SUGDEN:

10       Q.    Have you ever heard the name Bruce Jensen?

11       MR. ALIBERTI:  Excuse me one second.  I'm going to

12   object that there's no foundation to anything on the Corvette

13   and then we can move on.  I'm sorry. As far as who paid for

14   it, where it came from, how it was related to Mr. Medina,

15   there's no foundation at all.  It's all based on hearsay and

16   actually there's nothing but speculation.

17       MR. SUGDEN:  Based on statements that Mr. Medina

18   allegedly said, correct?

19       MR. ALIBERTI:  I'm not even sure if they would come

20   in.  But I just want to give you a heads-up now I'm going to

21   move to strike.  I would move to strike that to give you time

22   to lay your foundation.

23       MR. SUGDEN: Okay.  Can you clarify?  I know there

24   aren't any documents that we have here, but can you clarify

25   your objection for lack of foundation?

1          MR. ALIBERTI:  There's -- it's not based on

2    anything but his assumption as to where the car came from.

3    There's no direct evidence -- there's no admissible evidence

4    to show where the car came from.

5          MR. SUGDEN:  Okay, that's fine.

6          MR. ALIBERTI:  I'm sorry.  You were going to ask

7    Mr. Perrin a question.

8          MR. SUGDEN:  It is a best evidence objection.

9          MR. ALIBERTI:  We can do that too because of the

10   document.

11   BY MR. SUGDEN:

12        Q.   A '54 Corvette was shipped to you; is that correct?

13        A.   Yes.

14        Q.   Mr. Medina told you he was going to pay for a '54

15   Corvette; is that correct?

16        A.   Yes.

17        Q.   Did you ever pay anything for the '54 Corvette?

18        A.   Just the shipping.

19        Q.   Other than the shipping, did you pay for anything

20   else before receiving the '54 Corvette?

21        A.   No.

22        Q.   After you received the '54 Corvette you thanked Mr.

23   Medina; is that correct?

24        A.   Yes.

25        Q.   Prior to that, Mr. Medina told you he would pay for

1    a '54 Corvette; is that correct?

2        A.    That's correct.

3            MR. ALIBERTI:  I would leave the same objection.

4    BY MR. SUGDEN:

5        Q.    Have you ever heard the name Bruce Jensen?

6        A.    Yes, I have.

7        Q.    Who is Bruce Jensen?

8        A.    Bruce Jensen was the previous owner of Condor

9    Communications and actually became a good friend of mine.

10       Q.    Do you know whether Bruce Jensen ever worked for

11   Platinum?

12       A.    Yes.

13       Q.    Do you know when Mr. Jensen worked for Platinum?

14       A.    About two years ago.

15       Q.    Did Mr. Medina ever tell you that he acquired the

16   KeyGen software from among items that Bruce Jensen left

17   behind after he stopped working for Platinum?

18       A.    No.

19       Q.    Did Bruce Jensen ever tell you that he was in

20   possession of KeyGen?

21       A.    No.

22           MR. SUGDEN: I'll have the court reporter mark as

23   Exhibit 2, a document. Thank you.

24   **EXHIBIT 2 FOR IDENTIFICATION: Visa Statment**

25   BY MR. SUGDEN:

1       Q.    Mr. Perrin, can you identify this document?

2       A.    That's my Visa statement.

3       Q.    And is it your belief this is a true and correct

4   copy of your Visa statement?

5       A.    Mm-hmm, yes.

6       Q.    Would you please look at the second page of your

7   Visa statement?

8       A.    Yes.

9       Q.    And would you please look at the -- under

10  transaction details it states February 13th as the

11  transaction date. The post date is February 16th. Under the

12  description it says, Platinum Industries $6,000 U.S. Do you

13  see that?

14      A.    Yes, I do.

15      Q.    Do you know what that transaction represents?

16      A.    That was the down payment towards the KeyGen

17  program.

18      Q.    Under the amount it says $8,110.65. Do you see

19  that?

20      A.    Yes, I do.

21      Q.    Do you know what the additional monies were for?

22            MR. ALIBERTI: Objection, calls for speculation.

23            THE WITNESS: That's for the exchange rate as noted

24  right where the 6,000 U.S. dollars at .739768.

25  BY MR. SUGDEN:

1     Q.   Is it your understanding that the exchange rate is

2   the exchange between U.S. and Canadian dollars?

3     A.   That's correct.

4     Q.   Is your Visa account number 4505 5150 0093 8943?

5     A.   That's correct.

6     Q.   And is this a document that you received from CIBC?

7     A.   Yes.  I trust my Visa number won't be circulated

8   anywhere.

9     Q.   Correct.

10    A.   Sorry.

11         MR. SUGDEN: No problem.  Counsel, will we just

12   agree to have that information kept confidential as part of

13   the protective order?

14         MR. ALIBERTI:  I'm crossing my copy out now and I

15   have no problem with that.

16   BY MR. SUGDEN:

17    Q.   I believe you testified that you received KeyGen

18   from Platinum by Microsoft Instant Messenger; is that

19   correct?

20    A.   That's correct.

21    Q.   Do you recall who from Platinum Networks sent to

22   you -- sent it to you by Microsoft instant messenger?

23         MR. ALIBERTI:  Objection.  Lacks foundation, calls

24   for speculation.

25         THE WITNESS:  Who was in the same room as Gerry

1   Medina when the software was sent?  The conversation, Instant

2   Messenger, maybe I should clarify, has the ability you can

3   talk to people back and forth in Instant Messenger.  I was

4   told by phone conversation when Mario was in Mr. Medina's

5   office that Mario would send me the software from Mr.

6   Medina's  office.

7   BY MR. SUGDEN:

8        Q.   In the telephone conversation that you had with Mr.

9   Medina about you purchasing KeyGen software did Mr. Medina

10  tell you that Mario would send you the software by Microsoft

11  Instant Messenger?

12       A.   Yes.

13            MR. ALIBERTI:  Objection, misstates the testimony.

14  What I'm getting at -- you want a clarification?

15            MR. SUGDEN:  Sure.

16            MR. ALIBERTI:  What I'm getting at is were they

17  instant messaging or were on they on phone call.

18            MR. SUGDEN:  I'm going there.

19            MR. ALIBERTI: Okay.

20  BY MR. SUGDEN:

21       Q.   Had you communicated with Mario via Microsoft

22  Instant Messenger in the past?

23       A.   Yes.

24       Q.   Do you recall what Mario's screen name was on

25  Microsoft Instant Messenger?

1     A.    No, I'm sorry, I don't.

2     Q.    Okay.  At some point you received the KeyGen

3  software via Microsoft Instant Messenger; is that correct?

4     A.    Correct.

5     Q.    Was it your belief that you received the KeyGen

6  software from -- strike that.

7  Do you know who from Platinum sent you the KeyGen software by

8  Microsoft Instant Messenger?

9     A.    gmedina4.

10    Q.    And how do you know that?

11    A.    That was the screen name.

12    Q.    That was the screen name that sent you the

13  software; is that correct?

14    A.    That's correct.

15    Q.    Do you recall whose screen name that belonged to?

16          MR. ALIBERTI:  Objection, calls for speculation,

17  lacks foundation.

18          THE WITNESS:  Gerry Medina.

19  BY MR. SUGDEN:

20    Q.    And why do you believe that screen name belonged to

21  Gerry Medina?

22    A.    Because when I had a conversation with him prior to

23  all this, I used to communicate with Mr. Medina through

24  Messenger and he had added me to his contact list, and in

25  order for you to use that screen name you have to enter a

1    user name and a password, to log into Messenger and in order

2    for him to add me he has to accept me as somebody to add to

3    his contact list.

4         Q.   Before the KeyGen software transaction, had you

5    communicated with Gerry Medina via Microsoft Instant

6    Messenger before?

7         A.   Yes.

8         Q.   And the screen name Mr. Medina had used was the one

9    you just identified?

10        A.   gmedina4.

11        Q.   And is it gmedina, the number 4?

12        A.   Yes.

13        Q.   Okay.  Did Mr. Medina explain to you why he was

14   going to send you the KeyGen software via Microsoft Instant

15   Messenger?

16        A.   Because he trusted me and I already paid money for

17   it.

18        Q.   Did he explain why the method of transfer was

19   Microsoft Instant Messenger as opposed to e-mail or the mail

20   or some other method of transfer?

21        A.   Because it's more -- it's a more secure way of

22   transferring something without a trace.

23        Q.   Can you explain that?

24        A.   Because you're using Microsoft network's server

25   when you're communicating, you're not utilizing your own

1   personal server on your computer on either side of the

2   transaction.  So anything that happens with Microsoft

3   Messenger is held in limbo in Microsoft, meaning that

4   Platinum, Nortel or whoever, couldn't get their records back

5   from Microsoft to see what transpired.

6           MR. ALIBERTI:  I would object as to lacks

7   foundation.  He's not qualified to make such as an expert.

8   BY MR. SUGDEN:

9       Q.   Did Mr. Medina explain to you why he wanted to use

10  Microsoft Instant Messenger to transfer KeyGen software to

11  you?

12      A.   So there's no trace.  I would like to add -- not

13  saying anything, but I would like to add that I am Microsoft

14  Windows NT certified, just so we're clear.

15      Q.   Thank you?

16           MR. ALIBERTI:  Move to strike as non-responsive.

17           THE WITNESS:  Sorry.

18  BY MR. SUGDEN:

19      Q.   Do you believe that you are qualified to talk about

20  why Microsoft Instant Messenger is a useful way of keeping

21  the transfer secure?

22      A.   Yes.

23      Q.   Why do you believe you're qualified to explain

24  that?

25      A.   I'm Microsoft certified under Windows NT

1    environment.

2    Q.    Can you explain what that means?

3    A.    What that means is I've gone through a lengthy

4    course with Microsoft and Microsoft has deemed me efficient

5    enough to operate an NT operating system to their standards

6    through a Microsoft certification company.

7    Q.    Do you know who -- strike that.

8    Have you ever heard the name David Ahumada?

9    A.    I've heard the name David but not Ahumada.

10   Q.    Have you heard of a David that works at Platinum

11   Networks?

12   A.    Yes, I have.

13   Q.    Who is David that works at Platinum Networks?

14   A.    Gerry's right-hand man, from what I understand.

15   Q.    Have you ever talked to David Ahumada?

16   A.    Yes, I have.

17   Q.    Have you ever met him in person?

18   A.    Yes, I have.

19   Q.    When did you meet him in person?

20   A.    I met him in person approximately two years ago,

21   going back I had the original e-mail that you guys showed me,

22   that was a transaction of Platinum purchase for equipment and

23   what they decided to do, they wanted to fly down and look at

24   the equipment so I actually met Gerry Medina and David at the

25   same time.

1    Q.   Did David and Gerald Medina fly to Vancouver?

2    A.   Yes, they did.

3    Q.   And you met them in person; is that correct?

4    A.   Yes, that's correct.

5    Q.   Have you ever seen either gentleman in person since

6    that meeting?

7    A.   No.

8    Q.   And can you describe the transaction that was being

9    discussed in that face-to-face meeting that took place in

10   Vancouver?

11   A.   Yes.  The original transaction that they came down

12   for was to view the Nortel equipment that they had bought and

13   that was sitting in the Vancouver warehouse ready to be

14   shipped to Platinum Networks.

15   Q.   Do you recall how long the meet -- strike that.

16   When you met with Gerald Medina and David Ahumada did you

17   meet with them together?

18   A.   Yes, I did.

19       MR. ALIBERTI:  Objection, misstates his testimony.

20   He doesn't know who Dave Ahumada is.

21   BY MR. SUGDEN:  Strike that.

22   Q.   When you met with Gerald Medina and David from

23   Platinum Networks in Vancouver did you meet with them

24   together?

25   A.   Yes, I did.

1    Q.   How long was that meeting, do you recall?

2    A.   About four hours.

3    Q.   And it was to discuss Platinum purchasing the

4  products from you; is that correct?

5    A.   Not from me but from another -- from another

6  supplier, but I was involved in the transaction, yes.

7    Q.   How were you involved in the transaction?

8    A.   I had actually said to him maybe you should buy

9  some equipment from somebody I know and that's when -- I just

10  kind of put the deal together and they bought it.

11    Q.   Was the -- were there any over individuals present

12  during that four hour meeting with you, Gerry Medina and

13  David?

14    A.   No.

15    Q.   Not what you think. Do you know what David --

16  strike that.

17  You testified that David was Gerry Medina's right-hand man at

18  Platinum. Do you recall that testimony?

19    A.   Yes, I do.

20    Q.   What do you mean by, "right-hand man?"

21    A.   Gerry Medina and David are, from my understanding,

22  very close friends and they have been associated for quite

23  some length of time. David is also known as Junior. Sorry,

24  I mean ...

25    Q.   Have you ever talked to David about KeyGen

1   software?

2       A.   Yes.

3       Q.   Can you describe what David has said to you in

4   conversations about KeyGen software?

5       A.   I only spoke with David once.

6       Q.   When was that conversation, do you recall?

7       A.   If I was going to make an approximate I would have

8   to say about two and a half years ago when all this was

9   transpiring.

10      Q.   And was this conversation about KeyGen software

11  over the telephone?

12      A.   Yes.

13      Q.   What did David tell you in that telephone

14  conversation about KeyGen software?

15      A.   I got the KeyGen and you don't.  Sorry.

16      Q.   Did David tell you he had the KeyGen before Gerry

17  Medina told you he had the KeyGen?

18      A.   No.  They were actually riding me.

19      Q.   What do you mean by "riding" you?

20      A.   They were kind of like putting a carrot in front of

21  a rabbit in a sense.  They were saying, we got it, you don't,

22  and they were kind of laughing and we're not going to give it

23  to you now, blah-blah-blah, and I was kind of back and forth

24  and saying, hey, okay, whatever.  Just the communication was

25  very generic in a sense, but they were riding my tail about

1    it.  Sorry.

2         Q.   Do you recall David telling you anything else about

3    KeyGen software?

4         A.   At that time or at the meeting when I met with him?

5         Q.   Either time?

6         A.   Okay.  When Gerry and David came down to Vancouver

7    to over look the product and make sure -- verify the product

8    was there before they did the final wire transfer of the

9    money they came to my house, which is about ten minutes away

10   from here, thank goodness, but they came to my house and we

11   discussed in a meeting there what they had learned with

12   respect face-to-face with Nortel product and what I had

13   learned with respect to Nortel product on a one-to-one

14   face-to-face.

15        Q.   Had Gerry Medina already told you that he was in

16   possession of the KeyGen software when you met with him in

17   Vancouver face to face?

18        A.   He came -- when he came to Vancouver he had the

19   KeyGen -- he had the KeyGen before that.

20        Q.   How do you know that he had the KeyGen before you

21   met with him face to face?

22        A.   Because I bought it from him before that.

23        Q.   The transaction wherein you purchased KeyGen from

24   Platinum took place before the face-to-face meeting in

25   Vancouver; is that correct?

1      A.   That's correct.

2      Q.   Have you ever heard the term KRS access?

3      A.   I've heard of the term KRS, yes.

4      Q.   Where have you heard KRS?

5      A.   Through different people I've talked to; Platinum,

6   just different associates I've talked to over the years.

7      Q.   What is KRS?

8      A.   That is an acronym keycode retrieval system.

9      Q.   Can you describe what the key retrieval system --

10   strike that.

11   What does KRS stand for?

12     A.   Keycode retrieval system.

13     Q.   Do you have an understanding as to what the keycode

14   retrieval system is?

15     A.   Yes.

16     Q.   How do you have an understanding as to what the

17   keycode retrieval system is?

18     A.   I had access when I shouldn't have.

19     Q.   What is the keycode retrieval system?

20     A.   Keycode retrieval system is an automated system web

21   server that Nortel has in its network that allows authorized

22   distributors and channel partners to activate a Call Pilot or

23   a BCM or any type of product that has an internal system ID

24   number against an authorization number.

25     Q.   Does KRS generate an authorization number?

1    A.    No.

2    Q.    Does KRS generate a keycode?

3    A.    Yes.

4    Q.    Who is able to have access to KRS?

5    A.    Authorized distributors, channel partners,

6    anybody -- anybody affiliated with Nortel.

7    Q.    What is a channel partner?

8    A.    Channel partner is a partner that is a subversive

9    from another company who is a main distributor.  For example,

10   you have a president and then the president would have his

11   little senators so the little senators would be like channel

12   partners. At least that's how it works in the States, I don't

13   know.

14   Q.    Did you ever have access to KRS?

15   A.    Yes.

16   Q.    When did you have access to KRS?

17   A.    I would say about the same time, two and a half,

18   three years ago.  I actually had access to the KRS prior to

19   the key generator.

20   Q.    How did you obtain access to KRS?

21   A.    Well, there were lots of different news groups and

22   Nortel Networks user groups on the Internet.  Like a news

23   group is a place where people get together and just kind of

24   back and forth pass messages and news.  It's not Instant

25   Messenger.  You post, and there were some postings on there

1   that I found somebody had arbitrarily posted names and access

2   to the KRS.

3        Q.   And what information was posted in order for you to

4   obtain access to KRS?

5        A.   An e-mail address and a password.

6        Q.   Is the e-mail address and the password the

7   information that you had to provide KRS in order to access

8   KRS?

9        A.   Yes.

10        Q.   Is the e-mail address the user ID on KRS?

11        A.   Yes.

12        Q.   Did you purchase this e-mail address and password?

13        A.   No.

14        Q.   Do you recall what the e-mail address and password

15   was?

16        A.   I recall the e-mail, but I don't recall the

17   password.

18        Q.   What was the e-mail address?

19        A.   kevwilliams@jdsystems.ca.

20        Q.   Do you know who it was that provided you with the

21   e-mail address and password?

22        A.   News group.

23        Q.   Do you know what news group it was?

24        A.   I'm sorry I don't.  There is many Nortel user

25   groups, sorry.

1      Q.   Did you ever speak with anyone at Platinum Networks

2   about KRS?

3      A.   Yes, I did.

4      Q.   Who from Platinum did you speak with about KRS?

5      A.   Gerry Medina and Mario and David.

6      Q.   And when were these conversations?

7      A.   Two and a half, three years ago.

8      Q.   Can you tell me what was said in these

9   conversations about your access to KRS?

10     A.   As part of a joint venture that I had embarked on

11  with Platinum I told them that whenever I got KRS access that

12  I would -- as part of the remuneration that he gave me, I

13  would give him the passwords and user IDs as they became

14  available.

15     Q.   Did you at some point provide Platinum with the

16  e-mail address and password to access KRS?

17     A.   Yes.

18     Q.   Who did you provide the e-mail address and password

19  to at Platinum?

20     A.   Originally Mario.

21     Q.   How did you communicate that information to Mario?

22     A.   Instant Messenger.

23     Q.   Is there a reason why you chose Instant Messenger

24  as the method of communicating that information?

25     A.   More secure method of transferring information.

1    Q.    Did your access to KRS allow you to generate

2  keycodes for all Nortel products?

3    A.    Yes.

4    Q.    Did Platinum provide you with any compensation for

5  you providing the e-mail address and password to access KRS?

6    A.    Yes, they did.

7    Q.    Can you describe the compensation that you received

8  from Platinum Networks for providing the e-mail address and

9  password to access KRS?

10    A.    As part of the package, 1954 Corvette.

11    Q.    After you provided Platinum with the e-mail address

12  and password to access KRS did you have any other

13  conversations with Platinum about KRS access?

14    A.    Only when it was -- only when I either had to find

15  a new user name or figure out the password to find a new

16  password to access the system.  Other than that, no.

17    Q.    Did you ever speak with anyone at Platinum as to

18  how to use KRS?

19    A.    Yes, I did.

20    Q.    Who did you speak with at Platinum about how to use

21  KRS?

22    A.    Originally?

23    Q.    Yes.

24    A.    That would be David.

25    Q.    What was that conversation about?

1       A.      Explaining the processes involved in logging on to

2   the Nortel network secure server to get keycodes, generate

3   keycodes.

4       Q.      Was it you explained the process to him or the

5   other way around?

6       A.      I was explaining the process to him.

7       Q.      After you provided the e-mail address and password

8   did anyone from Platinum ever tell you that they were

9   successfully accessing KRS?

10      A.      Yes.

11      Q.      Who from Platinum told you they were able to

12  successfully access KRS?

13      A.      David and Mario.

14      Q.      What did they say, do you recall?

15      A.      We're still in.

16      Q.      Those were their words?

17      A.      Yes, there was.

18      Q.      And were those words spoken over the telephone?

19      A.      Yes, at different times.

20      Q.      Did anyone from Platinum tell you they were able to

21  generate keycodes through KRS access after you provided them

22  with the e-mail address and password?

23      A.      Yes.

24      Q.      Who told you that?

25      A.      Gerry Medina.

1   -- strike that.

2              Were there instances when the e-mail address

3   would stay the same, but the password would change?

4        A.   Yes.

5              MR. SUGDEN: I'll have the court reporter mark that

6   as Exhibit 3.

7              **EXHIBIT 3 FOR IDENTIFICATION:   E-mail dated**

8   **7/8/2003**

9              MR. SUGDEN: Let's go off the record for a moment.

10             **(OFF THE RECORD DISCUSSION)**

11             MR. BARKER: We're off the record.   The time is

12  11:27.

13             **(PROCEEDINGS ADJOURNED)**        .

14             **(PROCEEDINGS RESUMED)**

15             MR. BARKER: We're back on the record.   The time is

16  11:46.  You may proceed.

17  BY MR. SUGDEN:

18       Q.   Before the break I showed you what we'll call

19  Exhibit 3.  Mr. Perrin, can you identify this document?

20       A.   Yes.

21       Q.   What is this document?

22       A.   This document was for me talking to Dave at

23  Platinum and I can show him how to do the KRS access.

24       Q.   And do you know what you mean when you wrote,

25  thanks, they got the wire transfer?

1     A.    Yes.   That's when the -- the wire transfer for the

2   down payment for the product that he ordered that I had met

3   with Mr. Medina and David later that they came down to look

4   at.

5     Q.    What was the product that they ordered, do you

6   recall?

7     A.    Nortel equipment.

8     Q.    Do you recall what the equipment was?

9     A.    Everything:  Modular ACS's, compact ICS's, LSDS

10  cards, Call Pilots, caller I.D. cards, services cartridges,

11  all different hardware components for Nortel equipment.

12    Q.    And do you recall what you meant by the phrase,

13  "have dave call me, and we can start with the KRS access"?

14    A.    Yes.   That was when I was going to give him the

15  password and user I.D. or the e-mail to log into the KRS and

16  I was going to walk him through the process of utilizing KRS.

17    Q.    Did you at some point walk Dave through the process

18  of how to use KRS?

19    A.    Yes.

20    Q.    Did you walk him through KRS access during your

21  in-person visit?

22    A.    Yes, I did as well, just a refresher.

23    Q.    During the face-to-face meeting with David and

24  Gerry Medina, did you also walk Gerry Medina through KRS

25  access?

72

```
 1    A.    No.

 2    Q.    Did you just walk David through KRS access?

 3    A.    Not just David.

 4    Q.    Who else did you walk through?

 5    A.    Mario.

 6    Q.    Was Mario present during the face-to-face meeting?

 7    A.    No, he was not.

 8    Q.    How did you walk Mario through KRS access?

 9    A.    Voice conversation.

10    Q.    Over the telephone?

11    A.    Telephone.

12    Q.    And what do you mean by, "walking through the KRS

13 access"?

14    A.    Walking him through the Nortel secured server to

15 show him how the process works, what he has to do, the

16 buttons he has to click, where he has to enter the access

17 into it to get to the KRS.

18    Q.    In other words, were you showing him to how to use

19 KRS?

20    A.    Yes.

21    Q.    What do you mean by the phrase, "and if hes got

22 time, we will discuss callpilots"?

23    A.    Oh, okay.  Yeah, we were -- we were going to

24 further our discussions on the Call Pilots for what we both

25 -- when I say we'll discuss the Call Pilots, what I'm
```

1   referring to is our ongoing communication with respect to the

2   Call Pilots and the circumventing of them.

3        Q.   In other words, you were explaining you would

4   continue the conversations about how to circumvent Call

5   Pilots?

6        A.   Yes, yes.

7        Q.   Is that correct?

8        A.   Yes.

9        Q.   What did you mean by this statement, "We will make

10   our visit good and clean"?

11       A.   When he came down I didn't want to spend a lot of

12   time, because of my health, and I said to him, look, you guys

13   come down, look at your product.  We'll have a nice

14   face-to-face discussion, you know, for a few hours or

15   whatever it was at that juncture, and I said that's it.

16            MR. ALIBERTI:  Can we go off the record for a

17   second?

18            MR. SUGDEN:  Sure.

19            MR. BARKER: We're off the record.  The time is

20   11:50.

21            (PROCEEDINGS ADJOURNED)

22            (PROCEEDINGS RESUMED)

23            MR. BARKER:  We're back on the record.  The time

24   is 11:51.  You may proceed

25   BY MR. SUGDEN:

1        Q.    Can you explain what you mean by circumventing Call

2    Pilots with respect to this e-mail?

3        A.    Authorizing illegitimate voice mail-boxes, unified

4    messaging without paying for it.

5        Q.    And you have already testified as to how you shared

6    this information with Platinum; is that correct?

7        A.    Yes, I have.

8              MR. SUGDEN: I'll have the court reporter mark as

9    Exhibit 4 the document that I will hand you.

10             **EXHIBIT 4 FOR IDENTIFICATION:   E-mail dated**

11   **3/5/2003**

12   BY MR. SUGDEN:

13       Q.    Mr. Perrin, can you identify this document?

14       A.    That's an e-mail from myself, yes.

15       Q.    Do you know who this was an e-mail to?

16       A.    This was an e-mail to Gerry Medina.

17       Q.    Do you recall sending this e-mail to Gerry Medina

18   in March of 2003?

19       A.    I don't recall specifically, but I sent so many

20   e-mails back and forth that I'm sure that I have.

21       Q.    Is it your belief this is a true and correct copy

22   of an e-mail that you sent to Gerry Medina?

23       A.    Yes.

24       Q.    Can you explain to me what you meant by the phrase,

25   "I trust everything went well, with our dongle transaction"?

1      A.    Yes.  The dongles were the hardware keys that

2  attached to the LPT ports.  He had sent me some dongles to

3  look at and I had sent them back with authorization codes

4  attached to them.

5      Q.    And your sentence, "Have you given thought to our

6  other conversation regarding the CallPilot 100/150's."  Do

7  you see that?

8      A.    Yes.

9      Q.    What is the other conversation that this e-mail

10  refers to?

11      A.    What it refers to, it is basically in reference to

12  what you're saying here:  Have you given thought to our

13  conversation regarding the Call Pilot 100/ 150s.  That was

14  part of the circumvention process we were working on

15  collectively.

16      Q.    What is "Vivid pricing" which is described in the

17  next sentence?

18      A.    Vivid pricing was an initial term I believe that

19  was used by Northern or Nortel for their product pricing

20  sheets.

21      Q.    And your statement, "regardless of the rumors

22  NOBODY has the magic," can you explain what you meant by that

23  sentence?

24      A.    Well, the telecommunication industry is a wonderful

25  place for having rumors start -- rumor mills start.  There

1    had been a lot of rumors out there with respect to the

2    circumventions of call Pilot 150s and 100s, and the term

3    "nobody has the magic" is referring to -- well, I'm just --

4    I'm speculating on my part saying nobody knows what is

5    actually out there because nobody has got a solid foundation

6    to base it on.

7        Q.   What did the magic refer to in this e-mail?

8        A.   Circumvention.

9        Q.   Circumvention of the Call Pilots?

10       A.   Yes, that's correct.

11       Q.   Your last sentence, "I am also currently working on

12   the BCM, now that's interesting," can you explain what you

13   meant by that sentence?

14       A.   The operating system of the business communication

15   manager itself is Windows NT based.  It's embedded Windows NT

16   and I've been working diligently on trying to get access to

17   it to through the BCM, which I inevitably did, which is

18   another area of -- secure side of it, and I was basically

19   watching the BCM, what it did.

20       Q.   Were you trying to circumvent the BCM?

21       A.   Yes, I was.

22       Q.   Were you at one point able to circumvent the BCM?

23       A.   Yes, and no.

24       Q.   Can you explain what you mean by that?

25       A.   Yes, when I had the KeyGen, and no, when I was just

1    trying to circumvent it.  I understood the processes that the

2    BCM used and I knew how it did it, but I didn't catch the ...

3         Q.   But you were able to circumvent the BCM when you

4    acquired the KeyGen; is that correct?

5         A.   Yes, it is.

6         Q.   Was that the KeyGen that was provided to you by

7    Platinum?

8         A.   Yes, it was.

9              MR. SUGDEN: I'll have the court reporter mark as

10   Exhibit 5.

11   **EXHIBIT 5 FOR IDENTIFICATION:   E-mail stream**

12   BY MR. SUGDEN:

13        Q.   Can you take a look and look through that document?

14   I have a couple questions once you've had a chance to review

15   it.

16        A.   Okay.

17        Q.   Mr. Perrin, do you recognize this document?

18        A.   Vaguely, yes.

19        Q.   Can you identify what this document is?

20        A.   It came from -- it was an e-mail from Gerry Medina

21   to me.

22             MR. ALIBERTI:  Objection, move to strike.  It lacks

23   foundation.

24   BY MR. SUGDEN:

25        Q.   Do you recall receiving this document which is

1   identified as Exhibit 5 as an e-mail from Mr. Medina?

2        A.   Yes.

3        Q.   And Mr. Medina allegedly writes, "Here is an email

4   I just got today ... just to show you that others have the

5   'magic' too."

6   What did you understand Mr. Medina to mean when he stated

7   that others have the magic too?

8             MR. ALIBERTI:   Lacks foundation.   Calls for

9   speculation.

10            THE WITNESS:   In this respect?

11  BY MR. SUGDEN:

12       Q.   Yes.

13       A.   That other people have the ability to circumvent

14  it.

15       Q.   Was this the first time you had heard Mr. Medina

16  refer to the magic?

17       A.   No.   We used to refer to it as the magic all the

18  time.

19       Q.   Would Mr. Medina refer to the magic as the ability

20  to circumvent in telephone conversations with you?

21       A.   Yes.

22       Q.   Would you please look at the front page of that

23  exhibit where it appears to be an e-mail from Noel Rosario to

24  Wendy Valle?

25       A.   Okay, yes.

1      Q.    And I want to focus on the sentence, "Hey just so

2   you know, we can add unlimited voice/msg boxes to the call

3   pilot 150 & 100 for 800 $."

4   Do you see that?

5      A.    Yes, I do.

6      Q.    In your five years of buying and selling Nortel

7   equipment does that seem like a reasonable price?

8      A.    No.

9            MR. ALIBERTI:   Objection.   Lacks foundation, calls

10  for speculation.

11  BY MR. SUGDEN:

12     Q.    Why do you believe that unlimited voice mail-boxes

13  to the Call Pilot 150 and 100 for $800 is an unreasonable

14  price?

15     A.    Because I recall over the duration of time that I

16  spent with selling Nortel equipment, that the price lists

17  certainly wasn't $800 for unlimited mail-boxes.

18     Q.    Do you have a recollection of what the price for

19  unlimited voice mail-boxes was?

20           MR. ALIBERTI:   Calls for speculation.

21           THE WITNESS:   About 4 to $5,000, in that range.

22  BY MR. SUGDEN:

23     Q.    And that's from reviewing the price sheets you

24  testified to earlier; is that correct?

25     A.    Yes.

1          MR. SUGDEN: I'll have the court reporter mark as

2    Exhibit 6 a two-page document.

3    **EXHIBIT 6 FOR IDENTIFICATION:   E-mail Stream  - Medina Ex.9**

4    BY MR. SUGDEN:

5          Q.   Mr. Perrin, can you identify this document?

6          A.   Appears to be an e-mail.

7          Q.   Do you have a recollection of receiving this e-mail

8    from Gerry Medina?

9          MR. ALIBERTI:   Objection.  Lacks foundation.  Calls

10   for speculation.

11         THE WITNESS:  Vaguely.

12   BY MR. SUGDEN:

13         Q.   Is it your belief that this is a true and correct

14   copy of e-mail correspondence between you and Gerry Medina?

15         MR. ALIBERTI:  Lacks foundation, calls for

16   speculation.

17         THE WITNESS:  Yes, it is.

18   BY MR. SUGDEN:

19         Q.   I would like to focus on the first e-mail at the

20   bottom of the page.  Do you see the statement, "THANKS 200

21   MILLION MAN, IT'S PERFECT !!!!!!!!!!!!!!!!!!!!!!!!!!!"

22         A.   Yes, I do.

23         Q.   Do you have a recollection of what you were

24   thanking Mr. Medina for in that e-mail?

25         A.   The combined joint venture we were embarking on and

1    the '54 Corvette.

2        Q.    And the statement, "I guess its only fair to show

3    you what I got," what do you mean by that statement?

4        A.    I believe -- I don't recall completely, but I

5    believe I had indicated to him either by voice or by MSN I

6    gave him the link to the page where the '54 Corvette had

7    pictures from the supplier of the car.

8        Q.    And the next e-mail you sent to Mr. Medina up the

9    page states, "I look forward to working with you, and assure

10   you of complete disclosure of the magic/method."  Do you see

11   that?

12       A.    Yes.

13       Q.    What did you mean by that sentence?

14       A.    Well, I said to them whatever I found out during

15   the process of circumvention that I would definitely let them

16   know how many differences or changes, and that I would expect

17   from the same from them, but keep it under their hat.

18       Q.    And what do you mean by, "keep it under your hat"?

19       A.    Don't share it.

20       Q.    And you state:   "My next project is the BCM, do you

21   have a base BCM with which you can send me????"

22       A.    Yes.   I asked him for a BCM at that time and I said

23   I want a BCM and he inevitably sent it to me.

24       Q.    And I believe looks like the e-mail at the top of

25   the page, in e-mail from Gerry Medina to David Ahumada

1    wherein he writes, "Can you get Dave a base BCM." Do you see

2    that?

3        A.   Yes.

4        Q.   Did you receive a base BCM from Platinum Networks?

5        A.   Yes, I did.

6        Q.   Did you pay for the base BCM that you received?

7        A.   No, I did not.

8        Q.   And it appears that the e-mail that you sent on

9    July 20 to Mr. Medina was forwarded to Mr. Ahumada.  As you

10   sit here today, do you have a recollection of sending the

11   e-mail to Gerry Medina which is dated Sunday, July 20th,

12   2003?

13            MR. ALIBERTI:  Objection.  Question is compound and

14   leading.

15            THE WITNESS:  Are you referring to the --

16   BY MR. SUGDEN:

17       Q.   I'm not referring to the portion of the e-mail

18   where it appears that it was forwarded to David Ahumada. My

19   question is:  Do you recall sending an e-mail from David

20   Perrin to Gerry Medina on Sunday, July 20th?

21       A.   Yes.

22       Q.   And the e-mail that you sent is reflected on

23   Exhibit 6; is that your recollection?

24       A.   Yes, it is.

25            MR. SUGDEN:  I'll have the court reporter mark as

1    Exhibit 7 this document.

2    **EXHIBIT 7 FOR IDENTIFICATION:    Invoice dated 15-Jul-2003**

3    BY MR. SUGDEN:

4        Q.    Mr. Perrin, can you identify this document?

5        A.    That was an invoice I sent to Platinum Networks.

6        Q.    Do you recall what this invoice was for?

7        A.    I believe that was before we had made the

8    agreement.  This was -- this was part of the circumvention

9    process that he was paying me on an ongoing basis per unit

10   before he decided that it would be better if we just did it

11   -- and I decided if we just did it in one package.

12       Q.    Do you recall specifically what you were invoicing

13   Platinum for in this document?

14       A.    Yes.

15       Q.    Can you explain what it was?

16       A.    Circumvention of keycodes.

17       Q.    Do you know for which Nortel product the

18   circumvention was for?

19       A.    Call Pilot.  I don't recall if it was the 100 or

20   the 150, but I do know it was the Call Pilot.

21       Q.    Do you know if you were invoicing Platinum for

22   anything else in this document?

23       A.    No.

24            MR. SUGDEN: I'll have the court reporter mark Tthis

25   as Exhibit 8.

```
 1    EXHIBIT 8 FOR IDENTIFICATION:    E-mail Stream - Medina Ex 24

 2    BY MR. SUGDEN:

 3         Q.    And I would like you to look at the e-mail that's

 4    in the middle of the page that was sent Monday, October 11th,

 5    2004.  Would you please read that e-mail which is an e-mail

 6    allegedly from David A at Platinum Inc. to Gerry at Platinum

 7    Inc.?

 8         A.    The whole e-mail?

 9         Q.    Just read to yourself.  I have a couple questions,

10    okay.

11         A.    Okay.

12         Q.    Did Mario and David from Platinum Networks ever try

13    to contact you for assistance in obtaining keycodes?

14         A.    No.  If I'm reading the e-mail correctly, they were

15    trying to get ahold of me for getting the ability to log into

16    Nortel's website.

17              MR. ALIBERTI:  Move to strike as non-responsive.

18    BY MR. SUGDEN:

19         Q.    I think that's what I'm getting at.  I'm not trying

20    to find out if they talked to you in this instance, but in

21    the past did Mario and David ever contact you for assistance

22    in how to obtain keycodes?

23         A.    Yes.

24         Q.    Did Mario ever communicate you through Microsoft

25    Instant Messenger for assistance in how to generate keycodes?
```

1          MR. ALIBERTI:  Objection.  Calls for speculation,

2    lacks foundation.

3          THE WITNESS:  If we're using the analogy of logging

4    into the Nortel website, yes, they had.

5    BY MR. SUGDEN:

6      Q.   You testified earlier that the first payment for

7    KeyGen was $6,000; is that correct?

8      A.   That's correct.

9      Q.   Did you pay the remaining $6,500 to Platinum?

10     A.   No, I didn't.

11     Q.   Was there a reason why you didn't?

12     A.   I didn't have the money, and I also -- at that

13   juncture, I think sometime shortly after that I believe

14   Nortel came in and served me papers or documents.

15         MR. SUGDEN:  I see we're almost out of tape space.

16   I have no further questions at this time.  I may have some

17   questions after Mr.  Aliberti has asked you some questions on

18   redirect, but for now I will rest.  We'll change tapes.  We

19   are -- we'll go off the record.

20         MR. BARKER:  We are off the record.  The time is

21   12:10.

22   (OFF THE RECORD DISCUSSION)

23   (PROCEEDINGS ADJOURNED)

24   (PROCEEDINGS RESUMED)

25         MR. BARKER:  We're back on the record.  The time is

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4

   NORTEL NETWORKS LIMITED, a        )
5  Canadian corporation,            )
                                    )
6              Plaintiff,           )
                                    )
7          vs.                      ) Case No.
                                    ) 04 CV 1968L (LSP)
8  PLATINUM NETWORKS, INCORPORATED, a )
   California corporation; GERALD    )
9  MEDINA, an individual,           )
                                    )
10             Defendants.          )
   _____)

11

12         Deposition of NORMAN BRUCE JENSEN, taken

13 on behalf of plaintiff, at 610 Newport Center Drive,

14 Suite 700, Newport Beach, California beginning at

15 10:05 a.m. and ending at 12:04 p.m., on Friday,

16 July 22, 2005, before Kelly J. Schindele, Certified

17 Shorthand Reporter No. 8357.

18

19

20

21

22

23

24

25

                                                    2

EXHIBIT B

| | | |
|---|---|---|
| 10:05:39 | 1 | THE VIDEOGRAPHER:  Would the court |
| 10:05:40 | 2 | reporter please swear in the witness. |
| 10:05:50 | 3 | |
| 10:05:50 | 4 | NORMAN BRUCE JENSEN, |
| 10:05:50 | 5 | having been first duly administered an affirmation |
| 10:05:50 | 6 | to tell the truth by the Certified Shorthand |
| 10:05:50 | 7 | Reporter, was examined and testified as follows: |
| 10:06:00 | 8 | EXAMINATION |
| 10:06:01 | 9 | BY MR. SUGDEN: |
| 10:06:04 | 10 | Q   Good morning. |
| 10:06:05 | 11 | A   Good morning. |
| 10:06:06 | 12 | Q   Again, my name is David Sugden.  I'm the |
| 10:06:08 | 13 | lawyer for the plaintiff in this case, Nortel |
| 10:06:12 | 14 | Networks. |
| 10:06:13 | 15 | Can you please state your full name. |
| 10:06:15 | 16 | A   My actual legal name is Norman Bruce |
| 10:06:17 | 17 | Jensen.  I go by Bruce. |
| 10:06:19 | 18 | Q   Mr. Jensen, have you ever had your |
| 10:06:20 | 19 | deposition taken before? |
| 10:06:22 | 20 | A   Yes. |
| 10:06:23 | 21 | Q   How many times have you had your |
| 10:06:24 | 22 | deposition taken before? |
| 10:06:26 | 23 | A   Twice. |
| 10:06:27 | 24 | Q   When was the first time you had your |
| 10:06:29 | 25 | deposition taken? |

6

| | | |
|---|---|---|
| 10:08:11 | 1 | answer, and if you could do your best to make sure |
| 10:08:13 | 2 | that I've completed my question, it will make the |
| 10:08:17 | 3 | record clearer.  Is that fair? |
| 10:08:19 | 4 | A   Yes. |
| 10:08:19 | 5 | Q   And today Mr. Aliberti or Mr. Shields may |
| 10:08:22 | 6 | state objections.  The purpose of those objections |
| 10:08:24 | 7 | is really for the judge.  Unless you're instructed |
| 10:08:29 | 8 | by your counsel not to answer the question, you're |
| 10:08:33 | 9 | obligated to provide an answer. |
| 10:08:35 | 10 | Do you understand? |
| 10:08:35 | 11 | A   Yes. |
| 10:08:35 | 12 | Q   And if at any time you don't understand |
| 10:08:39 | 13 | one of my questions, please let me know.  I'll do my |
| 10:08:42 | 14 | very best to rephrase it in an understandable |
| 10:08:45 | 15 | manner. |
| 10:08:45 | 16 | If you answer the question, I'll assume |
| 10:08:48 | 17 | you understood it.  Is that fair? |
| 10:08:49 | 18 | A   Yes. |
| 10:08:50 | 19 | Q   And is there any reason, Mr. Jensen, you |
| 10:08:52 | 20 | cannot provide your best testimony today? |
| 10:08:55 | 21 | A   Nope. |
| 10:09:00 | 22 | Q   Mr. Jensen, have you ever testified in a |
| 10:09:02 | 23 | trial before? |
| 10:09:03 | 24 | A   Yes. |
| 10:09:04 | 25 | Q   What was that -- when was that trial? |

9

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| Time | # | |
|---|---|---|
| 10:09:07 | 1 | A    It was approximately six years ago. |
| 10:09:09 | 2 | Q    And just briefly, what was that trial |
| 10:09:10 | 3 | about? |
| 10:09:13 | 4 | A    I was sued by a company that I used to own |
| 10:09:17 | 5 | and then I countersued and we went to trial. |
| 10:09:20 | 6 | Q    What was the name of that company? |
| 10:09:22 | 7 | A    My company at the time was Single Point of |
| 10:09:23 | 8 | Contact, and the suit was against SPOC Installation. |
| 10:09:31 | 9 | So it was two separate companies. |
| 10:09:34 | 10 | Q    Did SPOC Installation have anything to do |
| 10:09:36 | 11 | with the telecommunications industry? |
| 10:09:38 | 12 | A    Yes. |
| 10:09:40 | 13 | Q    What did SPOC Installation do? |
| 10:09:41 | 14 | A    Installed and maintained business |
| 10:09:43 | 15 | telephone systems. |
| 10:09:45 | 16 | Q    And did you say that you used to own that |
| 10:09:47 | 17 | company -- |
| 10:09:47 | 18 | A    Yes. |
| 10:09:48 | 19 | Q    -- is that right? |
| 10:09:49 | 20 | A    I was one-third owner. |
| 10:09:50 | 21 | Q    And is Single Point of Contact different |
| 10:09:53 | 22 | from SPOC Installation? |
| 10:09:55 | 23 | A    Yes. |
| 10:09:56 | 24 | Q    What is Single Point of Contact? |
| 10:09:58 | 25 | A    We were an equipment provider. |

10

| | | |
|---|---|---|
| 10:10:11 | 1 | Q    Mr. Jensen, what's your home address? |
| 10:10:14 | 2 | A    Right now I'm in between houses, but |
| 10:10:18 | 3 | we're -- we have bought a new house and it's |
| 10:10:20 | 4 | 52 Dartmouth, D-a-r-t-m-o-u-t-h, Lane, Coto de Caza, |
| 10:10:27 | 5 | California 92679. |
| 10:10:28 | 6 | Q    And that's where you've just moved? |
| 10:10:30 | 7 | A    Well, I'm living with my in-laws and we |
| 10:10:32 | 8 | hope to move in next weekend. |
| 10:10:35 | 9 | Q    Okay.  And are you from Southern |
| 10:10:37 | 10 | California originally? |
| 10:10:38 | 11 | A    No. |
| 10:10:39 | 12 | Q    Where are you from originally? |
| 10:10:41 | 13 | A    Minneapolis. |
| 10:10:41 | 14 | Q    Is that where you went to school? |
| 10:10:43 | 15 | A    No. |
| 10:10:43 | 16 | Q    Where did you go to school? |
| 10:10:45 | 17 | A    Here in Los Angeles. |
| 10:10:46 | 18 | Q    Where did you go to high school? |
| 10:10:47 | 19 | A    Westchester High. |
| 10:10:48 | 20 | Q    Did you get any education after high |
| 10:10:50 | 21 | school? |
| 10:10:51 | 22 | A    Went to a year of junior college. |
| 10:10:56 | 23 | Q    And are you employed today, sir? |
| 10:11:00 | 24 | A    No. |
| 10:11:02 | 25 | Q    Do you do -- are you retired? |

11

10:11:03   1        A     Yes.

10:11:05   2        Q     And you're doing nothing for employment;

10:11:06   3   is that correct?

10:11:07   4        A     I work with my wife whenever she needs

10:11:08   5   help in the travel industry.

10:11:11   6        Q     Do you have anything to do with the

10:11:13   7   telecommunications industry today?

10:11:15   8        A     No.

10:11:18   9        Q     You're not making any money from the

10:11:19   10   telecommunications industry; is that true?

10:11:21   11        A     Correct.

10:11:22   12        Q     Do you have any financial interest in the

10:11:27   13   outcome of this lawsuit?

10:11:28   14        A     No.

10:11:35   15        Q     And did you at one point work for Platinum

10:11:38   16   Networks?

10:11:39   17        A     Yes.

10:11:40   18        Q     Before you worked for Platinum Networks,

10:11:41   19   where did you work?

10:11:43   20        A     Single Point of Contact.

10:11:44   21        Q     How long did you work for Single Point of

10:11:45   22   Contact?

10:11:47   23        A     18 years.

10:11:49   24        Q     And you stated earlier that Single Point

10:11:51   25   of Contact was an equipment provider; is that

12

| | | |
|---|---|---|
| 10:11:54 | 1 | correct? |
| 10:11:55 | 2 | A    Yes. |
| 10:11:56 | 3 | Q    What type of equipment did Single Point of |
| 10:11:57 | 4 | Contact provide? |
| 10:11:59 | 5 | A    Almost exclusively Nortel. |
| 10:12:02 | 6 | Q    What type of Nortel equipment did Single |
| 10:12:04 | 7 | Point of Contact provide? |
| 10:12:06 | 8 | A    Anything to do with the product from the |
| 10:12:07 | 9 | key system through PBX to telephone circuit boards. |
| 10:12:12 | 10 | Q    Would you provide phone systems? |
| 10:12:13 | 11 | A    Yes. |
| 10:12:14 | 12 | Q    In your 18 years working for Single Point |
| 10:12:17 | 13 | of Contact, did you gain an understanding as to how |
| 10:12:22 | 14 | Nortel equipment worked? |
| 10:12:24 | 15 | A    Oh, yes. |
| 10:12:25 | 16 | Q    And what was your position for Single |
| 10:12:27 | 17 | Point of Contact? |
| 10:12:29 | 18 | A    President. |
| 10:12:30 | 19 | Q    Were you the president of Single Point of |
| 10:12:31 | 20 | Contact for all 18 years? |
| 10:12:33 | 21 | A    No. |
| 10:12:35 | 22 | Q    What was your -- what were the other |
| 10:12:37 | 23 | positions that you held for that company? |
| 10:12:39 | 24 | A    Vice president, secretary, treasurer. |
| 10:12:41 | 25 | Q    And at some point did you leave those |

13

| | | |
|---|---|---|
| 10:12:43 | 1 | positions and become the president of Single Point |
| 10:12:45 | 2 | of Contact? |
| 10:12:46 | 3 | A    Yes. |
| 10:12:46 | 4 | Q    When was that? |
| 10:12:52 | 5 | A    Approximately eight, nine years ago. |
| 10:12:54 | 6 | Q    And is Single Point of Contact still in |
| 10:12:56 | 7 | business? |
| 10:12:58 | 8 | A    It is on the books.  It will be closed out |
| 10:13:02 | 9 | this September. |
| 10:13:05 | 10 | Q    And when did you join Platinum Networks? |
| 10:13:07 | 11 | A    Novem- -- September of '03. |
| 10:13:18 | 12 | Q    September 2003; is that correct? |
| 10:13:20 | 13 | A    Correct. |
| 10:13:21 | 14 | Q    And did you leave Single Point of Contact |
| 10:13:24 | 15 | to join Platinum Networks? |
| 10:13:26 | 16 | A    We were purchased by Platinum Networks. |
| 10:13:30 | 17 | Q    What did Platinum Networks purchase? |
| 10:13:36 | 18 | A    All the assets as far as the customer |
| 10:13:41 | 19 | list.  They did not purchase the inventory or the |
| 10:13:44 | 20 | computers.  Mainly it was the database with all the |
| 10:13:47 | 21 | customers. |
| 10:13:56 | 22 | Q    And in your 18-year -- strike that. |
| 10:13:59 | 23 | How long did you work for Platinum |
| 10:14:01 | 24 | Networks? |
| 10:14:05 | 25 | A    Approximately two months. |

14

| | | |
|---|---|---|
| 10:14:09 | 1 | Q    And since leaving Platinum Networks, have |
| 10:14:11 | 2 | you had anything to do with the telecommunications |
| 10:14:13 | 3 | industry? |
| 10:14:13 | 4 | A    No. |
| 10:14:15 | 5 | Q    Do you have any plans on going back to the |
| 10:14:18 | 6 | telecommunications industry? |
| 10:14:19 | 7 | A    No. |
| 10:14:20 | 8 | Q    You're fully retired? |
| 10:14:24 | 9 | A    Oh, yeah, and I love it. |
| 10:14:26 | 10 | Q    And in your 18 years in the |
| 10:14:29 | 11 | telecommunications industry, did you become familiar |
| 10:14:31 | 12 | with how the -- how Nortel equipment worked? |
| 10:14:35 | 13 | A    Yes. |
| 10:14:38 | 14 | Q    Did you become familiar with how Nortel |
| 10:14:40 | 15 | systems worked? |
| 10:14:41 | 16 | A    Yes. |
| 10:14:42 | 17 | Q    And do you have an understanding as to |
| 10:14:44 | 18 | what a Nortel phone system is? |
| 10:14:46 | 19 | A    Yes. |
| 10:14:46 | 20 | Q    What is your understanding of what a |
| 10:14:48 | 21 | Nortel phone system is? |
| 10:14:50 | 22 | A    If you're looking at the -- which I assume |
| 10:14:53 | 23 | you're looking at the complete system rather than |
| 10:14:55 | 24 | just a part, it's the brains of the unit with -- |
| 10:14:59 | 25 | with or without voice mail, with or without ACD, and |

15

10:20:34  1  strike that.

10:20:35  2          What would the end user purchase from

10:20:38  3  either Nortel or a Nortel distributor in order to

10:20:43  4  add additional voice mails?

10:20:44  5      A    Well, if -- with Nortel, you would usually

10:20:46  6  buy the software in blocks of either ten or 20 or

10:20:52  7  whatever you needed.  So you'd go to Nortel and say,

10:20:55  8  "I need ten additional voice mailboxes," or "ten new

10:20:59  9  Call Pilot users," then Nortel would give them a

10:21:02  10 price, and then if, you know, it was what they had

10:21:06  11 budgeted for or wanted, then they would purchase it

10:21:08  12 directly through Nortel or their distributor.

10:21:12  13     Q    What would the end user receive from

10:21:14  14 Nortel?  Would it be a disk with software on it or

10:21:17  15 would it be something else?

10:21:18  16     A    Usually it wouldn't go directly to the end

10:21:20  17 user.  It would go to the distributor who sold it

10:21:23  18 and then the distributor would go out and install

10:21:25  19 it.

10:21:26  20     Q    What would the authorized Nortel

10:21:27  21 distributor receive from Nortel to install into the

10:21:31  22 phone system?

10:21:33  23     A    Normally it was a software disk.

10:21:46  24     Q    Have you ever heard the term "Nortel

10:21:47  25 keycodes"?

| | | |
|---|---|---|
| 10:21:48 | 1 | A    Yes. |
| 10:21:49 | 2 | Q    What is a Nortel keycode? |
| 10:21:51 | 3 | A    It un- -- it's a key that unlocks, again, |
| 10:21:58 | 4 | either additional voice mailboxes, ACD users, even |
| 10:22:02 | 5 | additional telephones. |
| 10:22:07 | 6 | Q    And when you say "unlocks," what do you |
| 10:22:09 | 7 | mean by "unlocks"? |
| 10:22:10 | 8 | A    Well, Nortel, when they deliver a system |
| 10:22:14 | 9 | that's purchased, all the software, everything to do |
| 10:22:18 | 10 | with anything is usually with the system, but the |
| 10:22:21 | 11 | end user only purchases a certain amount of that for |
| 10:22:24 | 12 | use. |
| 10:22:25 | 13 | So if they want to add after that initial |
| 10:22:27 | 14 | purchase, then they have to get a keycode to unlock |
| 10:22:31 | 15 | those additional software options that the end user |
| 10:22:35 | 16 | is purchasing. |
| 10:22:37 | 17 | Q    Is there a difference between obtaining a |
| 10:22:42 | 18 | keycode versus obtaining the software that you just |
| 10:22:45 | 19 | described earlier?  Does it do the same thing? |
| 10:22:49 | 20 | A    When it gets down to it, it does the same |
| 10:22:52 | 21 | thing, just through a different mode. |
| 10:22:54 | 22 | Q    Is a keycode a way of adding additional |
| 10:22:58 | 23 | voice mails to a phone system when software isn't |
| 10:23:01 | 24 | needed? |
| 10:23:06 | 25 | A    I would say yes. |

21

| | | |
|---|---|---|
| 10:27:00 | 1 | Q    Have you ever seen something where it's a |
| 10:27:04 | 2 | series of numbers in a shrink-wrapped package that's |
| 10:27:07 | 3 | been referred to as an authorization code? |
| 10:27:12 | 4 | A    Not under that scenario, no. |
| 10:27:15 | 5 | Q    Can anyone outside of Nortel or authorized |
| 10:27:23 | 6 | Nortel distributors provide keycodes to end users? |
| 10:27:29 | 7 | A    No. |
| 10:27:50 | 8 | Q    You testified earlier that Single Point of |
| 10:27:52 | 9 | Contact was eventually bought by Platinum Networks; |
| 10:27:57 | 10 | is that correct? |
| 10:27:58 | 11 | A    Yes. |
| 10:27:58 | 12 | Q    Who was your contact person at Platinum |
| 10:28:01 | 13 | Networks? |
| 10:28:02 | 14 | A    The main contact was Gerry Medina. |
| 10:28:08 | 15 | Q    How did you first meet Gerry Medina? |
| 10:28:10 | 16 | A    We were buying product from Platinum. |
| 10:28:14 | 17 | Q    Single Point of Contact would sell their |
| 10:28:17 | 18 | products to the end user; is that correct? |
| 10:28:18 | 19 | A    Yes. |
| 10:28:19 | 20 | Q    Did Platinum Networks also sell Nortel |
| 10:28:22 | 21 | equipment to the end user? |
| 10:28:24 | 22 | A    Very, very little. |
| 10:28:27 | 23 | Q    What type of business was Platinum |
| 10:28:28 | 24 | Networks? |
| 10:28:30 | 25 | A    They were like we were, but they were -- |

25

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | | |
|---|---|---|
| 10:29:41 | 1 | market out there and there's some industry trade |
| 10:29:46 | 2 | journals of telecom gear whereby companies like |
| 10:29:51 | 3 | Platinum and ours advertise to other dealers as well |
| 10:29:54 | 4 | as the end users, and that's how you find your |
| 10:29:57 | 5 | customers. |
| 10:30:06 | 6 |     Q    Was your relation- -- when did you first |
| 10:30:08 | 7 | meet Gerry Medina?  Do you recall? |
| 10:30:12 | 8 |     A    In person or via telephone? |
| 10:30:14 | 9 |     Q    Via telephone. |
| 10:30:15 | 10 |     A    Oh, well, let's see.  November of '03, so |
| 10:30:19 | 11 | probably a good year before that, if -- |
| 10:30:21 | 12 |     Q    Before what? |
| 10:30:23 | 13 |     A    Before November -- or September of '03. |
| 10:30:24 | 14 | So probably sometime in '0- -- '02 or even late '01, |
| 10:30:31 | 15 | and we became a very large customer of theirs. |
| 10:30:35 | 16 |     Q    You purchased a lot of Nortel equipment |
| 10:30:38 | 17 | from them; is that right? |
| 10:30:39 | 18 |     A    Yes. |
| 10:30:42 | 19 |     Q    And before you sold Single Point of |
| 10:30:45 | 20 | Contact to Platinum Networks, was your relationship |
| 10:30:48 | 21 | with Gerry Medina strictly business, did you become |
| 10:30:51 | 22 | friends, or was it something else? |
| 10:30:53 | 23 |     A    Oh, it was strictly business. |
| 10:30:58 | 24 |     Q    How did you decide to sell -- strike that. |
| 10:31:00 | 25 |     Was it your decision to sell Single Point |

27

| | | |
|---|---|---|
| 10:31:02 | 1 | of Contact to Platinum Networks? |
| 10:31:04 | 2 | A    Yes. |
| 10:31:04 | 3 | Q    Did you negotiate that deal with Gerry |
| 10:31:06 | 4 | Medina exclusively? |
| 10:31:09 | 5 | A    Yes, I'd say so. |
| 10:31:11 | 6 | Q    How did you decide to sell Single Point of |
| 10:31:14 | 7 | Contact to Platinum Networks? |
| 10:31:18 | 8 | A    It was a pretty easy decision.  Our |
| 10:31:20 | 9 | business had gotten so -- oh, what's the word I'm |
| 10:31:28 | 10 | looking for? -- so competitive that to buy product |
| 10:31:32 | 11 | from Gerry or any other company in our business and |
| 10:31:35 | 12 | then mark it up and resell, the profit margins were |
| 10:31:39 | 13 | just slowly shrinking. |
| 10:31:41 | 14 | So when we looked at buying from Gerry, we |
| 10:31:45 | 15 | knew he had to buy lower than what he was selling it |
| 10:31:47 | 16 | to us for, so we figured if we could merge the two |
| 10:31:50 | 17 | companies together -- Gerry wanted to get into the |
| 10:31:54 | 18 | end user base.  We had it.  We wanted to get more |
| 10:31:58 | 19 | into better pricing.  So it was, you know, a pretty |
| 10:32:02 | 20 | easy decision. |
| 10:32:04 | 21 | Q    Whose idea was it to have Platinum |
| 10:32:07 | 22 | Networks purchase Single Point of Contact? |
| 10:32:09 | 23 | A    I think I originally approached Gerry. |
| 10:32:12 | 24 | Q    How long did the two of you negotiate the |
| 10:32:13 | 25 | deal? |

28

| | | |
|---|---|---|
| 10:32:16 | 1 | A    Probably around six months. |
| 10:32:21 | 2 | Q    Do you recall the price at which Platinum |
| 10:32:23 | 3 | Networks acquired Single Point of Contact? |
| 10:32:27 | 4 | A    It was over a period of time.  I don't |
| 10:32:31 | 5 | recall all the details.  Mr. Shields may, but I -- I |
| 10:32:35 | 6 | don't recall all the finite details. |
| 10:32:39 | 7 | Q    Do you recall the price? |
| 10:32:43 | 8 | A    Not really. |
| 10:32:46 | 9 | Q    Do you recall, was part of the deal -- |
| 10:32:50 | 10 | strike that. |
| 10:32:51 | 11 | After Single Point of Contact was sold to |
| 10:32:54 | 12 | Platinum Networks, were you then retiring from the |
| 10:32:58 | 13 | telecommunications industry or did you go work |
| 10:33:00 | 14 | somewhere else? |
| 10:33:01 | 15 | A    No.  I stayed on as an employee. |
| 10:33:03 | 16 | Q    For Platinum Networks? |
| 10:33:03 | 17 | A    Yes. |
| 10:33:04 | 18 | Q    What was your job title at Platinum |
| 10:33:05 | 19 | Networks? |
| 10:33:06 | 20 | A    Sales manager. |
| 10:33:07 | 21 | Q    Did you supervise anybody at Platinum |
| 10:33:10 | 22 | Networks? |
| 10:33:10 | 23 | A    Yes. |
| 10:33:10 | 24 | Q    Who did you supervise? |
| 10:33:14 | 25 | A    One, two -- I think it was approximately |

29

| 10:34:49 | 1 | this or somebody's got that," and it's just kind of |
| 10:34:51 | 2 | word of mouth but no specifics. |
| 10:34:53 | 3 | Q    Did you ever hear of anyone specifically |
| 10:34:56 | 4 | being able to generate keycodes in-house? |
| 10:34:59 | 5 | MR. ALIBERTI:  Objection.  Hearsay. |
| 10:35:08 | 6 | THE WITNESS:  I'd have to say no. |
| 10:35:10 | 7 | BY MR. SUGDEN: |
| 10:35:11 | 8 | Q    As you sit here today, have you ever heard |
| 10:35:12 | 9 | of anyone being able to generate keycodes in-house |
| 10:35:16 | 10 | who was not Nortel or an authorized Nortel |
| 10:35:19 | 11 | distributor? |
| 10:35:19 | 12 | A    Yes. |
| 10:35:20 | 13 | MR. ALIBERTI:  Objection.  Oops.  Sorry. |
| 10:35:22 | 14 | Objection.  Hearsay. |
| 10:35:22 | 15 | BY MR. SUGDEN: |
| 10:35:23 | 16 | Q    Can you please tell me all of the |
| 10:35:26 | 17 | instances in which you've heard or became aware of |
| 10:35:31 | 18 | people other than Nortel or authorized Nortel |
| 10:35:34 | 19 | distributors being able to generate keycodes |
| 10:35:36 | 20 | in-house. |
| 10:35:37 | 21 | MR. ALIBERTI:  Objection.  Hearsay. |
| 10:35:40 | 22 | THE WITNESS:  Do I answer still? |
| 10:35:41 | 23 | MR. SHIELDS:  Go ahead. |
| 10:35:42 | 24 | THE WITNESS:  The only one that I've heard |
| 10:35:43 | 25 | of that was concrete was a gentleman out of Canada. |

31

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | | |
|---|---|---|
| 10:35:53 | 1 | BY MR. SUGDEN: |
| 10:35:53 | 2 | Q    Do you recall his name? |
| 10:35:54 | 3 | A    It was David Perrin. |
| 10:35:59 | 4 | Q    And what did you hear about David |
| 10:36:01 | 5 | Perrin -- |
| 10:36:02 | 6 | MR. ALIBERTI:  Objection.  Hearsay. |
| 10:36:03 | 7 | BY MR. SUGDEN: |
| 10:36:03 | 8 | Q    -- with respect to keycodes? |
| 10:36:05 | 9 | A    That he had somehow been able to do a |
| 10:36:08 | 10 | software program, or whatever, to replicate Nortel's |
| 10:36:14 | 11 | keycodes. |
| 10:36:17 | 12 | Q    Where did you hear that information from? |
| 10:36:19 | 13 | MR. ALIBERTI:  Objection.  Hearsay. |
| 10:36:21 | 14 | THE WITNESS:  Mainly from David. |
| 10:36:21 | 15 | BY MR. SUGDEN: |
| 10:36:23 | 16 | Q    Do you recall when you spoke to David |
| 10:36:24 | 17 | Perrin about this issue? |
| 10:36:26 | 18 | A    Oh, it's been probably a year and a half, |
| 10:36:32 | 19 | two years ago. |
| 10:36:39 | 20 | Q    Was this conver- -- and this was a |
| 10:36:41 | 21 | conversation that you had with Mr. Perrin; is that |
| 10:36:42 | 22 | correct? |
| 10:36:43 | 23 | A    Yes. |
| 10:36:43 | 24 | Q    Was it a face-to-face conversation or over |
| 10:36:46 | 25 | the telephone? |

32

| | | |
|---|---|---|
| 10:36:47 | 1 | A   Just via telephone. |
| 10:36:48 | 2 | Q   Was that the first time you had ever |
| 10:36:50 | 3 | spoken to David Perrin? |
| 10:36:51 | 4 | A   No. |
| 10:36:51 | 5 | Q   How did you first get to know David |
| 10:36:53 | 6 | Perrin? |
| 10:36:56 | 7 | A   He worked for a company in Canada called |
| 10:37:00 | 8 | Condor Communications along with a gentleman by the |
| 10:37:05 | 9 | name of Winn Hartely.  And I knew Winn from a long |
| 10:37:09 | 10 | time ago.  So they were looking at either another |
| 10:37:12 | 11 | investor or selling the company.  And Winn was the |
| 10:37:16 | 12 | owner, David was an employee. |
| 10:37:17 | 13 |       So I flew up there and met with them and |
| 10:37:20 | 14 | then I purchased the company from Mr. Hartely. |
| 10:37:25 | 15 | Q   And what did that company do? |
| 10:37:27 | 16 | A   Sold new and refurbished Nortel equipment. |
| 10:37:32 | 17 | Q   And after -- when was that deal done?  Do |
| 10:37:34 | 18 | you recall? |
| 10:37:34 | 19 | A   Oh, boy.  That's probably five years ago, |
| 10:37:38 | 20 | maybe a little longer. |
| 10:37:39 | 21 | Q   Did you continue to speak with David |
| 10:37:41 | 22 | Perrin over the years until that conversation |
| 10:37:43 | 23 | wherein he disclosed that he had the ability to |
| 10:37:47 | 24 | generate keycodes? |
| 10:37:47 | 25 | A   Yes. |

33

| | | |
|---|---|---|
| 10:37:50 | 1 | Q    What would these communications be about? |
| 10:37:52 | 2 | A    Oh, everything.  You know, his -- he was |
| 10:37:54 | 3 | an employee until we closed the business down, and |
| 10:37:56 | 4 | he and I actually became pretty good friends just |
| 10:38:01 | 5 | out of the profession. |
| 10:38:04 | 6 | Q    Other than that one trip -- did you go to |
| 10:38:07 | 7 | Vancouver?  Is that right? |
| 10:38:08 | 8 | A    Yes. |
| 10:38:08 | 9 | Q    Other than that one trip where you went to |
| 10:38:10 | 10 | investigate whether or not you wanted to purchase |
| 10:38:12 | 11 | the company, have you made personal visits to David |
| 10:38:16 | 12 | Perrin since then? |
| 10:38:18 | 13 | A    I think one trip afterwards I went up to |
| 10:38:22 | 14 | interview the employees.  We were having a lot of |
| 10:38:27 | 15 | employee problems, so I went up to see what was |
| 10:38:29 | 16 | going on, and that was probably the last time I went |
| 10:38:31 | 17 | up there.  So it's been quite a while ago. |
| 10:38:33 | 18 | Q    When was the last time you spoke with |
| 10:38:34 | 19 | David Perrin? |
| 10:38:36 | 20 | A    Oh, probably six months. |
| 10:38:38 | 21 | Q    Have you talked to him at all about this |
| 10:38:40 | 22 | lawsuit? |
| 10:38:40 | 23 | A    No. |
| 10:38:42 | 24 | Q    When -- how many conversations did you |
| 10:38:44 | 25 | have with David Perrin about his ability to create |

34

| | | |
|---|---|---|
| 10:38:50 | 1 | keycodes?  Do you recall? |
| 10:38:52 | 2 | A    Well, maybe two or three. |
| 10:38:54 | 3 | Q    Can you tell me everything you remember |
| 10:38:56 | 4 | him saying about his ability to create keycodes? |
| 10:39:02 | 5 | A    Just exactly what you've said, that he -- |
| 10:39:04 | 6 | he had not only the ability, but he had probably |
| 10:39:08 | 7 | done that. |
| 10:39:10 | 8 | Q    And by "done that," what do you mean? |
| 10:39:13 | 9 | A    Obtained the keycodes. |
| 10:39:17 | 10 | Q    And I want to make sure my understanding |
| 10:39:20 | 11 | is clear.  He was able to generate keycodes that |
| 10:39:24 | 12 | could then upgrade Nortel phone systems without |
| 10:39:27 | 13 | having to purchase keycodes from Nortel; is that |
| 10:39:30 | 14 | correct? |
| 10:39:31 | 15 | A    Yeah.  And I don't know if he had done |
| 10:39:32 | 16 | that or he had gotten that from elsewhere, just that |
| 10:39:36 | 17 | he had the ability to do it. |
| 10:39:38 | 18 | Q    Did he tell you how he acquired the |
| 10:39:40 | 19 | ability to generate keycodes in-house? |
| 10:39:43 | 20 | A    No. |
| 10:39:44 | 21 | Q    Did you ever ask him how he acquired the |
| 10:39:47 | 22 | ability to generate keycodes in-house? |
| 10:39:50 | 23 | A    No, because I had no interest in it. |
| 10:39:52 | 24 | Q    Why did you have no interest in learning |
| 10:39:54 | 25 | as to why David Perrin was able to generate keycodes |

35

| | | |
|---|---|---|
| 10:39:58 | 1 | in-house? |
| 10:39:58 | 2 | A    Because I knew what he was doing wasn't |
| 10:40:00 | 3 | exactly the right thing to do. |
| 10:40:04 | 4 | Q    How did you know that it wasn't the right |
| 10:40:06 | 5 | thing to do? |
| 10:40:10 | 6 | A    Because knowing how Nortel does their |
| 10:40:11 | 7 | software and their keycodes and that it's |
| 10:40:15 | 8 | proprietary because they have "Proprietary" written |
| 10:40:17 | 9 | all over everything, and for that main reason right |
| 10:40:20 | 10 | there. |
| 10:40:24 | 11 | Q    Did you ever tell anybody that David |
| 10:40:27 | 12 | Perrin had the ability to generate keycodes |
| 10:40:29 | 13 | in-house? |
| 10:40:31 | 14 | MR. ALIBERTI:  Objection.  Hearsay. |
| 10:40:32 | 15 | THE WITNESS:  Not to my knowledge. |
| 10:40:32 | 16 | BY MR. SUGDEN: |
| 10:40:34 | 17 | Q    You don't recall talking to anybody about |
| 10:40:36 | 18 | David Perrin having the ability to generate keycodes |
| 10:40:39 | 19 | in-house; is that correct? |
| 10:40:41 | 20 | A    Not that I recall, no. |
| 10:40:42 | 21 | Q    Do you recall having a conversation with |
| 10:40:45 | 22 | Duncan Robertson about David Perrin having the |
| 10:40:49 | 23 | ability to generate keycodes in-house? |
| 10:40:53 | 24 | MR. ALIBERTI:  Objection.  Hearsay. |
| 10:40:54 | 25 | THE WITNESS:  I believe I did, yes. |

36

| | | |
|---|---|---|
| 10:42:49 | 1 | with Gerry Medina at all about the ability to |
| 10:42:51 | 2 | generate keycodes in-house? |
| 10:42:54 | 3 | MR. ALIBERTI: Objection. Hearsay. |
| 10:42:56 | 4 | THE WITNESS: Not that I recall. |
| 10:42:57 | 5 | BY MR. SUGDEN: |
| 10:42:58 | 6 | Q    Did Gerry Medina have the ability to |
| 10:43:01 | 7 | generate keycodes in-house? |
| 10:43:03 | 8 | MR. ALIBERTI: Objection. Calls for |
| 10:43:04 | 9 | speculation, lacks foundation. |
| 10:43:05 | 10 | THE WITNESS: That, I don't know. |
| 10:43:06 | 11 | BY MR. SUGDEN: |
| 10:43:07 | 12 | Q    Do you recall testifying under oath |
| 10:43:13 | 13 | previously that you told Gerry Medina about David |
| 10:43:18 | 14 | Perrin having the ability to generate keycodes |
| 10:43:20 | 15 | in-house? |
| 10:43:22 | 16 | MR. ALIBERTI: Objection. Hearsay. |
| 10:43:25 | 17 | THE WITNESS: Could be a possibility, but |
| 10:43:26 | 18 | I sure don't remember it. |
| 10:43:27 | 19 | BY MR. SUGDEN: |
| 10:43:33 | 20 | Q    As you sit here today, do you have any |
| 10:43:35 | 21 | recollection of anyone at Platinum Networks having |
| 10:43:39 | 22 | the ability to generate keycodes in-house? |
| 10:43:41 | 23 | A    No. |
| 10:43:44 | 24 | Q    Do you have any recollection of Gerry |
| 10:43:49 | 25 | Medina traveling to Vancouver to meet with David |

39

| | | |
|---|---|---|
| 10:43:51 | 1 | Perrin? |
| 10:43:53 | 2 | A    I know that he did go up there, I think, |
| 10:43:58 | 3 | with his operations manager to meet with David and |
| 10:44:02 | 4 | Winn, but that was to purchase telephone equipment, |
| 10:44:06 | 5 | which was not software, that it was to purchase a |
| 10:44:09 | 6 | large amount of Norstar and Nortel PBX telephones. |
| 10:44:14 | 7 | Q    Who accompanied Mr. Medina on that trip to |
| 10:44:17 | 8 | Vancouver? |
| 10:44:17 | 9 | A    I -- I can't remember his name.  He was |
| 10:44:20 | 10 | operations.  I think it's -- somehow David Araho |
| 10:44:23 | 11 | comes to mind, but I'm not sure that's the right |
| 10:44:28 | 12 | name.  Who's the operations guy? |
| 10:44:31 | 13 | Q    Does David Ahumada ring a bell? |
| 10:44:34 | 14 | A    Or -- that's it, David Ahumada. |
| 10:44:35 | 15 | Q    And is it your testimony that the only |
| 10:44:37 | 16 | reason that Mr. Medina and Mr. Ahumada went to |
| 10:44:40 | 17 | Vancouver was to inspect Nortel hardware?  Is that |
| 10:44:43 | 18 | correct? |
| 10:44:43 | 19 | A    Correct. |
| 10:44:44 | 20 | MR. ALIBERTI:  Objection.  Misstates his |
| 10:44:45 | 21 | testimony. |
| 10:44:45 | 22 | You can answer. |
| 10:44:46 | 23 | BY MR. SUGDEN: |
| 10:44:46 | 24 | Q    Do you have any recollection that you |
| 10:44:47 | 25 | testified under oath that you told Mr. Medina that |

| | | |
|---|---|---|
| 10:58:35 | 1 | THE VIDEOGRAPHER:  We're now back on the |
| 10:58:37 | 2 | record.  The time is 10:59. |
| 10:58:39 | 3 | BY MR. SUGDEN: |
| 10:58:40 | 4 | Q    I want to go back and make sure I |
| 10:58:45 | 5 | understood your previous testimony. |
| 10:58:48 | 6 | Is it true that only Nortel or an |
| 10:58:55 | 7 | authorized Nortel distributor has the ability to |
| 10:58:57 | 8 | upgrade a phone system? |
| 10:59:04 | 9 | A    I would say in the -- the legal aspect of |
| 10:59:09 | 10 | it, yes. |
| 10:59:09 | 11 | Q    Are there other companies aside from |
| 10:59:11 | 12 | Nortel or authorized Nortel distributors that |
| 10:59:14 | 13 | upgrade Nortel phone systems without purchasing |
| 10:59:18 | 14 | upgrades from Nortel or an authorized Nortel |
| 10:59:20 | 15 | distributor? |
| 10:59:22 | 16 | A    Yes. |
| 10:59:22 | 17 | MR. ALIBERTI:  Objection.  Cumulative. |
| 10:59:23 | 18 | BY MR. SUGDEN: |
| 10:59:24 | 19 | Q    Are you aware of specific companies that |
| 10:59:25 | 20 | have done that? |
| 10:59:30 | 21 | A    A few of them, yes. |
| 10:59:32 | 22 | Q    Can you list them for me, please. |
| 10:59:33 | 23 | A    One was, you know, David Perrin.  There |
| 10:59:42 | 24 | was one, and I don't know the name, out of -- I |
| 10:59:45 | 25 | think it was in the Boston area, and we were never |

43

| | | |
|---|---|---|
| 10:59:50 | 1 | able to obtain a name or a company on that one.  And |
| 10:59:55 | 2 | then I -- also Platinum Networks. |
| 11:00:01 | 3 |     Q    Can you describe how Platinum Networks was |
| 11:00:03 | 4 | able to upgrade phone systems -- |
| 11:00:07 | 5 |       MR. ALIBERTI:  Objection.  Calls for |
| 11:00:09 | 6 | speculation. |
| 11:00:09 | 7 | BY MR. SUGDEN: |
| 11:00:10 | 8 |     Q    -- that, in your opinion, was not legal? |
| 11:00:12 | 9 |     A    There are -- I think there's two factors |
| 11:00:13 | 10 | here.  One is looking at the Norstar system, which |
| 11:00:20 | 11 | is a key system, and one is the PBX system, which |
| 11:00:25 | 12 | have -- |
| 11:00:25 | 13 |     Q    The let- -- I'm sorry.  The letter is PBX; |
| 11:00:27 | 14 | is that right? |
| 11:00:28 | 15 |     A    Yes.  Private branch exchange. |
| 11:00:33 | 16 |     Q    Okay.  Go ahead. |
| 11:00:34 | 17 |     A    And those are two separate entities with |
| 11:00:36 | 18 | two different software cores. |
| 11:00:39 | 19 |     Q    And when you say they're two different |
| 11:00:40 | 20 | entities, what do you mean by that? |
| 11:00:42 | 21 |     A    They're both manufactured by Northern, but |
| 11:00:43 | 22 | they're not compatible with one another as far as |
| 11:00:46 | 23 | the telephones and all of -- they are two separate |
| 11:00:51 | 24 | systems. |
| 11:00:52 | 25 |     Q    And Norstar -- Norstar is a type of Nortel |

44

| | | |
|---|---|---|
| 11:00:54 | 1 | phone system; is that correct? |
| 11:00:56 | 2 | A   Yes. |
| 11:00:57 | 3 | Q   And is PBX another type of Nortel phone |
| 11:01:01 | 4 | system? |
| 11:01:01 | 5 | A   Yes. |
| 11:01:05 | 6 | Q   Okay.  I'm sorry.  Go ahead. |
| 11:01:06 | 7 | A   Okay.  And then referring back to your |
| 11:01:10 | 8 | last question, on the Norstar side, David Perrin was |
| 11:01:18 | 9 | able to replicate the Northern codes. |
| 11:01:26 | 10 | Q   Did Platinum Networks contact David Perrin |
| 11:01:32 | 11 | with respect to his ability to replicate the Nortel |
| 11:01:37 | 12 | keycodes? |
| 11:01:37 | 13 | MR. ALIBERTI:  Objection.  Lacks |
| 11:01:38 | 14 | foundation, calls for speculation, calls for |
| 11:01:40 | 15 | hearsay. |
| 11:01:41 | 16 | THE WITNESS:  Either Platinum called |
| 11:01:44 | 17 | Mr. Perrin or Mr. Perrin called them.  I don't know |
| 11:01:50 | 18 | of that, who called who first. |
| 11:01:52 | 19 | BY MR. SUGDEN: |
| 11:01:52 | 20 | Q   How did you become aware that David Perrin |
| 11:01:56 | 21 | and people at Platinum Networks were communicating |
| 11:01:59 | 22 | about David Perrin's ability to generate keycodes |
| 11:02:05 | 23 | for the Norstar phone system? |
| 11:02:08 | 24 | A   Through my discussions with Dave. |
| 11:02:10 | 25 | Q   Did David Perrin tell you that he was |

45

| | | |
|---|---|---|
| 11:02:13 | 1 | speaking with people from Platinum Networks about |
| 11:02:16 | 2 | David Perrin's ability to replicate keycodes for the |
| 11:02:21 | 3 | Nortel phone system? |
| 11:02:22 | 4 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:02:23 | 5 | THE WITNESS:  For the Nortel key system, |
| 11:02:26 | 6 | which was the Norstar.  Actually, it's a Norstar |
| 11:02:29 | 7 | system. |
| 11:02:30 | 8 | BY MR. SUGDEN: |
| 11:02:30 | 9 | Q    Okay.  What did David Perrin tell you?  Do |
| 11:02:32 | 10 | you recall? |
| 11:02:33 | 11 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:02:34 | 12 | THE WITNESS:  That -- yeah.  That he was |
| 11:02:35 | 13 | working with people at Platinum to provide them the |
| 11:02:39 | 14 | codes and that he, at a later conversation, had |
| 11:02:43 | 15 | downloaded the information to their computers. |
| 11:02:47 | 16 | BY MR. SUGDEN: |
| 11:02:47 | 17 | Q    Did you ever talk to anyone about -- at |
| 11:02:49 | 18 | Platinum Networks about this? |
| 11:02:50 | 19 | A    No. |
| 11:02:54 | 20 | Q    Is there a particular reason why you never |
| 11:02:56 | 21 | spoke with anybody at Platinum Networks about them |
| 11:03:00 | 22 | obtaining these keycodes for the Norstar system? |
| 11:03:04 | 23 | MR. ALIBERTI:  Objection.  Relevance, |
| 11:03:05 | 24 | calls for speculation. |
| 11:03:06 | 25 | THE WITNESS:  I didn't really care.  It |

46

| | | |
|---|---|---|
| 11:03:07 | 1 | was none of my business.  I was totally out of it. |
| 11:03:12 | 2 | BY MR. SUGDEN: |
| 11:03:12 | 3 | Q    Do you recall when these conversations |
| 11:03:14 | 4 | with Mr. Perrin took place? |
| 11:03:20 | 5 | MR. ALIBERTI:  The question is vague. |
| 11:03:22 | 6 | MR. SUGDEN:  I'll rephrase it. |
| 11:03:23 | 7 | BY MR. SUGDEN: |
| 11:03:23 | 8 | Q    Do you recall when you had these |
| 11:03:25 | 9 | conversations with respect to David Perrin |
| 11:03:29 | 10 | communicating with Platinum Networks about David |
| 11:03:32 | 11 | Perrin providing keycodes for the Norstar system? |
| 11:03:35 | 12 | A    I think it was about two and a half years |
| 11:03:36 | 13 | ago. |
| 11:03:42 | 14 | Q    Was it before or after you joined Platinum |
| 11:03:45 | 15 | Networks?  Do you recall? |
| 11:03:46 | 16 | A    It was before. |
| 11:03:47 | 17 | Q    Do you recall how soon it was before? |
| 11:03:51 | 18 | A    Probably six months to a year. |
| 11:03:55 | 19 | Q    And is it your understanding that Platinum |
| 11:04:01 | 20 | Networks -- strike that. |
| 11:04:04 | 21 | Did Plat- -- you testified earlier that |
| 11:04:08 | 22 | David Perrin downloaded something onto Platinum |
| 11:04:11 | 23 | Networks' computers; is that correct? |
| 11:04:14 | 24 | A    Yes. |
| 11:04:14 | 25 | Q    How did you find that out? |

47

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | | |
|---|---|---|
| 11:04:15 | 1 | A      From Mr. Perrin. |
| 11:04:16 | 2 | Q      And do you recall what it is that he told |
| 11:04:18 | 3 | you he downloaded onto Platinum Networks' computers? |
| 11:04:21 | 4 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:04:22 | 5 | THE WITNESS:  Just the information that |
| 11:04:25 | 6 | Platinum needed to do the keycodes on the Norstar |
| 11:04:29 | 7 | system. |
| 11:04:29 | 8 | BY MR. SUGDEN: |
| 11:04:29 | 9 | Q      So once Platinum Networks had this |
| 11:04:33 | 10 | software from Mr. Perrin, was Platinum Networks then |
| 11:04:37 | 11 | able to generate keycodes in-house for the Norstar |
| 11:04:41 | 12 | phone system? |
| 11:04:41 | 13 | A      Yes. |
| 11:04:42 | 14 | MR. ALIBERTI:  Calls for speculation, |
| 11:04:43 | 15 | lacks foundation. |
| 11:04:43 | 16 | BY MR. SUGDEN: |
| 11:04:44 | 17 | Q      Do you know whether or not Platinum |
| 11:04:46 | 18 | Networks did indeed generate keycodes in-house for |
| 11:04:50 | 19 | the Norstar phone system? |
| 11:04:52 | 20 | MR. ALIBERTI:  Lacks foundation, calls for |
| 11:04:53 | 21 | speculation. |
| 11:04:54 | 22 | THE WITNESS:  No.  Not personally, no. |
| 11:04:55 | 23 | BY MR. SUGDEN: |
| 11:04:58 | 24 | Q      And other -- I understand you don't have |
| 11:05:06 | 25 | any personal knowledge, but did you ever hear about |

48

| | | |
|---|---|---|
| 11:05:09 | 1 | Platinum Networks having the ability to generate |
| 11:05:11 | 2 | keycodes for the Norstar system? |
| 11:05:14 | 3 | MR. ALIBERTI:  Calls for hearsay. |
| 11:05:16 | 4 | THE WITNESS:  Yes. |
| 11:05:16 | 5 | BY MR. SUGDEN: |
| 11:05:16 | 6 | Q    What did you hear about Platinum Networks' |
| 11:05:18 | 7 | ability to generate keycodes for the Norstar phone |
| 11:05:22 | 8 | system? |
| 11:05:22 | 9 | A    From Mr. Perrin. |
| 11:05:23 | 10 | MR. ALIBERTI:  Calls for hearsay. |
| 11:05:24 | 11 | BY MR. SUGDEN: |
| 11:05:25 | 12 | Q    What did Mr. Perrin tell you? |
| 11:05:27 | 13 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:05:29 | 14 | THE WITNESS:  That originally when he |
| 11:05:29 | 15 | loaded the software or they loaded at their end of |
| 11:05:33 | 16 | it, that they were having a lot of problems and he |
| 11:05:35 | 17 | had to work them through the problems, and once the |
| 11:05:38 | 18 | problems were solved, they were then able to |
| 11:05:40 | 19 | replicate the codes. |
| 11:05:41 | 20 | BY MR. SUGDEN: |
| 11:05:49 | 21 | Q    Do you know whether or not Mr. Perrin sold |
| 11:05:52 | 22 | this software to Platinum Networks? |
| 11:05:55 | 23 | MR. ALIBERTI:  Calls for speculation. |
| 11:05:56 | 24 | THE WITNESS:  Yeah.  I believe he did, but |
| 11:05:59 | 25 | I have no specifics. |

49

| | | |
|---|---|---|
| 11:06:00 | 1 | BY MR. SUGDEN: |
| 11:06:01 | 2 | Q    Do you know what the price was? |
| 11:06:02 | 3 | A    No. |
| 11:06:06 | 4 | Q    Do you know who Mr. Perrin spoke with at |
| 11:06:10 | 5 | Platinum Networks about delivering this software |
| 11:06:13 | 6 | that was able to generate keycodes for the Norstar |
| 11:06:16 | 7 | phone system? |
| 11:06:17 | 8 | MR. ALIBERTI:  Objection.  Cumulative, |
| 11:06:18 | 9 | calls for hearsay. |
| 11:06:19 | 10 | THE WITNESS:  No, I can't give you a |
| 11:06:20 | 11 | definite name. |
| 11:06:21 | 12 | BY MR. SUGDEN: |
| 11:06:21 | 13 | Q    Did Mr. Perrin tell you who he was |
| 11:06:23 | 14 | speaking with? |
| 11:06:25 | 15 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:06:26 | 16 | THE WITNESS:  He may have, but I don't |
| 11:06:27 | 17 | recall any specific name. |
| 11:06:28 | 18 | BY MR. SUGDEN: |
| 11:06:28 | 19 | Q    You don't recall if it was Gerry Medina or |
| 11:06:31 | 20 | David Ahumada or someone else? |
| 11:06:32 | 21 | A    No, I -- it had to be one of the two, I'm |
| 11:06:35 | 22 | sure, but as to which one or both, I don't know. |
| 11:06:40 | 23 | MR. ALIBERTI:  Move to strike as |
| 11:06:41 | 24 | nonresponsive, calls for speculation. |
| 11:06:42 | 25 | BY MR. SUGDEN: |

50

11:06:43  1      Q    Why do you think that it would have been

11:06:44  2  either Gerry Medina or David Ahumada?

11:06:47  3           MR. ALIBERTI:  Objection.  Lacks

11:06:48  4  foundation.

11:06:48  5           THE WITNESS:  Well, because they were the

11:06:49  6  main principals.

11:06:49  7  BY MR. SUGDEN:

11:07:01  8      Q    Do you -- do you know whether or not --

11:07:04  9  strike that.

11:07:09  10          Once Platinum Networks had the ability to

11:07:13  11 generate keycodes in-house for the Nortel -- Norstar

11:07:17  12 phone system, would they have been able to upgrade

11:07:21  13 the Norstar phone system in-house?

11:07:24  14     A    Yes.

11:07:24  15          MR. ALIBERTI:  Objection.  Leading, calls

11:07:25  16 for speculation.

11:07:25  17 BY MR. SUGDEN:

11:07:26  18     Q    Would they have been able to upgrade the

11:07:28  19 Norstar phone system at zero cost?

11:07:32  20          MR. ALIBERTI:  Objection.  Leading, calls

11:07:33  21 for speculation.

11:07:34  22          THE WITNESS:  Yes.

11:07:34  23 BY MR. SUGDEN:

11:07:34  24     Q    Would they have been able to upgrade the

11:07:37  25 Norstar phone system without having to contact

51

| | | |
|---|---|---|
| 11:07:42 | 1 | Nortel or an authorized Nortel distributor? |
| 11:07:45 | 2 | MR. ALIBERTI:  Leading, calls for |
| 11:07:45 | 3 | speculation. |
| 11:07:46 | 4 | THE WITNESS:  Yes. |
| 11:07:46 | 5 | BY MR. SUGDEN: |
| 11:07:54 | 6 | Q    If a customer of Platinum Networks |
| 11:07:58 | 7 | purchased a Norstar phone system from Platinum |
| 11:08:02 | 8 | Networks that had been upgraded in-house, is there |
| 11:08:05 | 9 | any way the customer would know that it had been |
| 11:08:08 | 10 | upgraded in-house? |
| 11:08:10 | 11 | MR. ALIBERTI:  Improper hypothetical, |
| 11:08:11 | 12 | but -- |
| 11:08:13 | 13 | THE WITNESS:  Not to my knowledge, no. |
| 11:08:14 | 14 | BY MR. SUGDEN: |
| 11:08:24 | 15 | Q    And when we're talking about upgrading a |
| 11:08:26 | 16 | Norstar phone system, what type of upgrades could be |
| 11:08:28 | 17 | made to that phone system that you're aware of? |
| 11:08:31 | 18 | A    That would be mainly on the voice mail or |
| 11:08:35 | 19 | the Call Pilot. |
| 11:08:40 | 20 | Q    And if you're upgrading the voice mail, |
| 11:08:43 | 21 | what are you doing? |
| 11:08:44 | 22 | A    You're adding additional mailboxes. |
| 11:08:47 | 23 | Q    If you're upgrading a Call Pilot, what are |
| 11:08:49 | 24 | you doing? |
| 11:08:50 | 25 | A    Same thing. |

52

| | | |
|---|---|---|
| 11:08:54 | 1 | Q    Is it fair to say that when you're |
| 11:08:55 | 2 | upgrading a Nortel Norstar phone system, you are |
| 11:09:00 | 3 | adding additional voice mails? |
| 11:09:02 | 4 | A    Yes. |
| 11:09:03 | 5 | Q    Are there any other upgrades that can be |
| 11:09:05 | 6 | made to that phone system that you're aware of? |
| 11:09:13 | 7 | A    It's a pretty general question because you |
| 11:09:14 | 8 | can add telephones, you can add lines and that's all |
| 11:09:17 | 9 | hardware related, nothing to do with software. |
| 11:09:21 | 10 | Q    With respect to upgrades that can be made |
| 11:09:23 | 11 | by using software, are you aware of any other |
| 11:09:26 | 12 | upgrades that can be made to these systems? |
| 11:09:30 | 13 | A    No. |
| 11:09:32 | 14 | Q    And is it your understanding that Platinum |
| 11:09:36 | 15 | Networks was able to upgrade the Norstar phone |
| 11:09:40 | 16 | system by using keycodes that had been generated |
| 11:09:44 | 17 | in-house at Platinum Networks? |
| 11:09:47 | 18 | MR. ALIBERTI:  Objection. |
| 11:09:47 | 19 | THE WITNESS:  Yes. |
| 11:09:50 | 20 | MR. ALIBERTI:  Leading, calls for |
| 11:09:51 | 21 | speculation. |
| 11:09:51 | 22 | BY MR. SUGDEN: |
| 11:09:52 | 23 | Q    I want to talk now for a moment about the |
| 11:09:55 | 24 | second component.  You mentioned the PBX.  Do you |
| 11:09:59 | 25 | recall that testimony? |

53

| | | |
|---|---|---|
| 11:09:59 | 1 | A     Yes. |
| 11:10:01 | 2 | Q     And can you describe for me how Platinum |
| 11:10:04 | 3 | Networks was able to upgrade the PBX by using |
| 11:10:13 | 4 | keycodes generated in-house or something to that |
| 11:10:16 | 5 | effect? |
| 11:10:16 | 6 | MR. ALIBERTI:  Objection.  Hearsay, calls |
| 11:10:18 | 7 | for speculation, lacks foundation. |
| 11:10:20 | 8 | MR. SUGDEN:  I'll rephrase the question. |
| 11:10:21 | 9 | BY MR. SUGDEN: |
| 11:10:21 | 10 | Q     What did you learn about with respect to |
| 11:10:27 | 11 | Platinum Networks and its ability to upgrade the |
| 11:10:30 | 12 | PBX? |
| 11:10:31 | 13 | MR. ALIBERTI:  Objection.  Hearsay, lacks |
| 11:10:32 | 14 | foundation, calls for speculation. |
| 11:10:33 | 15 | THE WITNESS:  Well, my understanding is |
| 11:10:34 | 16 | that they had the capability to do that. |
| 11:10:37 | 17 | BY MR. SUGDEN: |
| 11:10:38 | 18 | Q     Did Platinum Networks have the capability |
| 11:10:41 | 19 | to upgrade the PBX phone system in-house? |
| 11:10:46 | 20 | MR. ALIBERTI:  Calls for speculation, lack |
| 11:10:48 | 21 | of foundation. |
| 11:10:49 | 22 | THE WITNESS:  Again, the PBX phone system, |
| 11:10:53 | 23 | again, on the PBX side, you have to open up |
| 11:10:55 | 24 | keycodes, so I'd say that is -- the answer would be |
| 11:10:59 | 25 | "yes." |

54

| | | |
|---|---|---|
| 11:10:59 | 1 | BY MR. SUGDEN: |
| 11:11:00 | 2 | Q   How did you learn that Platinum Networks |
| 11:11:02 | 3 | had the ability to upgrade the PBX phone system |
| 11:11:06 | 4 | in-house? |
| 11:11:08 | 5 | MR. ALIBERTI:  Calls for hearsay. |
| 11:11:10 | 6 | THE WITNESS:  From Mr. Perrin. |
| 11:11:11 | 7 | BY MR. SUGDEN: |
| 11:11:11 | 8 | Q   When was this conversation with |
| 11:11:12 | 9 | Mr. Perrin? |
| 11:11:13 | 10 | A   It was probably two years ago, something |
| 11:11:16 | 11 | to that effect. |
| 11:11:17 | 12 | Q   Was it in the same conversation wherein |
| 11:11:19 | 13 | you learned that -- strike that. |
| 11:11:22 | 14 | Would it be in the same conversations that |
| 11:11:24 | 15 | you had with Mr. Perrin regarding the Norstar phone |
| 11:11:26 | 16 | system? |
| 11:11:27 | 17 | A   Yes. |
| 11:11:27 | 18 | MR. ALIBERTI:  Calls for hearsay. |
| 11:11:28 | 19 | BY MR. SUGDEN: |
| 11:11:31 | 20 | Q   Do you recall how Platinum Networks |
| 11:11:35 | 21 | acquired the ability to upgrade the PBX phone system |
| 11:11:38 | 22 | in-house? |
| 11:11:39 | 23 | MR. ALIBERTI:  Objection.  Lacks |
| 11:11:40 | 24 | foundation -- |
| 11:11:41 | 25 | THE WITNESS:  I have no idea. |

55

| | | |
|---|---|---|
| 11:11:41 | 1 | MR. ALIBERTI:  -- calls for hearsay.  I'm |
| 11:11:44 | 2 | sorry. |
| 11:11:44 | 3 | BY MR. SUGDEN: |
| 11:11:45 | 4 | Q    Do you have an understanding with respect |
| 11:11:46 | 5 | to how David Perrin learned that Platinum Networks |
| 11:11:49 | 6 | had the ability to upgrade a PBX phone system |
| 11:11:53 | 7 | in-house? |
| 11:11:54 | 8 | MR. ALIBERTI:  Objection.  Hearsay, lacks |
| 11:11:55 | 9 | foundation. |
| 11:11:55 | 10 | THE WITNESS:  I believe that Mr. Perrin |
| 11:11:57 | 11 | mentioned that he was purchasing it from Platinum. |
| 11:12:01 | 12 | BY MR. SUGDEN: |
| 11:12:06 | 13 | Q    Did Mr. Perrin tell you -- strike that. |
| 11:12:12 | 14 | Do you have an understanding as to how |
| 11:12:15 | 15 | Platinum Networks acquired the ability to upgrade a |
| 11:12:19 | 16 | PBX phone system in-house? |
| 11:12:21 | 17 | MR. ALIBERTI:  Objection.  Lacks |
| 11:12:22 | 18 | foundation. |
| 11:12:22 | 19 | THE WITNESS:  No.  It wasn't through |
| 11:12:23 | 20 | Nortel, so -- |
| 11:12:26 | 21 | BY MR. SUGDEN: |
| 11:12:29 | 22 | Q    Is it your understanding that Platinum |
| 11:12:31 | 23 | Networks' ability to gen- -- upgrade the PBX phone |
| 11:12:36 | 24 | system in-house was illegal? |
| 11:12:39 | 25 | MR. ALIBERTI:  Lacks foundation, calls for |

56

| | | |
|---|---|---|
| 11:12:39 | 1 | speculation, calls for a legal conclusion. |
| 11:12:41 | 2 | THE WITNESS:  You have to repeat the |
| 11:12:42 | 3 | question. |
| 11:12:49 | 4 | THE REPORTER:  "Is it your understanding |
| 11:12:49 | 5 | that Platinum Networks' ability to upgrade the PBX |
| 11:12:49 | 6 | phone system in-house was illegal?" |
| 11:12:50 | 7 | THE WITNESS:  Yes. |
| 11:12:50 | 8 | BY MR. SUGDEN: |
| 11:12:58 | 9 | Q   Did you ever talk to anybody at Platinum |
| 11:13:00 | 10 | Networks about their ability to upgrade the PBX |
| 11:13:03 | 11 | phone system in-house? |
| 11:13:05 | 12 | A   No. |
| 11:13:05 | 13 | MR. ALIBERTI:  Calls for hearsay. |
| 11:13:06 | 14 | BY MR. SUGDEN: |
| 11:13:06 | 15 | Q   Did you ever hear anyone at Platinum |
| 11:13:08 | 16 | Networks talking about its ability to upgrade a PBX |
| 11:13:14 | 17 | phone system in-house? |
| 11:13:15 | 18 | MR. ALIBERTI:  Calls for hearsay. |
| 11:13:16 | 19 | THE WITNESS:  No. |
| 11:13:16 | 20 | BY MR. SUGDEN: |
| 11:13:17 | 21 | Q   Did you ever hear anybody at Platinum |
| 11:13:19 | 22 | Networks talk about the company's ability to |
| 11:13:22 | 23 | generate keycodes for any Nortel system in-house? |
| 11:13:26 | 24 | MR. ALIBERTI:  Calls for hearsay. |
| 11:13:27 | 25 | THE WITNESS:  No. |

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

11:16:03  1   speculation.

11:16:05  2            THE WITNESS:  Not that I recall, no.

11:16:06  3   BY MR. SUGDEN:

11:16:08  4       Q    Would there be a way of you knowing

11:16:10  5   whether or not a Nortel phone system had been

11:16:12  6   upgraded in-house when you're selling it?

11:16:15  7            MR. ALIBERTI:  Lacks foundation.

11:16:16  8            THE WITNESS:  If I was making a sale,

11:16:19  9   because I was a working sales manager, so I was

11:16:21  10  selling accounts too, I would have known because it

11:16:25  11  would be reflected in the pricing and in talking

11:16:28  12  with Gerry.

11:16:29  13  BY MR. SUGDEN:

11:16:29  14      Q    How would it be reflected in the pricing?

11:16:32  15      A    Because our cost on the product would

11:16:34  16  probably be zero, versus going through Nortel, which

11:16:38  17  would be, you know, several thousands of dollars.

11:16:48  18      Q    Did Gerry ever tell you that any of Nortel

11:16:52  19  products that sold were upgraded in-house?

11:16:56  20      A    No.

11:16:56  21           MR. ALIBERTI:  Objection.  Hearsay.

11:16:57  22  BY MR. SUGDEN:

11:17:13  23      Q    Can you also explain what you mean about

11:17:15  24  the price would indicate whether or not a product

11:17:19  25  had been upgraded in-house?

59

| | | |
|---|---|---|
| 11:17:20 | 1 | MR. ALIBERTI:  Lacks foundation. |
| 11:17:22 | 2 | THE WITNESS:  Well, you could go into the |
| 11:17:23 | 3 | computer and call up the product code, and usually |
| 11:17:27 | 4 | it would give you your -- your cost, Nortel's cost |
| 11:17:31 | 5 | and Nortel's list price, and if you saw your cost at |
| 11:17:34 | 6 | zero, it pretty much told you that there was no cost |
| 11:17:38 | 7 | on it, and the only way that could be is that it |
| 11:17:40 | 8 | was, you know, bootlegged software. |
| 11:17:42 | 9 | BY MR. SUGDEN: |
| 11:17:43 | 10 | Q     Did you ever review Platinum Networks' |
| 11:17:46 | 11 | books? |
| 11:17:47 | 12 | A     No. |
| 11:17:47 | 13 | Q     Are you aware of whether or not there are |
| 11:17:49 | 14 | any items on Platinum's books that articulate that |
| 11:17:53 | 15 | there is a zero cost to certain products that it |
| 11:17:55 | 16 | sold? |
| 11:17:55 | 17 | A     No. |
| 11:18:07 | 18 | Q     Since leaving Plat- -- strike that. |
| 11:18:10 | 19 | You were terminated from Platinum |
| 11:18:11 | 20 | Networks; is that correct? |
| 11:18:12 | 21 | A     Yes. |
| 11:18:13 | 22 | Q     Since your termination, have you spoken |
| 11:18:15 | 23 | with anybody at Platinum Networks? |
| 11:18:17 | 24 | A     No. |
| 11:18:18 | 25 | MR. SHIELDS:  Well, hold it.  In the |

60

| | | |
|---|---|---|
| 11:19:11 | 1 | MR. SUGDEN:  No problem. |
| 11:19:15 | 2 | BY MR. SUGDEN: |
| 11:19:30 | 3 | Q    Other than the Norstar system and the PBX, |
| 11:19:34 | 4 | are you aware of Platinum Networks being able to |
| 11:19:39 | 5 | upgrade any other systems in-house? |
| 11:19:41 | 6 | A    I believe the BCM, which is a business |
| 11:19:45 | 7 | communications manager. |
| 11:19:48 | 8 | Q    How did you learn that Platinum Networks |
| 11:19:50 | 9 | has the ability to upgrade the BCM in-house? |
| 11:19:54 | 10 | MR. ALIBERTI:  Objection.  Hearsay, |
| 11:19:55 | 11 | lacks -- |
| 11:19:55 | 12 | THE WITNESS:  Through Mr. Perrin. |
| 11:19:56 | 13 | BY MR. SUGDEN: |
| 11:19:58 | 14 | Q    What did Mr. Perrin tell you about |
| 11:20:01 | 15 | Platinum Networks' ability to upgrade a BCM |
| 11:20:03 | 16 | in-house? |
| 11:20:04 | 17 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:20:05 | 18 | THE WITNESS:  That he was working with |
| 11:20:06 | 19 | Gerry on the -- that Gerry had it and that he could |
| 11:20:13 | 20 | purchase it. |
| 11:20:15 | 21 | BY MR. SUGDEN: |
| 11:20:16 | 22 | Q    I'm sorry.  Did you say that Gerry Medina |
| 11:20:19 | 23 | had the ability to upgrade a BCM in-house and |
| 11:20:23 | 24 | Mr. Perrin wanted to purchase it from Mr. Medina? |
| 11:20:25 | 25 | Is that correct? |

11:20:27  1          MR. ALIBERTI:  Objection.  Hearsay.

11:20:28  2          THE WITNESS:  That is correct.

11:20:28  3  BY MR. SUGDEN:

11:20:29  4      Q    When was this conversation with

11:20:30  5  Mr. Perrin?  Do you recall?

11:20:31  6      A    Oh, it was still -- while I was still with

11:20:34  7  Single Point of Contact, so it was approximately two

11:20:37  8  years ago.

11:20:37  9      Q    And was it in that same conversation where

11:20:39  10 you also discussed Norstar and PBX?

11:20:42  11     A    I believe it was.

11:20:44  12     Q    Did Mr. Perrin say anything else about

11:20:48  13 Mr. Medina's ability to upgrade a BCM in-house?

11:20:53  14     A    No.

11:20:54  15         MR. ALIBERTI:  Objection.  Hearsay.

11:20:55  16 BY MR. SUGDEN:

11:20:55  17     Q    Did Mr. Perrin tell you how Mr. Medina

11:20:59  18 acquired the ability to upgrade a BCM in-house?

11:21:03  19     A    No.

11:21:04  20         MR. ALIBERTI:  Objection.  Hearsay.

11:21:05  21 BY MR. SUGDEN:

11:21:05  22     Q    As you sit here today, do you have any

11:21:06  23 understanding as to how Mr. Medina was able to

11:21:11  24 upgrade a BCM in-house?

11:21:13  25         MR. ALIBERTI:  Lacks foundation.

63

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | | |
|---|---|---|
| 11:21:16 | 1 | THE WITNESS:  The only way it could be |
| 11:21:17 | 2 | done is through the back door. |
| 11:21:18 | 3 | BY MR. SUGDEN: |
| 11:21:19 | 4 | Q    What do you mean by "the back door"? |
| 11:21:21 | 5 | A    Well, it was obtained illegally. |
| 11:21:24 | 6 | Q    Did you ever talk to Mr. Medina about his |
| 11:21:28 | 7 | ability to upgrade a BCM in-house? |
| 11:21:30 | 8 | A    No. |
| 11:21:31 | 9 | Q    And in order to upgrade a BCM in-house, |
| 11:21:34 | 10 | how do you do that? |
| 11:21:36 | 11 | A    Same thing, keycodes. |
| 11:21:40 | 12 | Q    In other words, Mr. Medina would have some |
| 11:21:42 | 13 | type of software that could generate keycodes and |
| 11:21:46 | 14 | those keycodes would be used to upgrade the BCM?  Is |
| 11:21:50 | 15 | my understanding correct? |
| 11:21:51 | 16 | A    Correct. |
| 11:21:54 | 17 | Q    Did you ever talk to anyone at Platinum |
| 11:21:57 | 18 | Networks about the company's ability to upgrade BCMs |
| 11:22:02 | 19 | in-house? |
| 11:22:03 | 20 | A    No. |
| 11:22:03 | 21 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:22:04 | 22 | BY MR. SUGDEN: |
| 11:22:04 | 23 | Q    When you worked for Platinum Networks, did |
| 11:22:06 | 24 | you ever see any evidence of BCMs being upgraded |
| 11:22:10 | 25 | in-house? |

64

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | | |
|---|---|---|
| 11:22:11 | 1 | A    No. |
| 11:22:12 | 2 | Q    When you worked for Platinum Networks, did |
| 11:22:15 | 3 | you ever observe the company upgrading any phone |
| 11:22:20 | 4 | systems in-house? |
| 11:22:24 | 5 | A    Oh, I'm sure we were upgrading, but, |
| 11:22:27 | 6 | again, upgrading not so much on the software side. |
| 11:22:31 | 7 | It was more adding additional hardware.  So it was |
| 11:22:34 | 8 | two different things there. |
| 11:22:36 | 9 | Q    Did you ever observe any evidence of |
| 11:22:42 | 10 | Platinum Networks upgrading the software on Nortel |
| 11:22:45 | 11 | products while you worked there? |
| 11:22:46 | 12 | A    No. |
| 11:22:51 | 13 | Q    Do you know whether or not Mr. Medina ever |
| 11:22:56 | 14 | sent Mr. Perrin this software that could be used to |
| 11:22:59 | 15 | upgrade BCMs? |
| 11:23:02 | 16 | MR. ALIBERTI:  Lacks foundation, calls for |
| 11:23:03 | 17 | speculation and hearsay. |
| 11:23:04 | 18 | THE WITNESS:  Could you repeat the |
| 11:23:04 | 19 | question? |
| 11:23:06 | 20 | BY MR. SUGDEN: |
| 11:23:06 | 21 | Q    I can rephrase it if you want. |
| 11:23:08 | 22 | Did you ever learn whether Mr. Medina sent |
| 11:23:14 | 23 | Mr. Perrin the information necessary to upgrade BCMs |
| 11:23:18 | 24 | in-house? |
| 11:23:18 | 25 | A    I believe so, yes. |

65

| | | |
|---|---|---|
| 11:23:19 | 1 | Q    How do you believe that? |
| 11:23:21 | 2 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:23:22 | 3 | THE WITNESS:  In telephone conversations |
| 11:23:23 | 4 | with Mr. Perrin. |
| 11:23:24 | 5 | BY MR. SUGDEN: |
| 11:23:24 | 6 | Q    Do you recall what Mr. Perrin said? |
| 11:23:26 | 7 | A    Just to the -- that he was negotiating |
| 11:23:30 | 8 | with Gerry to purchase the keycodes or the gen codes |
| 11:23:36 | 9 | for the PBX and the BCM. |
| 11:23:40 | 10 | Q    Did Mr. Perrin say anything else that you |
| 11:23:41 | 11 | recall? |
| 11:23:42 | 12 | A    No. |
| 11:23:43 | 13 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:23:43 | 14 | BY MR. SUGDEN: |
| 11:23:46 | 15 | Q    Are you aware of Platinum Networks having |
| 11:23:48 | 16 | the ability to upgrade any other phone systems |
| 11:23:53 | 17 | besides what you've already mentioned today? |
| 11:23:54 | 18 | MR. ALIBERTI:  Lacks foundation. |
| 11:23:55 | 19 | THE WITNESS:  No. |
| 11:23:55 | 20 | BY MR. SUGDEN: |
| 11:23:57 | 21 | Q    You've identified all the phone systems |
| 11:24:00 | 22 | that you're aware of that Platinum Networks was able |
| 11:24:03 | 23 | to upgrade in-house; is that correct? |
| 11:24:05 | 24 | MR. ALIBERTI:  Lacks foundation. |
| 11:24:06 | 25 | THE WITNESS:  That I'm aware of, that's |

66

| | | |
|---|---|---|
| 11:27:28 | 1 | A    Not that I was aware of, no. |
| 11:27:34 | 2 | Q    Are you aware that -- of Mr. Medina ever |
| 11:27:37 | 3 | loaning the company money? |
| 11:27:38 | 4 | A    No. |
| 11:27:39 | 5 | Q    Did Mr. Medina ever say anything about |
| 11:27:41 | 6 | that? |
| 11:27:41 | 7 | A    No. |
| 11:27:45 | 8 | Q    Who was your supervisor at the company? |
| 11:27:48 | 9 | A    It's kind of dual between Pat McIntosh and |
| 11:27:52 | 10 | Gerry, but directly, I would say more Gerry. |
| 11:28:01 | 11 | Q    Was there someone at Platinum Networks who |
| 11:28:04 | 12 | had particular expertise in the software for Nortel |
| 11:28:09 | 13 | equipment? |
| 11:28:09 | 14 | MR. ALIBERTI:  Calls for speculation. |
| 11:28:12 | 15 | THE WITNESS:  Two people. |
| 11:28:13 | 16 | BY MR. SUGDEN: |
| 11:28:13 | 17 | Q    Who are the two people? |
| 11:28:14 | 18 | A    One was David Ahumada, and the other was a |
| 11:28:17 | 19 | gentleman on the Norstar side, and I can't remember |
| 11:28:23 | 20 | him -- or his name, I should say, and I think before |
| 11:28:27 | 21 | I left, he was either fired or terminated. |
| 11:28:31 | 22 | Q    Do you recall why he was fired or |
| 11:28:32 | 23 | terminated? |
| 11:28:33 | 24 | A    No.  No idea. |
| 11:28:36 | 25 | Q    But David Ahumada was the other employee |

70

| | | |
|---|---|---|
| 11:28:39 | 1 | at Platinum Networks who had an expertise in |
| 11:28:42 | 2 | technical or software issues; is that right? |
| 11:28:43 | 3 | A    Yes. |
| 11:29:07 | 4 | Q    Were you ever aware of Platinum Networks |
| 11:29:09 | 5 | engaging in cash sales? |
| 11:29:11 | 6 | MR. ALIBERTI:  Lacks foundation, not |
| 11:29:13 | 7 | relevant. |
| 11:29:14 | 8 | THE WITNESS:  No. |
| 11:29:14 | 9 | BY MR. SUGDEN: |
| 11:29:16 | 10 | Q    Do you have an understanding of what a |
| 11:29:18 | 11 | cash sale is? |
| 11:29:21 | 12 | A    Somebody -- c.o.d., somebody would walk in |
| 11:29:23 | 13 | with a check or cash. |
| 11:29:24 | 14 | Q    Did you ever observe that happening at |
| 11:29:26 | 15 | Platinum Networks? |
| 11:29:27 | 16 | A    Not directly, no. |
| 11:29:28 | 17 | Q    Did you ever observe it indirectly? |
| 11:29:31 | 18 | A    Yes. |
| 11:29:31 | 19 | Q    How did you observe it indirectly? |
| 11:29:33 | 20 | A    We had c.o.d.s where technicians or |
| 11:29:35 | 21 | customers would come into the warehouse and pay |
| 11:29:38 | 22 | either by cash or check. |
| 11:29:41 | 23 | Q    Do you know whether or not those sales |
| 11:29:42 | 24 | were recorded on Platinum Networks' books? |
| 11:29:44 | 25 | A    I have no way -- I would assume so, but I |

| | | |
|---|---|---|
| 11:32:22 | 1 | Q    Have you ever heard of a company called |
| 11:32:24 | 2 | Torrey Ventures? |
| 11:32:25 | 3 | A    No. |
| 11:32:31 | 4 | Q    Did you ever have in your possession |
| 11:32:35 | 5 | software that could be used to upgrade any Nortel |
| 11:32:37 | 6 | phone systems? |
| 11:32:38 | 7 | A    Never. |
| 11:32:41 | 8 | Q    Did you ever have a CD which could be used |
| 11:32:45 | 9 | to upgrade Nortel phone systems? |
| 11:32:48 | 10 | A    No. |
| 11:32:48 | 11 | Q    Were you aware that Mr. Medina testified |
| 11:32:52 | 12 | that he believes you left behind a CD and on that CD |
| 11:32:56 | 13 | was software that could be used to upgrade phone |
| 11:33:01 | 14 | systems? |
| 11:33:02 | 15 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:33:03 | 16 | THE WITNESS:  It's a lie. |
| 11:33:04 | 17 | BY MR. SUGDEN: |
| 11:33:16 | 18 | Q    Has Mr. Medina ever contacted you to ask |
| 11:33:18 | 19 | you whether or not you knew anything about the |
| 11:33:21 | 20 | ability to upgrade Nortel phone systems? |
| 11:33:24 | 21 | A    No. |
| 11:33:24 | 22 | MR. ALIBERTI:  Objection.  Relevance. |
| 11:33:25 | 23 | BY MR. SUGDEN: |
| 11:33:44 | 24 | Q    Were you ever given a reason as to why you |
| 11:33:46 | 25 | were terminated from Platinum Networks? |

74

| | | |
|---|---|---|
| 11:52:08 | 1 | BY MR. SUGDEN: |
| 11:52:08 | 2 | Q    You weren't at that meeting -- |
| 11:52:10 | 3 | A    No. |
| 11:52:10 | 4 | Q    -- is that correct? |
| 11:52:11 | 5 | Did you hear somehow that that |
| 11:52:13 | 6 | face-to-face meeting in Vancouver dealt with the |
| 11:52:18 | 7 | ability to upgrade Nortel phone systems? |
| 11:52:20 | 8 | MR. ALIBERTI:  Calls for hearsay. |
| 11:52:21 | 9 | THE WITNESS:  Yes. |
| 11:52:22 | 10 | BY MR. SUGDEN: |
| 11:52:22 | 11 | Q    How did you learn indirectly? |
| 11:52:23 | 12 | A    From Mr. Perrin. |
| 11:52:24 | 13 | Q    Mr. Perrin told you that during that |
| 11:52:27 | 14 | meeting in Vancouver, he and Mr. Medina discussed |
| 11:52:31 | 15 | the ability to upgrade phone systems; is that |
| 11:52:34 | 16 | correct? |
| 11:52:35 | 17 | A    Yes. |
| 11:52:36 | 18 | MR. ALIBERTI:  Calls for hearsay. |
| 11:52:36 | 19 | BY MR. SUGDEN: |
| 11:52:37 | 20 | Q    Did Mr. Perrin tell you whether or not |
| 11:52:40 | 21 | anyone was with Mr. Medina from Platinum Networks on |
| 11:52:42 | 22 | that visit? |
| 11:52:44 | 23 | MR. ALIBERTI:  Calls for hearsay. |
| 11:52:45 | 24 | THE WITNESS:  Yes. |
| 11:52:45 | 25 | BY MR. SUGDEN: |

78

| | | |
|---|---|---|
| 11:52:46 | 1 | Q    Who was with Mr. Medina on that visit? |
| 11:52:48 | 2 | A    Mr. Ahumada. |
| 11:52:50 | 3 | MR. ALIBERTI:  Objection.  Hearsay. |
| 11:52:50 | 4 | BY MR. SUGDEN: |
| 11:52:51 | 5 | Q    Did you ever talk to Mr. Medina about his |
| 11:52:53 | 6 | trip to Vancouver? |
| 11:52:54 | 7 | A    No. |
| 11:52:54 | 8 | Q    Did you ever talk to Mr. Ahumada about his |
| 11:52:56 | 9 | trip to Vancouver? |
| 11:52:57 | 10 | A    No. |
| 11:52:58 | 11 | Q    Did you talk very much with Mr. Ahumada |
| 11:53:00 | 12 | while you worked for Platinum Networks? |
| 11:53:02 | 13 | A    Not that often, no. |
| 11:53:05 | 14 | Q    How often would you talk to him, do you |
| 11:53:06 | 15 | think? |
| 11:53:06 | 16 | A    Oh, if it was on a one on one, maybe once |
| 11:53:09 | 17 | every couple of weeks. |
| 11:53:12 | 18 | Q    Have you ever heard the term "doggled" |
| 11:53:13 | 19 | transaction? |
| 11:53:16 | 20 | A    Dongle. |
| 11:53:17 | 21 | Q    Dongle transaction? |
| 11:53:20 | 22 | A    Yes. |
| 11:53:20 | 23 | Q    What's that? |
| 11:53:21 | 24 | A    Dongle is -- goes to the Norstar, which is |
| 11:53:24 | 25 | the non-PBX, and that is the -- to my |

79

***-

          I do solemnly declare under penalty of

perjury that the foregoing is my deposition under

oath; that these are the questions asked of me and

my answers thereto; that I have read same and have

made the necessary corrections, additions, or

changes to my answers that I deem necessary.

          In witness thereof, I hereby subscribe my

name this _____ day of _____,

20 05 .

                              WITNESS SIGNATURE

91

1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3

4

5  NORTEL NETWORKS LIMITED, a        )
   Canadian corporation,             )
6                                     )
                    Plaintiff(s),     )
7                                     )
       vs.                            )   Case No.
8                                     )04 CV 1968L (LSP)
   PLATINUM NETWORKS,                 )
9  INCORPORATED, a California         )
   corporation; GERALD MEDINA, an     )
10 individual,                        )
                                      )
11                  Defendant(s).     )
   -----------------------------------)

12

13

14        CONFIDENTIAL SEALED TRANSCRIPT

15

16        Deposition of RUSS GAMBREL, taken on

17 behalf of Plaintiff, at the law offices of Call,

18 Jensen & Ferrell, 610 Newport Center Drive,

19 Suite 700, Newport Beach, California, beginning at

20 9:01 a.m., and ending at 11:54 a.m., on Wednesday,

21 June 8, 2005, before Cheryl A. Miller,

22 Certified Shorthand Reporter, No. 6711.

23

24

25

2

EXHIBIT C

| | | |
|---|---|---|
| 09:02:56:03 | 1 | plaintiff, Nortel Networks. |
| 09:02:57:19 | 2 | THE VIDEOGRAPHER:  Would the court |
| 09:02:57:19 | 3 | reporter please swear in the witness? |
| 09:02:59:07 | 4 | |
| 09:02:59:07 | 5 | RUSS GAMBREL |
| 09:02:59:07 | 6 | having been first duly sworn, was |
| 09:02:59:07 | 7 | examined and testified as follows: |
| 09:02:59:07 | 8 | |
| 09:02:59:07 | 9 | EXAMINATION |
| 09:02:59:09 | 10 | |
| 09:03:11:00 | 11 | BY MR. SUGDEN: |
| 09:03:12:16 | 12 | Q    Good morning. |
| 09:03:12:16 | 13 | A    Good morning. |
| 09:03:14:27 | 14 | Q    You've stated your full name. |
| 09:03:16:16 | 15 | Could you please provide your address and |
| 09:03:19:13 | 16 | telephone number for the record? |
| 09:03:19:13 | 17 | A    Sure. |
| 09:03:19:15 | 18 | It's 2515 Front Street, San Diego, |
| 09:03:22:27 | 19 | California, 92103. |
| 09:03:26:07 | 20 | Did you say phone number? |
| 09:03:28:18 | 21 | Q    Please. |
| 09:03:28:18 | 22 | A    (619)838-4303. |
| 09:03:31:15 | 23 | Q    Mr. Grambel, have you ever been deposed |
| 09:03:33:12 | 24 | before? |
| 09:03:33:12 | 25 | A    Never. |

6

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | | |
|---|---|---|
| 09:07:13:21 | 1 | Q    Okay.  And when did you stop working for |
| 09:07:20:03 | 2 | Platinum Networks? |
| 09:07:21:06 | 3 | A    I believe the date was January 5th, 2005. |
| 09:07:30:22 | 4 | Q    Could you describe for us your educational |
| 09:07:32:01 | 5 | background? |
| 09:07:33:04 | 6 | A    Yeah.  I have a bachelor's degree from |
| 09:07:36:28 | 7 | Baylor University in accounting, and I'm -- I don't |
| 09:07:42:15 | 8 | know -- probably a semester short of my master's in |
| 09:07:48:10 | 9 | information systems from the University of Maryland. |
| 09:07:50:28 | 10 | Q    Okay.  And are you a CPA? |
| 09:07:53:06 | 11 | A    I am. |
| 09:07:53:06 | 12 | Q    Where did you work before joining Platinum |
| 09:07:56:01 | 13 | Networks? |
| 09:07:57:18 | 14 | A    Well, I was doing some consulting work |
| 09:08:00:18 | 15 | since I arrived in San Diego.  My wife's in the |
| 09:08:02:03 | 16 | Navy, and we arrived the summer of 2001. |
| 09:08:06:24 | 17 | I guess the last corporate job I had was |
| 09:08:11:12 | 18 | for a Virginia commercial real estate company by the |
| 09:08:14:15 | 19 | name of Thalhimer. |
| 09:08:16:00 | 20 | Q    Could you spell Thalhimer for the court |
| 09:08:17:18 | 21 | reporter? |
| 09:08:17:18 | 22 | A    It's T-h-a-l-h-i-m-e-r. |
| 09:08:22:18 | 23 | Q    And when did you begin working for |
| 09:08:25:22 | 24 | Platinum Networks? |
| 09:08:27:12 | 25 | A    I believe it was April 20th, 2004. |

11

| | | |
|---|---|---|
| 09:08:34:27 | 1 | Q    So you worked for just under a year for |
| 09:08:39:13 | 2 | them; is that correct? |
| 09:08:39:13 | 3 | A    Yeah. |
| 09:08:41:25 | 4 | Closer to seven -- seven months, eight |
| 09:08:41:25 | 5 | months. |
| 09:08:44:27 | 6 | Q    Sure. |
| 09:08:44:27 | 7 | Sure. |
| 09:08:46:21 | 8 | And were you a consultant for Platinum |
| 09:08:48:13 | 9 | Networks or were you full-time employee? |
| 09:08:52:15 | 10 | A    I was a full-time employee.  I was the |
| 09:08:56:10 | 11 | controller. |
| 09:08:56:10 | 12 | Q    And how did you learn about a job opening |
| 09:08:59:15 | 13 | at Platinum Networks? |
| 09:08:59:15 | 14 | A    There was a corporate headhunter that -- |
| 09:09:01:18 | 15 | I was working for the San Diego County |
| 09:09:05:15 | 16 | Water Authority and they contacted me. |
| 09:09:10:21 | 17 | I believe there was a consulting company |
| 09:09:12:21 | 18 | that Gerry had hired for Platinum, and they were out |
| 09:09:17:22 | 19 | of Houston.  I forget the name of it. |
| 09:09:19:24 | 20 | But they, I guess, made the initial |
| 09:09:22:15 | 21 | contact with -- with my headhunter, and then I |
| 09:09:24:21 | 22 | interviewed with the -- the consulting |
| 09:09:26:19 | 23 | representative.  I guess he -- he kind of pushed me |
| 09:09:31:27 | 24 | through to the next round, and I think the second |
| 09:09:35:12 | 25 | interview I -- I met with Gerry, and then I was |

12

| | | |
|---|---|---|
| 09:09:35:12 | 1 | hired after that. |
| 09:09:38:07 | 2 | Q    Okay.  And as a CPA are you -- |
| 09:09:41:21 | 3 | And by CPA I mean certified public |
| 09:09:44:03 | 4 | accountant? |
| 09:09:46:15 | 5 | A    Accountant. |
| 09:09:46:15 | 6 | Q    And are you familiar with GAAP? |
| 09:09:48:19 | 7 | A    Sure. |
| 09:09:48:19 | 8 | Q    And GAAP is generally accepted accounting |
| 09:09:51:03 | 9 | principles, correct? |
| 09:09:53:18 | 10 | A    Yes. |
| 09:09:53:18 | 11 | Q    Okay.  Can you describe for me what your |
| 09:09:55:28 | 12 | duties and responsibilities were when you worked for |
| 09:09:58:15 | 13 | Platinum Networks? |
| 09:10:00:27 | 14 | A    I guess, in a nutshell, was to preside |
| 09:10:03:06 | 15 | over the accounting function at Platinum.  The |
| 09:10:08:03 | 16 | payroll, the budgeting, the AP, which is accounts |
| 09:10:11:27 | 17 | payable, the AR, accounts receivable. |
| 09:10:14:15 | 18 | I had a couple staff members. |
| 09:10:17:00 | 19 | Anything from filing the -- any kind of |
| 09:10:21:27 | 20 | official state reports, like for the quarterly sales |
| 09:10:27:03 | 21 | tax or the State Board of Equalization. |
| 09:10:29:16 | 22 | I also had to handle all the human |
| 09:10:32:00 | 23 | resource function at Platinum. |
| 09:10:38:09 | 24 | Q    And who were the staff members that worked |
| 09:10:41:00 | 25 | under you? |

13

| | | |
|---|---|---|
| 09:10:43:18 | 1 | A    Emily, and I'm blanking on her last name. |
| 09:10:46:12 | 2 | Q    Rodriquez? |
| 09:10:46:12 | 3 | A    She's been there -- |
| 09:10:46:12 | 4 | Yeah, I think it was her. |
| 09:10:49:03 | 5 | And when I got there the cash hadn't been |
| 09:10:54:18 | 6 | reconciled for something like 17 or 18 months. |
| 09:10:57:15 | 7 | So I talked to Gerry.  So that I -- |
| 09:11:02:06 | 8 | I said the first thing any company has to |
| 09:11:02:06 | 9 | do is -- is know what their cash balance is, and so |
| 09:11:05:06 | 10 | I convinced him to hire Vernilda Ang. |
| 09:11:11:03 | 11 | Her name is Vernilda Ang. |
| 09:11:11:03 | 12 | V-e-r-n-i-l-d-a, and her last name is A-n-g. |
| 09:11:16:27 | 13 | And I hired another woman.  She was a |
| 09:11:22:12 | 14 | Russian lady. |
| 09:11:28:06 | 15 | Boy, I'm blanking. |
| 09:11:28:06 | 16 | I hired another woman because the cash was |
| 09:11:31:03 | 17 | such a disaster.  There was no way we were going to |
| 09:11:34:03 | 18 | get through it, so her name was -- |
| 09:11:44:03 | 19 | Q    Not Wendy Val? |
| 09:11:48:12 | 20 | A    No. |
| 09:11:48:12 | 21 | She was a temporary person I brought in |
| 09:11:48:12 | 22 | for three or four months. |
| 09:11:51:21 | 23 | Boy. |
| 09:11:51:19 | 24 | Yeah. |
| 09:11:51:19 | 25 | I'm just blanking here. |

14

| | | |
|---|---|---|
| 09:11:55:18 | 1 | Q    Okay. |
| 09:11:55:18 | 2 | A    Vernilda would know -- would know her |
| 09:11:58:25 | 3 | name.  She was there. |
| 09:11:58:25 | 4 | Q    What -- |
| 09:11:58:25 | 5 |      Okay.  What I may do is just have the |
| 09:12:04:09 | 6 | court reporter leave a blank in the deposition |
| 09:12:04:09 | 7 | transcript, and that way when you get the |
| 09:12:08:22 | 8 | transcript, if that name comes to you, you can just |
| 09:12:08:22 | 9 | fill it out and initial the transcript, and that way |
| 09:12:12:04 | 10 | it will be complete. |
| 09:12:16:00 | 11 |      Is that fair? |
| 09:12:16:00 | 12 | A    Okay. |
| 09:12:16:00 | 13 |      Yeah. |
| 09:12:16:00 | 14 | Q    Did you assist in the preparation of |
| 09:12:20:07 | 15 | Platinum Networks' balance sheets? |
| 09:12:20:07 | 16 | A    We -- we really didn't have a balance |
| 09:12:25:21 | 17 | sheet, per se.  I built a spreadsheet -- |
| 09:12:30:19 | 18 |      Well, let me take that back. |
| 09:12:30:19 | 19 |      When you do the monthly closing procedures |
| 09:12:33:00 | 20 | in -- in the Mas200 Module -- it's an accounting |
| 09:12:36:07 | 21 | software -- it -- it produces a balance sheet and a |
| 09:12:39:04 | 22 | fi -- and a set of financial statements, which, |
| 09:12:42:12 | 23 | frankly, Gerry never wanted.  In fact, never one |
| 09:12:47:15 | 24 | single time did I hand him the balance sheet. |
| 09:12:49:25 | 25 |      What he had me do was I would put the -- |

15

| | | |
|---|---|---|
| 09:12:52:03 | 1 | You know, instead of financial statements, |
| 09:12:54:07 | 2 | you get the balance sheet, which shows your assets, |
| 09:12:58:10 | 3 | liabilities, and equity, and then your income |
| 09:13:04:12 | 4 | statement, which basically shows, on a monthly |
| 09:13:08:00 | 5 | basis, what your income is, what your expenses are, |
| 09:13:10:15 | 6 | and what the balance is.  They call -- |
| 09:13:14:04 | 7 | A set of financial statements -- |
| 09:13:15:13 | 8 | I mean, there's a number of statements, |
| 09:13:16:24 | 9 | but mainly you are talking about a balance sheet and |
| 09:13:18:04 | 10 | income statement. |
| 09:13:19:15 | 11 | Gerry's desire was to know the income |
| 09:13:22:06 | 12 | statement.  He had very little interest in the |
| 09:13:23:18 | 13 | balance sheet. |
| 09:13:25:00 | 14 | So every month I would take the income |
| 09:13:31:15 | 15 | statement showing the amount of money that they made |
| 09:13:34:12 | 16 | and I built it into a spreadsheet, so it would -- |
| 09:13:36:22 | 17 | the spreadsheet would just go month to month to |
| 09:13:39:27 | 18 | month and just keep spreading out. |
| 09:13:42:25 | 19 | He basically wanted to see how he was |
| 09:13:42:24 | 20 | doing compared to the prior month. |
| 09:13:49:00 | 21 | MR. ALIBERTI:  Perhaps we could advise the |
| 09:13:50:18 | 22 | witness -- the question was who worked for you -- to |
| 09:13:53:24 | 23 | just -- just answer the question, if that's okay? |
| 09:13:56:03 | 24 | MR. SUGDEN:  That's fine. |
| 09:14:00:13 | 25 | Q    Do you know why Gerry Medina was only |

16

| | |
|---|---|
| 09:14:04:16 | 1 |
| 09:14:07:15 | 2 |
| 09:14:10:13 | 3 |
| 09:14:10:13 | 4 |
| 09:14:10:13 | 5 |
| 09:14:12:01 | 6 |
| 09:14:13:21 | 7 |
| 09:14:15:09 | 8 |
| 09:14:20:03 | 9 |
| 09:14:26:01 | 10 |
| 09:14:30:00 | 11 |
| 09:14:33:18 | 12 |
| 18:00:01:00 | 13 |
| 09:14:38:28 | 14 |
| 09:14:40:28 | 15 |
| 09:14:42:27 | 16 |
| 09:14:42:27 | 17 |
| 09:14:46:21 | 18 |
| 09:14:48:21 | 19 |
| 09:14:50:18 | 20 |
| 09:14:56:12 | 21 |
| 09:14:56:13 | 22 |
| 09:14:58:15 | 23 |
| 09:15:00:18 | 24 |
| 09:15:05:25 | 25 |

1  concerned with viewing the income statement as

2  opposed to looking at a balance sheet?

3      A    I --

4          MR. ALIBERTI:  Objection.  Calls for

5  speculation.

6          You can answer.

7          THE WITNESS:  I can answer?

8          My opinion would be Gerry -- his only

9  concern was the bottom line numbers.  The as -- the

10  assets and the liabilities on that balance sheet

11  were completely unreliable, and that was the case

12  when I -- when I entered the company.

13  BY MR. SUGDEN:

14      Q    Do you know why the assets and liabilities

15  were completely unreliable on the balance sheets?

16          MR. ALIBERTI:  Objection.  Calls for

17  speculation.  Lacks foundation.

18          THE WITNESS:  The --

19          Any accountant will tell you that if the

20  cash isn't reconciled, you have no assurances of

21  anything else on that balance sheet.

22          The inventory wasn't locked down.  None of

23  the amounts on those balance sheets had any what --

24          In accounting what we like to provide as

25  proof is externally generated confirmation.

17

| | | |
|---|---|---|
| 09:15:10:03 | 1 | That would be like a statement from your |
| 09:15:13:15 | 2 | car company saying this is how much you owe on |
| 09:15:19:13 | 3 | your -- on your car.  That to us is proof that, |
| 09:15:19:13 | 4 | yeah, this asset is worth that amount of money. |
| 09:15:24:13 | 5 | BY MR. SUGDEN: |
| 09:15:24:15 | 6 | Q    And there was none of that at Platinum |
| 09:15:24:12 | 7 | Networks? |
| 09:15:26:24 | 8 | A    Absolutely none of that. |
| 09:15:26:24 | 9 | Q    Okay.  Do you know why there was none of |
| 09:15:29:04 | 10 | that at Platinum Networks? |
| 09:15:31:09 | 11 | MR. ALIBERTI:  Objection.  Calls for |
| 09:15:31:09 | 12 | speculation.  Lacks foundation. |
| 09:15:31:09 | 13 | THE WITNESS:  My opinion is the books were |
| 09:15:40:21 | 14 | a disaster and no one seemed to care, and they had |
| 09:15:45:18 | 15 | gone through three controllers.  I was the third |
| 09:15:48:01 | 16 | controller, I think, in less than three years. |
| 09:15:50:16 | 17 | BY MR. SUGDEN: |
| 09:15:50:16 | 18 | Q    Do you know who the previous controllers |
| 09:15:50:16 | 19 | were for Platinum Networks? |
| 09:15:53:04 | 20 | A    Pat McIntosh, who I spent about a week |
| 09:15:55:15 | 21 | with during the turnover, and there was an oriental |
| 09:16:06:07 | 22 | lady. |
| 09:16:08:18 | 23 | Q    Was her name spelled G-i-a-n-g Yang? |
| 09:16:13:18 | 24 | A    Yes. |
| 09:16:13:18 | 25 | Q    I don't know how her name is pronounced. |

18

| | | |
|---|---|---|
| 09:16:16:04 | 1 | I've heard its -- |
| 09:16:19:12 | 2 | A    I -- |
| 09:16:19:12 | 3 | All I saw was her personnel file. |
| 09:16:22:03 | 4 | Q    Okay. |
| 09:16:22:06 | 5 | A    I -- I don't how you it was spelled, |
| 09:16:22:03 | 6 | either.  I never met her. |
| 09:16:24:25 | 7 | Q    You never met her. |
| 09:16:24:25 | 8 | Never spoke with her? |
| 09:16:24:24 | 9 | A    Never spoke with her. |
| 09:16:24:24 | 10 | Q    And you say you spent a -- about one week |
| 09:16:27:21 | 11 | working with Pat McIntosh before he left.  Is that |
| 09:16:30:12 | 12 | right? |
| 09:16:30:12 | 13 | A    Yeah.  I was in contact with him for |
| 09:16:33:09 | 14 | probably three months subsequently after taking |
| 09:16:37:12 | 15 | over. |
| 09:16:37:12 | 16 | Q    Did Pat McIntosh ever explain the reason |
| 09:16:37:12 | 17 | for the problems with Platinum Networks' books? |
| 09:16:43:00 | 18 | A    Not in a very kind way.  I mean, he -- he |
| 09:16:48:21 | 19 | warned me.  He -- he warned me. |
| 09:16:51:22 | 20 | I should have listened to me, but he |
| 09:16:51:21 | 21 | warned me.  He said that some day someone would show |
| 09:16:54:25 | 22 | up in the office and Gerry would run out the back |
| 09:16:57:18 | 23 | door, and that's exactly what happened. |
| 09:17:01:13 | 24 | Q    Did he explain why someone would show -- |
| 09:17:04:15 | 25 | A    You know, when you say something like that |

19

| | | |
|---|---|---|
| 09:17:08:09 | 1 | between two accountants, a lot of it's in jest -- |
| 09:17:08:09 | 2 | Q    Sure. |
| 09:17:08:09 | 3 | A    -- so I'm not suggesting he knew -- he had |
| 09:17:11:10 | 4 | any kind of specific knowledge. |
| 09:17:15:06 | 5 | He had told me about he had real concern |
| 09:17:19:03 | 6 | about the 2002 tax return. |
| 09:17:28:12 | 7 | Q    I want to talk just briefly for a moment |
| 09:17:34:15 | 8 | about November of 2004. |
| 09:17:34:15 | 9 | A    Okay. |
| 09:17:37:25 | 10 | Q    And that was when U.S. marshals, along |
| 09:17:41:03 | 11 | with Nortel representatives and attorneys, arrived |
| 09:17:44:15 | 12 | at Platinum Networks' offices.  Were you working |
| 09:17:44:15 | 13 | that day? |
| 09:17:47:25 | 14 | A    I was. |
| 09:17:47:25 | 15 | Q    And were you there when the U.S. marshals |
| 09:17:47:25 | 16 | arrived? |
| 09:17:52:25 | 17 | A    I was. |
| 09:17:52:25 | 18 | Q    Was Gerry Medina there when the U.S. |
| 09:17:52:25 | 19 | marshals arrived? |
| 09:17:56:12 | 20 | A    As soon as they arrived, when we said |
| 09:17:56:12 | 21 | where's Gerry, they said he left. |
| 09:18:00:15 | 22 | Q    Who said he left? |
| 09:18:00:15 | 23 | A    A number of people that -- |
| 09:18:00:16 | 24 | When I -- |
| 09:18:00:16 | 25 | When I went to the back I was saying, |

20

| | | |
|---|---|---|
| 09:18:07:03 | 1 | where's Gerry?  Where's Gerry? |
| 09:18:07:03 | 2 | And everyone's got this puzzled look. |
| 09:18:07:03 | 3 | And then David Ahumada come out and say -- |
| 09:18:08:10 | 4 | David Ahumada came out and said that he had left. |
| 09:18:11:09 | 5 | Q    Did Gerry Medina know the U.S. marshals |
| 09:18:14:15 | 6 | had arrived? |
| 09:18:15:15 | 7 | A    That -- |
| 09:18:18:06 | 8 | MR. ALIBERTI:  Objection.  Calls for |
| 09:18:19:15 | 9 | speculation.  Lacks foundation. |
| 09:18:22:18 | 10 | THE WITNESS:  And I'll speculate. |
| 09:18:23:21 | 11 | Which is of course he knew. |
| 09:18:24:21 | 12 | BY MR. SUGDEN: |
| 09:18:24:21 | 13 | Q    I want to go back to your conversations |
| 09:18:26:24 | 14 | with Pat McIntosh. |
| 09:18:27:25 | 15 | You've said that he had some serious |
| 09:18:31:01 | 16 | concerns about the 2002 tax return.  Did he have any |
| 09:18:33:10 | 17 | other concerns about the accounting going on at |
| 09:18:35:21 | 18 | Platinum Networks that he told you about? |
| 09:18:36:28 | 19 | A    Yeah.  A big one was -- |
| 09:18:39:09 | 20 | MR. ALIBERTI:  I'm going-- I'm going to |
| 09:18:40:15 | 21 | object.  And this is part of the CPA-client |
| 09:18:45:06 | 22 | privilege and it's also part of the taxpayer -- |
| 09:18:46:15 | 23 | payer privilege. |
| 09:18:47:22 | 24 | And I'm also going to object that it's not |
| 09:18:51:01 | 25 | relevant. |

| | | |
|---|---|---|
| 09:20:42:15 | 1 | He'll continue making objections.  He's |
| 09:20:44:18 | 2 | entitled to do that.  And unless you stop answering |
| 09:20:51:21 | 3 | questions, I think we'll be able to finish the |
| 09:20:55:16 | 4 | deposition and then the lawyers can fight over -- |
| 09:20:55:16 | 5 | A   Okay. |
| 09:20:55:16 | 6 | Q   -- what you said -- |
| 09:20:55:16 | 7 | A   ÇzQ |
| 09:20:55:18 | 8 | Q   -- and whether it's admissible or not. |
| 09:20:58:06 | 9 | A   Okay. |
| 09:20:58:06 | 10 | MR. ALIBERTI:  Can we go off the record |
| 09:21:01:10 | 11 | for a second or we can stay on if you prefer, but -- |
| 09:21:04:00 | 12 | MR. SUGDEN:  I have no preference. |
| 09:21:07:16 | 13 | It might be easier just to have a regular |
| 09:21:10:06 | 14 | conversation. |
| 09:21:10:06 | 15 | Can we go off the record a moment? |
| 09:21:10:06 | 16 | THE VIDEOGRAPHER:  We're now going off the |
| 09:21:12:15 | 17 | record. |
| 09:21:12:15 | 18 | The time is 9:20. |
| 09:21:14:24 | 19 | (Discussion held off the record.) |
| 09:22:29:09 | 20 | THE VIDEOGRAPHER:  We're now back on the |
| 09:22:34:03 | 21 | record. |
| 09:22:34:04 | 22 | The time is 9:22. |
| 09:22:34:03 | 23 | BY MR. SUGDEN: |
| 09:22:36:19 | 24 | Q   Okay.  Before the discussion between |
| 09:22:38:27 | 25 | Counsel, I think I was getting into the |

24

| | | |
|---|---|---|
| 09:22:44:01 | 1 | conversations that you had with Pat McIntosh -- |
| 09:22:46:19 | 2 | A     Uh-huh. |
| 09:22:46:19 | 3 | Q     -- and he said that he had some concerns |
| 09:22:46:19 | 4 | about the accounting going on at Platinum Networks. |
| 09:22:49:10 | 5 | One of them was the 2002 tax return.  And I believe |
| 09:22:52:03 | 6 | you testified he had other concerns, and I want to |
| 09:22:54:27 | 7 | get those other concerns from you. |
| 09:22:58:25 | 8 | MR. ALIBERTI:  Again, I'm going to object |
| 09:22:58:25 | 9 | it's part of the taxpayer privilege and -- and the |
| 09:23:01:22 | 10 | CPA-client privilege. |
| 09:23:04:18 | 11 | And I'm also going to sug -- |
| 09:23:04:18 | 12 | It's also hearsay. |
| 09:23:07:18 | 13 | But I'm going to suggest highly that |
| 09:23:10:15 | 14 | Mr. Gambrel remember his ethical duties and not |
| 09:23:13:12 | 15 | answer that question. |
| 09:23:13:12 | 16 | THE WITNESS:  No. |
| 09:23:17:10 | 17 | Under those ethics I'm very clear on this. |
| 09:23:17:10 | 18 | I can answer that. |
| 09:23:17:12 | 19 | Mr. McIntosh, specifically told me -- |
| 09:23:17:12 | 20 | And he's right, it would be hearsay. |
| 09:23:20:09 | 21 | But he specifically said there was cash |
| 09:23:24:06 | 22 | sales going on. |
| 09:23:24:07 | 23 | I -- I found proof of at least a couple, |
| 09:23:28:09 | 24 | and Gerry assured me that they would stop. |
| 09:23:34:06 | 25 | Mr. McIntosh told me about a $25,000 cash |

25

| | | |
|---|---|---|
| 09:23:37:09 | 1 | deal that him and Gerry had a confrontation over. |
| 09:23:43:13 | 2 | BY MR. SUGDEN: |
| 09:23:50:24 | 3 | Q    Were there other problems that |
| 09:23:50:24 | 4 | Pat McIntosh identified for you with respect to |
| 09:23:53:24 | 5 | Platinum Networks' accounting? |
| 09:23:57:01 | 6 | A    Just that -- |
| 09:23:57:01 | 7 | MR. ALIBERTI:  Objection.  Nonresponsive. |
| 09:24:00:07 | 8 | It's a ye -- |
| 09:24:00:09 | 9 | Calls for yes or no. |
| 09:24:00:07 | 10 | THE WITNESS:  Yes. |
| 09:24:00:07 | 11 | BY MR. SUGDEN: |
| 09:24:03:15 | 12 | Q    What were those problems? |
| 09:24:03:15 | 13 | MR. ALIBERTI:  Objection.  Again, calls |
| 09:24:03:15 | 14 | for the taxpayer privilege and the C -- CPA p -- |
| 09:24:07:24 | 15 | client privilege, and I am going to again highly |
| 09:24:11:03 | 16 | suggest that Mr. Gambrel not answer those questions. |
| 09:24:15:16 | 17 | THE WITNESS:  Okay. |
| 09:24:15:18 | 18 | We don't have to deal with the tax issue. |
| 09:24:20:04 | 19 | His -- his problem was the same problem |
| 09:24:20:03 | 20 | that I had, which is I've never seen a company where |
| 09:24:23:15 | 21 | the controller doesn't have signature authority over |
| 09:24:30:03 | 22 | the cash, which makes it real difficult to keep any |
| 09:24:35:18 | 23 | kind of cash control. |
| | 24 | BY MR. SUGDEN: |
| 09:24:35:18 | 25 | Q    You did not have signature authority? |

26

| | | |
|---|---|---|
| 09:24:35:18 | 1 | A    I did not, and he did not and he |
| 09:24:36:18 | 2 | complained about that. |
| 09:24:39:13 | 3 | Q    Who had signature authority at Platinum? |
| 09:24:42:18 | 4 | A    Gerry Medina and David Ahumada. |
| 09:24:47:21 | 5 | Q    Any other problems that Pat McIntosh |
| 09:24:49:18 | 6 | identified for you? |
| 09:24:52:09 | 7 | A    Not that I recall. |
| 09:24:53:07 | 8 | Q    Okay.  I want to now talk about the 2002 |
| 09:24:56:06 | 9 | tax returns. |
| 09:24:56:06 | 10 | What were the problems that Pat McIntosh |
| 09:24:59:19 | 11 | had with the 2002 tax return? |
| 09:25:01:24 | 12 | MR. ALIBERTI:  Objection.  Hearsay. |
| 09:25:02:27 | 13 | Again, it's part of the taxpayer privilege |
| 09:25:06:00 | 14 | and the CPA-client privilege. |
| 09:25:08:12 | 15 | And again I'm going to highly suggest that |
| 09:25:10:18 | 16 | Mr. Gambrel not answer these questions. |
| 09:25:12:27 | 17 | THE WITNESS:  I'll just say quickly what |
| 09:25:14:01 | 18 | he told, which is he thought that there was a |
| 09:25:15:07 | 19 | $300,000 -- at least a $300,000 tax liability to the |
| 09:25:20:27 | 20 | IRS. |
| 09:25:20:27 | 21 | BY MR. SUGDEN: |
| 09:25:22:06 | 22 | Q    Can you explain in detail what that |
| 09:25:23:15 | 23 | liability was about? |
| 09:25:25:16 | 24 | MR. ALIBERTI:  Objection.  Hearsay. |
| 09:25:26:25 | 25 | Objection.  Calls for speculation.  Objection.  It's |

27

| | | |
|---|---|---|
| 09:25:29:15 | 1 | part of the CPA-client privilege and the taxpayer |
| 09:25:32:03 | 2 | privilege. |
| 09:25:33:15 | 3 | And I'm going to highly suggest |
| 09:25:34:28 | 4 | Mr. Gambrel not answer that question. |
| 09:25:36:10 | 5 | THE WITNESS:  Okay. |
| 09:25:36:10 | 6 | MR. SUGDEN:  Do you want to make that a |
| 09:25:39:06 | 7 | standing objection -- |
| 09:25:39:06 | 8 | MR. ALIBERTI:  I'm sorry. |
| 09:25:40:24 | 9 | I apologize. |
| 09:25:40:24 | 10 | MR. SUGDEN:  -- and I won't -- I won't -- |
| 09:25:43:25 | 11 | For example, later on in the trial if I |
| 09:25:45:12 | 12 | have a question and an answer, I won't argue that |
| 09:25:48:18 | 13 | you waived that objection.  You can have that as a |
| 09:25:51:25 | 14 | standing objection.  That way it might speed things |
| 09:25:56:18 | 15 | up. |
| 09:25:56:18 | 16 | MR. ALIBERTI:  Please. |
| | 17 | BY MR. SUGDEN: |
| 09:25:56:18 | 18 | Q   Okay.  Could you explain to me what the |
| 09:25:58:09 | 19 | $300,000 tax liability was in reference to? |
| 09:26:03:18 | 20 | MR. ALIBERTI:  Objection as discussed. |
| 09:26:05:06 | 21 | THE WITNESS:  He -- |
| 09:26:05:07 | 22 | They set up a company, Torrey Ventures, |
| 09:26:06:24 | 23 | which was an unfunded ESOP, E-S-O-P.  It's an |
| 09:26:12:15 | 24 | employee stock option plan. |
| 09:26:17:12 | 25 | There were cases in the eighties and |

28

| | | |
|---|---|---|
| 09:26:19:03 | 1 | nineties where those were used as slush funds and -- |
| 09:26:22:18 | 2 | and the way the money was moved around -- if you're |
| 09:26:25:15 | 3 | familiar with the Enron case, which is basically you |
| 09:26:29:09 | 4 | set up a company and then you funnel money through |
| 09:26:34:27 | 5 | that company so as not to pay tax on it.  The |
| 09:26:38:27 | 6 | company then you've just sent that money to loans |
| 09:26:43:00 | 7 | you back the money, usually minus a fee. |
| 09:26:46:09 | 8 |         And I believe the guy that was in control |
| 09:26:48:12 | 9 | of that company used to be the vice president or |
| 09:26:50:15 | 10 | Gerry's right-hand man at Platinum. |
| 09:26:54:10 | 11 |         So it would be like I set up a company and |
| 09:26:58:13 | 12 | I hand $100 to it.  I then write that off as an |
| 09:27:04:03 | 13 | expense.  I don't pay taxes on it.  Then they turn |
| 09:27:06:15 | 14 | around and loan me the $100.  And then a few years |
| 09:27:09:00 | 15 | later I go back and they say look, I'm -- I'm |
| 09:27:11:04 | 16 | waiving the $100.  You don't owe it to me, with -- |
| 09:27:15:24 | 17 |         Obviously -- |
| 09:27:15:24 | 18 |         And I am not implying there was any |
| 09:27:18:03 | 19 | illegality to it. |
| 09:27:20:06 | 20 |         But in a case where there would be a -- a |
| 09:27:22:12 | 21 | slush fund or some kind of tax evasion scheme, that |
| 09:27:28:00 | 22 | was assumed all along, that the -- that the loans |
| 09:27:30:06 | 23 | would be eventually wiped out.  And that was the -- |
| 09:27:34:25 | 24 | that was the case. |
| 09:27:37:06 | 25 |         What Pat explained to me was that there |

| | | |
|---|---|---|
| 09:27:42:22 | 1 | was over one million dollars, I think, that was |
| 09:27:42:22 | 2 | forgiven.  It was sent -- money sent to |
| 09:27:47:10 | 3 | Torrey Ventures, and then the -- it was written off |
| 09:27:51:01 | 4 | as consulting fees.  Therefore, not -- no tax was |
| 09:27:56:01 | 5 | paid on that money.  And then that money was lent |
| 09:27:58:19 | 6 | back to Platinum and then those loans were -- |
| 09:28:04:09 | 7 | It gets complicated, but those loans were |
| 09:28:06:22 | 8 | eventually forgiven in exchange for half of a stake |
| 09:28:11:28 | 9 | in Platinum, and then that half stake -- |
| 09:28:17:00 | 10 | Keep in mind, which was supposedly worth |
| 09:28:19:27 | 11 | over one million dollars, Gerry then bought that |
| 09:28:23:28 | 12 | half stake back for $25,000.  I believe it was about |
| 09:28:23:28 | 13 | that amount. |
| 09:28:27:27 | 14 | MR. ALIBERTI:  I move to strike as |
| 09:28:27:27 | 15 | nonresponsive. |
| | 16 | BY MR. SUGDEN: |
| 09:28:31:01 | 17 | Q    Did you ever review documents that |
| 09:28:36:13 | 18 | verified that that's what happened with Torrey |
| 09:28:41:28 | 19 | Ventures? |
| 09:28:41:28 | 20 | A    Yes. |
| 09:28:45:13 | 21 | Q    Okay.  What documents did you review?  Do |
| 09:28:45:13 | 22 | you recall? |
| 09:28:45:13 | 23 | MR. ALIBERTI:  I'm going to object.  Same |
| 09:28:49:16 | 24 | objection. |
| 09:28:49:16 | 25 | THE WITNESS:  What documents? |

30

| | | |
|---|---|---|
| 09:28:52:12 | 1 | I reviewed -- |
| 09:28:52:12 | 2 | They had a legal agreement drawn up for |
| 09:28:55:07 | 3 | the Torrey Ventures. |
| 09:28:58:09 | 4 | I remember when we were cleaning out |
| 09:28:58:07 | 5 | the -- the other building I -- there was an |
| 09:29:02:12 | 6 | executive meeting where I specifically asked Gerry |
| 09:29:02:12 | 7 | about it. |
| 09:29:02:12 | 8 | And Gerry always encouraged me to, you |
| 09:29:08:18 | 9 | know, go take a look.  It was drawn up by lawyers. |
| 09:29:12:16 | 10 | Everything's fine. |
| 09:29:15:24 | 11 | So I do need to say that. |
| 09:29:15:25 | 12 | I mean, Gerry -- Gerry was under the |
| 09:29:18:24 | 13 | impression, or at least outwardly to me, that all |
| 09:29:22:00 | 14 | the documents were official and legal and -- and |
| 09:29:25:09 | 15 | that he wasn't worried about it. |
| 09:29:25:09 | 16 | MR. ALIBERTI:  Move to strike as |
| 09:29:29:19 | 17 | nonresponsive. |
| 09:29:29:19 | 18 | BY MR. SUGDEN: |
| 09:29:29:19 | 19 | Q    As a CPA did you think -- was it your |
| 09:29:32:28 | 20 | opinion that the Torrey Ventures dealings were |
| 09:29:40:15 | 21 | illegal? |
| 09:29:40:15 | 22 | MR. ALIBERTI:  Objection.  Same objection. |
| 09:29:40:15 | 23 | Calls for speculation. |
| 09:29:40:15 | 24 | THE WITNESS:  Yes. |
| 09:29:40:16 | 25 | /// |

31

| | | |
|---|---|---|
| 09:29:40:15 | 1 | BY MR. SUGDEN: |
| 09:29:44:24 | 2 | Q    Did you tell Gerry Medina that you thought |
| 09:29:44:24 | 3 | that the Torrey Ventures was illegal? |
| 09:29:48:00 | 4 | A    Of course. |
| 09:29:48:00 | 5 | MR. ALIBERTI:  Objection. |
| 09:29:51:24 | 6 | Same objection.  Calls for speculation. |
| 09:29:51:24 | 7 | Hearsay. |
| 09:29:51:24 | 8 | BY MR. SUGDEN: |
| 09:29:51:24 | 9 | Q    What did Gerry Medina say when you told |
| 09:29:51:24 | 10 | him you felt the Torrey Ventures were illegal? |
| 09:29:59:18 | 11 | MR. ALIBERTI:  Same objection.  Objection. |
| 09:29:59:18 | 12 | THE WITNESS:  I think when I first got |
| 09:29:59:18 | 13 | there Gerry wanted to make things better.  He knew |
| 09:30:02:24 | 14 | there were problems in the past. |
| 09:30:06:27 | 15 | And he -- he -- he would change from month |
| 09:30:06:25 | 16 | to month. |
| 09:30:08:13 | 17 | I was getting irate because |
| 09:30:10:06 | 18 | David Ahumada -- |
| 09:30:11:00 | 19 | The first time I saw a check written to |
| 09:30:14:28 | 20 | Torrey Ventures I said what is this for? |
| 09:30:16:24 | 21 | It was written to David Ahumada, which |
| 09:30:20:21 | 22 | right there is a serious -- a serious problem. |
| 09:30:22:27 | 23 | I went to David.  I know exactly where we |
| 09:30:25:03 | 24 | were sitting in the warehouse when I asked him. |
| 09:30:28:18 | 25 | And I said what is this? |

32

| | | |
|---|---|---|
| 09:30:28:18 | 1 | And he said oh, that's a -- a deal that |
| 09:30:29:25 | 2 | Gerry and I set up so that I can avoid paying taxes. |
| 09:30:35:16 | 3 | MR. ALIBERTI:  Move to strike as |
| 09:30:36:22 | 4 | nonresponsive. |
| 09:30:36:22 | 5 | BY MR. SUGDEN: |
| 09:30:37:27 | 6 | Q    Did you -- |
| 09:30:37:28 | 7 | Did you tell David Ahumada that it was |
| 09:30:39:01 | 8 | illegal for Torrey Ventures to be sending -- sending |
| 09:30:41:13 | 9 | him a check for $25,000? |
| 09:30:42:24 | 10 | A    Yes. |
| 09:30:44:03 | 11 | MR. ALIBERTI:  Same objection.  Hearsay. |
| 09:30:45:09 | 12 | THE WITNESS:  Jer -- |
| 09:30:46:18 | 13 | I was irate.  I've never worked for a |
| 09:30:49:03 | 14 | company that had this kind of shady business |
| 09:30:51:21 | 15 | practice. |
| 09:30:52:28 | 16 | Gerry called me in my office. |
| 09:30:54:09 | 17 | I -- I believe I hung up on him.  I was -- |
| 09:30:57:00 | 18 | I was furious.  I was furious that I had left |
| 09:31:00:24 | 19 | another job to come to a company that practiced this |
| 09:31:00:24 | 20 | kind of thing. |
| 09:31:02:09 | 21 | MR. ALIBERTI:  Move to strike as |
| 09:31:03:16 | 22 | nonresponsive everything after yes. |
| 09:31:07:13 | 23 | BY MR. SUGDEN: |
| 09:31:10:16 | 24 | Q    I'm sorry. |
| 09:31:10:18 | 25 | The -- the conversation where you were |

33

| | | |
|---|---|---|
| 09:31:12:04 | 1 | irate with David Ahumada, that was a telephone |
| 09:31:15:10 | 2 | conversation; is that right? |
| 09:31:15:12 | 3 | A    No, that was face-to-face. |
| 09:31:17:00 | 4 | Q    Okay.  And then Gerry Medina called you; |
| 09:31:19:09 | 5 | is that right? |
| 09:31:19:09 | 6 | A    I walked back to my office.  Presumably |
| 09:31:22:18 | 7 | David went straight to Gerry. |
| 09:31:24:27 | 8 | And, yes, there was a telep -- Gerry |
| 09:31:28:03 | 9 | called me in my office. |
| 09:31:29:22 | 10 | Q    And -- |
| 09:31:29:21 | 11 | MR. ALIBERTI:  Motion to strike as |
| 09:31:31:12 | 12 | nonresponsive.  Calls for speculation. |
| 09:31:33:03 | 13 | BY MR. SUGDEN: |
| 09:31:33:03 | 14 | Q    What did Gerry Medina tell you when he |
| 09:31:36:15 | 15 | called you? |
| 09:31:36:15 | 16 | MR. ALIBERTI:  Same objection.  Calls for |
| 09:31:36:15 | 17 | speculation.  Hearsay. |
| 09:31:39:24 | 18 | THE WITNESS:  He said, you know, what's |
| 09:31:41:15 | 19 | wrong? |
| 09:31:43:03 | 20 | I said Gerry, David just essentially told |
| 09:31:46:15 | 21 | me that we're paying him money so that, A, it |
| 09:31:50:00 | 22 | doesn't hit the payroll and, B, it's so it's a deal |
| 09:31:53:22 | 23 | that you guys had worked out. |
| 09:31:57:21 | 24 | And I said something about a slush fund |
| 09:31:59:12 | 25 | or -- or something angry, and I hung up the phone on |

34

| | | |
|---|---|---|
| 09:32:03:06 | 1 | him. |
| 09:32:03:07 | 2 | And he called me back and said let's -- |
| 09:32:05:09 | 3 | come into my office. |
| 09:32:07:06 | 4 | MR. ALIBERTI:  Move to strike as |
| 09:32:09:09 | 5 | nonresponsive. |
| 09:32:09:09 | 6 | BY MR. SUGDEN: |
| 09:32:09:09 | 7 | Q    When was this telephone conversation?  Do |
| 09:32:11:09 | 8 | you recall? |
| 09:32:16:22 | 9 | A    It would have been two or three weeks |
| 09:32:18:21 | 10 | after I started.  First two weeks in May. |
| 09:32:20:25 | 11 | Q    Okay.  And when Gerry Medina then called |
| 09:32:25:00 | 12 | you into his office, what did he say in that |
| 09:32:27:04 | 13 | meeting? |
| 09:32:30:12 | 14 | A    He -- he wanted to smooth things out. |
| 09:32:30:13 | 15 | David was in there, and -- and in that |
| 09:32:34:15 | 16 | meeting Gerry took my side on everything, which |
| 09:32:38:21 | 17 | allayed my fears. |
| 09:32:40:21 | 18 | I specifically -- |
| 09:32:43:06 | 19 | And all three parties will remember this. |
| 09:32:46:12 | 20 | I said look, if you continue to do this, |
| 09:32:49:00 | 21 | then there's a 1099 that has to be sent out to |
| 09:32:51:12 | 22 | David, which means -- |
| 09:32:53:24 | 23 | The 1099 is what he -- |
| 09:32:56:10 | 24 | Most people get a W-2, which he would get |
| 09:32:59:15 | 25 | for his salary, but then he would also get a 1099 |

35

| | | |
|---|---|---|
| 09:33:53:22 | 1 | MR. ALIBERTI:  Same objection. |
| 02:00:01:00 | 2 | BY MR. SUGDEN: |
| 09:33:53:21 | 3 | Q    Oh.  I'm sorry. |
| 09:33:57:00 | 4 | A    Ask your question. |
| 09:33:57:00 | 5 | I'm sorry. |
| 09:33:57:00 | 6 | Q    Sure. |
| 09:33:57:00 | 7 | There was -- |
| 09:34:00:04 | 8 | We're talking about a check that was from |
| 09:34:00:03 | 9 | Torrey Ventures payable to David Ahumada; is that |
| 09:34:03:01 | 10 | correct? |
| 09:34:03:01 | 11 | A    Uh-huh. |
| 09:34:07:21 | 12 | It was $3,000. |
| 09:34:07:21 | 13 | Q    Okay.  Do you recall who signed that |
| 09:34:07:21 | 14 | check? |
| 09:34:07:21 | 15 | MR. ALIBERTI:  Same objection. |
| 09:34:12:03 | 16 | THE WITNESS:  Gerry Medina. |
| 09:34:12:03 | 17 | BY MR. SUGDEN: |
| 09:34:12:03 | 18 | Q    Gerry Medina had signing authority for |
| 09:34:16:07 | 19 | checks from Torrey Ventures; is that correct? |
| 09:34:16:07 | 20 | A    That's correct. |
| 09:34:16:07 | 21 | So did David. |
| 09:34:19:06 | 22 | Oh. |
| 09:34:19:04 | 23 | Q    Did anyone else have signing authority? |
| 09:34:22:01 | 24 | A    David Ahumada had signing authority. |
| 09:34:40:01 | 25 | Q    Were there any other problems with the |

37

| | | |
|---|---|---|
| 09:34:44:10 | 1 | 2002 tax return other than this Torrey Ventures' |
| 09:34:47:15 | 2 | issue? |
| 09:34:47:15 | 3 | MR. ALIBERTI:  Same objection. |
| 09:34:47:15 | 4 | THE WITNESS:  To my knowledge, no. |
| 09:34:47:15 | 5 | BY MR. SUGDEN: |
| 09:34:50:21 | 6 | Q    And you said that Pat McIntosh told you |
| 09:34:53:25 | 7 | there were cash sales going on at Platinum Networks; |
| 09:34:57:01 | 8 | is that correct? |
| 09:34:57:01 | 9 | A    That's correct. |
| 09:34:57:01 | 10 | MR. ALIBERTI:  Same objection. |
| 09:35:01:03 | 11 | I'm going to again remind Mr. Gambrel he |
| 09:35:01:01 | 12 | should not answer these questions. |
| 09:35:04:19 | 13 | BY MR. SUGDEN: |
| 09:35:07:24 | 14 | Q    Can you explain what you mean by the term |
| 09:35:07:24 | 15 | cash sales? |
| 09:35:10:28 | 16 | MR. ALIBERTI:  Same objection.  Calls for |
| 09:35:10:28 | 17 | speculation. |
| 09:35:14:07 | 18 | THE WITNESS:  A cash sale -- |
| 09:35:14:09 | 19 | Most companies would involve a cash |
| 09:35:18:18 | 20 | register, so you have a -- a receipt.  There was -- |
| 09:35:18:18 | 21 | was a means of tracking the flow of the cash.  In -- |
| 09:35:22:28 | 22 | Well, two occasions that I witnessed, not |
| 09:35:26:25 | 23 | for big amounts.  I mean, we're talking less than |
| 09:35:33:09 | 24 | $100.  The -- |
| 09:35:33:09 | 25 | A cash sales would be it comes in, money |

38

| | | |
|---|---|---|
| 09:35:34:13 | 1 | is handed to someone, be it Rick or Gerry, and then |
| 09:35:39:25 | 2 | I was not told about it. I would see it show up |
| 09:35:41:24 | 3 | with the inventory going out, but I wouldn't see an |
| 09:35:44:28 | 4 | accompanying cash receipt. That's the problem with |
| 09:35:47:06 | 5 | a cash sale. It is not going through the accounting |
| 09:35:49:16 | 6 | system. |
| 09:35:50:15 | 7 | MR. ALIBERTI: Move to strike as |
| 09:35:51:18 | 8 | nonresponsive. |
| 16:00:01:00 | 9 | BY MR. SUGDEN: |
| 09:35:53:09 | 10 | Q So, in other words, it's money that the |
| 09:35:56:06 | 11 | company receives, but it's not accounted for |
| 09:35:58:09 | 12 | anywhere and, therefore it wouldn't show up on the |
| 09:36:01:27 | 13 | books; is that correct? |
| 09:36:01:27 | 14 | A That is correct. |
| 09:36:01:27 | 15 | MR. ALIBERTI: Same objection. |
| 09:36:04:10 | 16 | BY MR. SUGDEN: |
| 09:36:04:10 | 17 | Q And Pat McIntosh warned you that Platinum |
| 09:36:06:25 | 18 | Networks engaged in cash sales; is that correct? |
| 09:36:09:06 | 19 | A Yes. |
| 09:36:09:07 | 20 | MR. ALIBERTI: Same objection. |
| 09:36:09:06 | 21 | BY MR. SUGDEN: |
| 09:36:10:12 | 22 | Q And did Pat McIntosh say whether or not |
| 09:36:12:24 | 23 | there was a large volume of cash sales going on? |
| 09:36:16:15 | 24 | MR. ALIBERTI: Same objection. |
| 09:36:20:18 | 25 | THE WITNESS: He didn't specify the |

39

| | | |
|---|---|---|
| 09:36:20:18 | 1 | volume.  He said that it was going on and he raised |
| 09:36:23:09 | 2 | the specific $25,000 cash sale. |
| 09:36:26:00 | 3 | MR. ALIBERTI:  Move to strike as |
| 09:36:28:12 | 4 | nonresponsive. |
| 13:00:01:00 | 5 | BY MR. SUGDEN: |
| 09:36:33:24 | 6 | Q    Did Mr. McIntosh tell you what this |
| 09:36:35:03 | 7 | $25,000 cash sale was for? |
| 09:36:39:10 | 8 | MR. ALIBERTI:  Same objection. |
| 09:36:40:25 | 9 | THE WITNESS:  I mean, it would have been |
| 09:36:40:25 | 10 | for retail -- the inventory we sold on an everyday |
| 09:36:44:03 | 11 | basis, except -- |
| 09:36:45:27 | 12 | Sorry. |
| 09:36:45:27 | 13 | BY MR. SUGDEN: |
| 09:36:47:12 | 14 | Q    Go ahead. |
| 09:36:48:28 | 15 | MR. ALIBERTI:  Same objection. |
| 09:36:50:15 | 16 | THE WITNESS:  On a sale that enormous |
| 09:36:52:04 | 17 | the -- the least you would expect is it would be put |
| 09:36:55:09 | 18 | into the accounting system. |
| 09:37:01:10 | 19 | BY MR. SUGDEN: |
| 09:37:03:24 | 20 | Q    And when you witnessed cash sales at |
| 09:37:06:25 | 21 | Platinum Networks, did you confront Gerry Medina |
| 09:37:11:06 | 22 | about that? |
| 09:37:11:06 | 23 | A    Yes. |
| 09:37:11:07 | 24 | MR. ALIBERTI:  Same objection. |
| 09:37:13:16 | 25 | /// |

40

| | | |
|---|---|---|
| 09:38:12:03 | 1 | your books if you -- if you do |
| 09:38:14:06 | 2 | this -- I remember I had to badger |
| 09:38:18:28 | 3 | him two or three times, but he |
| 09:38:21:03 | 4 | finally brought me the money.") |
| 09:38:59:27 | 5 | BY MR. SUGDEN: |
| 09:39:07:16 | 6 | Q    You testified that you've never seen a |
| 09:39:07:16 | 7 | company where the controller does not have signature |
| 09:39:13:18 | 8 | authority over the cash.  Do you recall that? |
| 09:39:13:18 | 9 | A    Yes. |
| 09:39:13:18 | 10 | Q    What -- |
| 09:39:13:19 | 11 | Why is it important that a -- for a |
| 09:39:16:09 | 12 | company to have its controller with signature |
| 09:39:18:24 | 13 | authority? |
| 09:39:18:24 | 14 | A    Well, I imagine that's where the term |
| 09:39:23:28 | 15 | controller originated. |
| 09:39:26:12 | 16 | The controller has to be the guy, the |
| 09:39:28:24 | 17 | control point, for the financial data and -- and the |
| 09:39:34:00 | 18 | cash going in and out. |
| 09:39:36:21 | 19 | If -- if there's -- |
| 09:39:39:15 | 20 | One person has to track it.  That in most |
| 09:39:41:28 | 21 | companies is the controller.  That is the reason |
| 09:39:45:15 | 22 | they're hired. |
| 09:39:45:15 | 23 | Q    Did you ever discuss with Mr. Medina the |
| 09:39:48:09 | 24 | importance of a controller having signature |
| 09:39:51:04 | 25 | authority over the checks? |

43

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | | |
|---|---|---|
| 09:39:51:04 | 1 | A    Yes. |
| 09:39:55:15 | 2 | MR. ALIBERTI:  Same objection. |
| 09:39:55:15 | 3 | BY MR. SUGDEN: |
| 09:39:55:15 | 4 | Q    What did Mr. Medina tell you in response? |
| 09:39:55:15 | 5 | MR. ALIBERTI:  Same objection. |
| 09:40:01:01 | 6 | THE WITNESS:  I don't recall the specific |
| 09:40:01:01 | 7 | conversation.  He -- he -- the -- |
| 09:40:03:28 | 8 | At the end of the day he wasn't going to |
| 09:40:07:09 | 9 | give it to me. |
| 09:40:07:09 | 10 | BY MR. SUGDEN: |
| 09:40:07:09 | 11 | Q    Did he ever give you a reason why you |
| 09:40:11:15 | 12 | would not be given signature authority over the |
| 09:40:11:15 | 13 | cash? |
| 09:40:15:00 | 14 | MR. ALIBERTI:  Same objection. |
| 09:40:15:00 | 15 | THE WITNESS:  No. |
| 09:40:15:00 | 16 | BY MR. SUGDEN: |
| 09:40:15:00 | 17 | Q    Do you have an opinion as to why he did |
| 09:40:18:06 | 18 | not give you signature authority over the cash? |
| 09:40:21:06 | 19 | A    Yes. |
| 09:40:21:06 | 20 | MR. ALIBERTI:  Calls for speculation. |
| 09:40:21:06 | 21 | Same objection. |
| 09:40:21:06 | 22 | BY MR. SUGDEN: |
| 09:40:21:06 | 23 | Q    What is that opinion? |
| 09:40:24:07 | 24 | A    He doesn't want -- |
| 09:40:24:09 | 25 | He's a very private person.  He doesn't |

44

| | | |
|---|---|---|
| 09:40:28:21 | 1 | want anyone, including his controller, to know where |
| 09:40:31:27 | 2 | the cash is going. |
| 09:40:46:13 | 3 | Q    How were you compensated when you worked |
| 09:40:49:18 | 4 | for Platinum?  Were you paid a salary? |
| 09:40:52:28 | 5 | A    Salary. |
| 09:40:56:00 | 6 | Q    And were you generally familiar with the |
| 09:40:59:04 | 7 | types of products that Platinum Networks sold? |
| 09:41:02:13 | 8 | A    No. |
| 09:41:05:19 | 9 | Q    I didn't mean to cut off your answer. |
| 09:41:09:03 | 10 | Do -- do you have a general understanding |
| 09:41:09:01 | 11 | as to what they sold? |
| 09:41:09:01 | 12 | A    No. |
| 09:41:13:21 | 13 | Specifically on that point, when I first |
| 09:41:13:21 | 14 | started there and Pat McIntosh told me that the |
| 09:41:21:24 | 15 | inventory was not a very reliable number, I |
| 09:41:21:24 | 16 | basically -- I had nothing to do with the inventory. |
| 09:41:25:21 | 17 | I -- I knew right then and there there was no |
| 09:41:29:12 | 18 | physical count at the end of the year, which most |
| 09:41:32:24 | 19 | companies do, and there was no point.  I knew |
| 09:41:36:27 | 20 | nothing about the inventory.  I just -- |
| 09:41:36:28 | 21 | You know, I would look at the daily sales |
| 09:41:36:27 | 22 | and see a part number. |
| 09:41:38:12 | 23 | BY MR. SUGDEN: |
| 09:41:38:13 | 24 | Q    Okay. |
| 09:41:39:09 | 25 | MR. ALIBERTI:  Move to strike as |

45

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | | |
|---|---|---|
| 09:41:40:09 | 1 | nonresponsive. |
| 09:41:41:07 | 2 | BY MR. SUGDEN: |
| 09:41:44:00 | 3 | Q    And did you report to Gerry Medina? |
| 09:41:47:25 | 4 | A    Yes. |
| 09:41:47:25 | 5 | Q    Did you report to anyone else? |
| 09:41:52:24 | 6 | A    No. |
| 09:41:53:21 | 7 | Q    And who reported to you? |
| 09:41:58:27 | 8 | A    Vernilda and Emily. |
| 09:42:02:03 | 9 | Q    Did Vernilda or Emily ever come to you and |
| 09:42:06:06 | 10 | identify problems they perceived with Platinum |
| 09:42:08:16 | 11 | Networks' accounting? |
| 09:42:09:21 | 12 | MR. ALIBERTI:  Same objection. |
| 09:42:10:24 | 13 | THE WITNESS:  Yes. |
| 09:42:10:24 | 14 | BY MR. SUGDEN: |
| 09:42:10:24 | 15 | Q    Okay.  Let's talk first of all Vernilda. |
| 09:42:14:24 | 16 | What problems did Vernilda identify for |
| 09:42:16:00 | 17 | you with respect to Platinum Networks' accounting? |
| 09:42:19:15 | 18 | MR. ALIBERTI:  Same objection. |
| 09:42:19:15 | 19 | THE WITNESS:  She was doing the cash |
| 09:42:19:15 | 20 | reconciliation.  She was the one -- |
| 09:42:21:28 | 21 | When you reconcile the cash, you take in |
| 09:42:25:07 | 22 | the cash account on the company's books and proofing |
| 09:42:28:15 | 23 | it next to the bank reconciliations.  She was coming |
| 09:42:31:04 | 24 | to me and saying, Russ, there's -- there's |
| 09:42:36:16 | 25 | supposedly money coming in on this day and it's not |

46

| | | |
|---|---|---|
| 09:42:39:09 | 1 | in the bank. |
| 09:42:39:09 | 2 | BY MR. SUGDEN: |
| 09:42:41:27 | 3 | Q    And how many occasions did she come and |
| 09:42:45:28 | 4 | tell you those -- those types of things? |
| 09:42:45:28 | 5 | MR. ALIBERTI:  Same objection. |
| 09:42:49:06 | 6 | THE WITNESS:  I'm guessing. |
| 09:42:52:09 | 7 | Between five and 10. |
| 09:42:53:22 | 8 | BY MR. SUGDEN: |
| 09:42:56:03 | 9 | Q    And did you personally investigate to find |
| 09:42:57:19 | 10 | out why cash is coming in and not going to the bank? |
| 09:43:01:00 | 11 | MR. ALIBERTI:  Same objection. |
| 09:43:02:19 | 12 | THE WITNESS:  Did I investigate?  No.  I |
| 09:43:02:19 | 13 | told her to investigate it.  Obviously, I didn't |
| 09:43:07:18 | 14 | feel that any of the amounts were material and so I |
| 09:43:12:13 | 15 | wouldn't have spent my -- my own personal time on |
| 09:43:14:03 | 16 | it. |
| | 17 | BY MR. SUGDEN: |
| 09:43:15:24 | 18 | Q    Do you know whether Vernilda ever |
| 09:43:17:12 | 19 | discovered why cash was coming into Platinum |
| 09:43:19:00 | 20 | Networks and not making it to the bank? |
| 09:43:22:12 | 21 | MR. ALIBERTI:  Same objection.  Calls for |
| 09:43:22:12 | 22 | speculation. |
| 09:43:24:04 | 23 | THE WITNESS:  When an answer was found, |
| 09:43:25:22 | 24 | maybe twice, it was I guess the cash was given to |
| 09:43:29:10 | 25 | Gerry or Rick or Steve. |

47

| | | |
|---|---|---|
| 09:43:31:06 | 1 | BY MR. SUGDEN: |
| 09:43:32:27 | 2 | Q    In other words, the cash would come in and |
| 09:43:34:16 | 3 | it should have gone to Platinum Networks' bank and |
| 09:43:36:09 | 4 | it instead went directly to Gerry Medina, for |
| 09:43:41:25 | 5 | example -- |
| 09:43:41:27 | 6 | Is that correct? |
| 09:43:41:25 | 7 | A    Or the sales manager or one of the sales |
| 09:43:45:24 | 8 | guys. |
| 09:43:47:19 | 9 | Q    And when you say the amounts weren't |
| 09:43:49:21 | 10 | material, can you give a range as to what amounts |
| 09:43:53:16 | 11 | you did not perceive as material? |
| 09:43:55:18 | 12 | MR. ALIBERTI:  Same objection. |
| 09:43:57:18 | 13 | THE WITNESS:  I would say $1,000 or less. |
| | 14 | BY MR. SUGDEN: |
| 09:43:59:19 | 15 | Q    Did Vernilda identify any other problems |
| 09:44:01:21 | 16 | with respect to Platinum Networks' accounting? |
| 09:44:03:22 | 17 | MR. ALIBERTI:  Same objection. |
| 09:44:10:03 | 18 | THE WITNESS:  Yes. |
| | 19 | BY MR. SUGDEN: |
| 09:44:10:03 | 20 | Q    What other problems did she identify? |
| 09:44:16:15 | 21 | A    The -- the problem of us paying Gerry's |
| 09:44:20:15 | 22 | personal bills, his personal expenses showing up on |
| 09:44:24:18 | 23 | company accounts left and right. |
| 09:44:28:27 | 24 | Q    And when you say us, who do you mean? |
| 09:44:31:25 | 25 | MR. ALIBERTI:  Same objection. |

48

| | | |
|---|---|---|
| 09:44:31:25 | 1 | THE WITNESS:  I'm sorry? |
| 09:44:31:25 | 2 | BY MR. SUGDEN: |
| 09:44:31:25 | 3 | Q    I think your answer was she -- she found a |
| 09:44:34:03 | 4 | problem with us paying his personal bills. |
| 09:44:38:25 | 5 | A    Us, the accounting department. |
| 09:44:38:25 | 6 | MR. ALIBERTI:  Same objection. |
| 09:44:38:25 | 7 | BY MR. SUGDEN: |
| 09:44:38:25 | 8 | Q    Okay.  Can you -- can you explain in |
| 09:44:43:15 | 9 | detail what you mean by the accounting department |
| 09:44:43:15 | 10 | paying Gerry Medina's personal bills? |
| 09:44:47:03 | 11 | MR. ALIBERTI:  Same objection. |
| 09:44:49:16 | 12 | THE WITNESS:  Yes.  When I told Gerry -- |
| 09:44:49:18 | 13 | And Gerry did have interest.  After I |
| 09:44:51:27 | 14 | explained to him that financial statements needed to |
| 09:44:54:12 | 15 | be balanced, I set about trying to prove the |
| 09:45:00:00 | 16 | balances on the balance sheet.  In order to do that |
| 09:45:02:16 | 17 | I would have to have an American Express bill that |
| 09:45:07:12 | 18 | matches the liability on the balance sheet. |
| 09:45:12:09 | 19 | If personal expenses are going on those |
| 09:45:17:06 | 20 | cards, there's no expense to the business. |
| 09:45:19:24 | 21 | There's -- so the -- the -- that causes a journal |
| 09:45:22:15 | 22 | entry that's out of balance and that causes the |
| 09:45:25:06 | 23 | books to be out of balance. |
| 09:45:28:04 | 24 | I -- |
| 09:45:28:04 | 25 | The first thing -- |

49

| | | |
|---|---|---|
| 09:45:30:27 | 1 | Probably two weeks after I arrived there |
| 09:45:30:25 | 2 | and really started to understand it, I explained to |
| 09:45:33:19 | 3 | Gerry the accounting principle of separate entity, |
| 09:45:36:18 | 4 | which is the business has to be separate from his |
| 09:45:40:03 | 5 | personal life, and he gave me assurances many times. |
| 09:45:45:19 | 6 | And I would get that American Express bill |
| 09:45:45:18 | 7 | and it would be just chock full of personal stuff, |
| 09:45:51:12 | 8 | and we had many arguments over that. |
| 09:45:54:03 | 9 | MR. ALIBERTI:  Move to strike as |
| 09:45:54:03 | 10 | nonresponsive. |
| 09:45:54:03 | 11 | BY MR. SUGDEN: |
| 09:45:56:28 | 12 | Q    Can you give examples of the types of |
| 09:46:02:15 | 13 | personal expenses that Gerry Medina was having |
| 09:46:05:12 | 14 | Platinum Networks' accounting department pay? |
| 09:46:08:09 | 15 | MR. ALIBERTI:  Same objection. |
| 09:46:08:09 | 16 | THE WITNESS:  Groceries.  He told us in an |
| 09:46:14:15 | 17 | executive meeting -- he probably slipped in an |
| 09:46:14:15 | 18 | executive meeting -- that he was going to Monterey |
| 09:46:17:16 | 19 | on a vacation or something or other, so when I got |
| 09:46:21:21 | 20 | the next American Express bill there was all these |
| 09:46:24:27 | 21 | charges for dinners, hotel.  That one specifically I |
| 09:46:32:24 | 22 | knew was not business, and I -- I brought that up. |
| 09:46:38:28 | 23 | I'm telling you. |
| 09:46:38:28 | 24 | Furniture. |
| 09:46:42:03 | 25 | One card which he assured me he would not |

50

| | | |
|---|---|---|
| 09:46:45:09 | 1 | use for personal, there was some Ross for Less.  I |
| 09:46:49:06 | 2 | took it to him and he said -- told me he was buying |
| 09:46:52:21 | 3 | some furniture or something for his office. |
| 09:46:56:18 | 4 | BY MR. SUGDEN: |
| 09:46:56:18 | 5 |      Q    So even after you told Gerry Medina that |
| 09:46:59:24 | 6 | he must not use the American Express card for |
| 09:47:03:24 | 7 | personal expenses, he went and did so?  Is that your |
| 09:47:03:24 | 8 | testimony? |
| 09:47:03:24 | 9 |      A    Yes. |
| 09:47:03:24 | 10 |           MR. ALIBERTI:  Same objection. |
| 14:00:01:00 | 11 | BY MR. SUGDEN: |
| 09:47:09:03 | 12 |      Q    And he did it lots of times; is that |
| 09:47:09:03 | 13 | correct? |
| 09:47:09:03 | 14 |      A    Lots of times. |
| 09:47:09:03 | 15 |           MR. ALIBERTI:  Same objections. |
| 09:47:09:03 | 16 |           MR. SUGDEN:  Let's all make sure that |
| 09:47:13:09 | 17 | we're not talking at the same time. |
| 09:47:13:09 | 18 |           MR. ALIBERTI:  Just throw them in. |
| 09:47:16:21 | 19 | BY MR. SUGDEN: |
| 09:47:20:27 | 20 |      Q    What I'm -- |
| 09:47:20:27 | 21 |           I'll ask every question and then I'll say |
| 09:47:20:27 | 22 | Joe's going to object. |
| 09:47:33:06 | 23 |           Were there any other problems that |
| 09:47:36:24 | 24 | Vernilda identified with respect to Platinum |
| 09:47:41:07 | 25 | Networks' accounting? |

51

| | | |
|---|---|---|
| 09:47:42:07 | 1 | MR. ALIBERTI:  Same objection. |
| 09:47:51:15 | 2 | THE WITNESS:  Specifically, no. |
| 09:47:52:15 | 3 | BY MR. SUGDEN: |
| 09:47:54:09 | 4 | Q     And what types of problems did Emily |
| 09:47:56:07 | 5 | identify with respect to Platinum Networks' -- |
| 09:48:00:03 | 6 | MR. ALIBERTI:  Same objection. |
| 09:48:00:03 | 7 | BY MR. SUGDEN: |
| 09:48:02:04 | 8 | Q     -- accounting? |
| 09:48:02:04 | 9 | MR. ALIBERTI:  Sorry. |
| 09:48:03:04 | 10 | Same objection. |
| 09:48:05:13 | 11 | THE WITNESS:  That she was spending |
| 09:48:06:16 | 12 | company time paying Gerry's personal bills.  His |
| 09:48:09:15 | 13 | three mortgages, his Hummer, condo fees.  You know, |
| 09:48:22:00 | 14 | things like that. |
| 09:48:22:00 | 15 | BY MR. SUGDEN: |
| 09:48:23:06 | 16 | Q     And were these expenses being paid by |
| 09:48:26:22 | 17 | Platinum Networks? |
| 09:48:26:22 | 18 | A     Yes. |
| 09:48:27:27 | 19 | MR. ALIBERTI:  Same objection. |
| 09:48:29:03 | 20 | THE WITNESS:  Out of the cash account at |
| 09:48:35:06 | 21 | Platinum Networks. |
| 09:48:35:06 | 22 | BY MR. SUGDEN: |
| 09:48:36:12 | 23 | Q     In other words, company money was being |
| 09:48:38:18 | 24 | used to pay Mr. Medina's personal bills, his |
| 09:48:42:15 | 25 | mortgage, his Hummer, his condo fees, et cetera; is |

52

| | | |
|---|---|---|
| 09:48:47:18 | 1 | that correct? |
| 09:48:47:18 | 2 | A    Yes. |
| 09:48:49:15 | 3 | MR. ALIBERTI:   Same objection. |
| 09:48:49:15 | 4 | BY MR. SUGDEN: |
| 09:48:49:15 | 5 | Q    And when Miss -- |
| 09:48:50:25 | 6 | Strike that. |
| 09:48:52:06 | 7 | When Emily came to you with this complaint |
| 09:48:53:16 | 8 | do you recall when that was? |
| 09:48:56:10 | 9 | MR. ALIBERTI:   Same objection. |
| 09:48:56:10 | 10 | THE WITNESS:   I -- I believe I brought |
| 09:48:59:09 | 11 | it -- I -- I was -- |
| 09:49:02:03 | 12 | When I am going through the checks, before |
| 09:49:02:01 | 13 | I hand them to Gerry, I'm, of course, checking the |
| 09:49:05:09 | 14 | accounting records to make sure that, okay, we're |
| 09:49:07:00 | 15 | paying for a Hummer.  Where's the auto expense? |
| 09:49:10:10 | 16 | We're paying a mortgage here.  Where's the rent -- |
| 09:49:12:03 | 17 | the -- the revenue, if we apparently own a building? |
| 09:49:17:03 | 18 | I -- I was alarmed at these checks coming |
| 09:49:21:19 | 19 | through that were for Gerry's personal business. |
| 09:49:23:09 | 20 | I took it to Emily and she said these are |
| 09:49:26:22 | 21 | Gerry's personal bills. |
| 09:49:28:16 | 22 | I said why are you -- why are you cutting |
| 09:49:32:01 | 23 | checks for his personal bills? |
| 09:49:32:03 | 24 | And she said well, Pat -- it had come up |
| 09:49:37:15 | 25 | with Pat.  Pat told her to continue to -- to cut |

53

| Timestamp | | |
|---|---|---|
| 09:49:39:09 | 1 | them, and then Pat was moving back cash into the |
| 09:49:45:03 | 2 | equity section of the balance sheet, which basically |
| 09:49:47:03 | 3 | says it treats it as if it was cash -- perfectly |
| 09:49:52:27 | 4 | legally.  As an owner withdrawal of his own company |
| 09:49:56:06 | 5 | funds, so Pat was doing the adjustments afterwards. |
| 09:49:59:19 | 6 | I said it's -- it's absolutely wrong and |
| 09:50:02:06 | 7 | the only way I feel comfortable in us doing this was |
| 09:50:08:10 | 8 | for us to cut one cash check to Gerry Medina and |
| 09:50:10:13 | 9 | then he pay his own bills. |
| 09:50:12:16 | 10 | MR. ALIBERTI:  Move to strike as |
| 09:50:14:22 | 11 | nonresponsive. |
| 09:50:14:22 | 12 | BY MR. SUGDEN: |
| 09:50:16:27 | 13 | Q    And when -- |
| 09:50:16:27 | 14 | Did you make that suggestion to Emily or |
| 09:50:19:25 | 15 | Gerry Medina, or someone else? |
| 09:50:22:06 | 16 | A    I first made it to Emily -- |
| 09:50:22:06 | 17 | MR. ALIBERTI:  Same objection. |
| 09:50:25:18 | 18 | THE WITNESS:  I then made it to Gerry. |
| 09:50:25:18 | 19 | BY MR. SUGDEN: |
| 09:50:25:18 | 20 | Q    And when you made that suggestion to |
| 09:50:28:00 | 21 | Gary -- to Gerry did he accept his proposal? |
| 09:50:30:03 | 22 | A    He did. |
| 09:50:30:03 | 23 | MR. ALIBERTI:  Same objection. |
| 09:50:30:03 | 24 | BY MR. SUGDEN: |
| 09:50:32:16 | 25 | Q    And so were then -- |

54

| | | |
|---|---|---|
| 09:53:57:12 | 1 | reflected money that Gerry Medina had either loaned |
| 09:54:01:28 | 2 | or put into the company? |
| 09:54:03:15 | 3 | MR. ALIBERTI:  Same objection. |
| 09:54:05:00 | 4 | THE WITNESS:  No. |
| 09:54:05:00 | 5 | BY MR. SUGDEN: |
| 09:54:07:18 | 6 | Q    Did Mr. Medina ever tell you that he had |
| 09:54:10:21 | 7 | put cash into the company? |
| 09:54:12:10 | 8 | A    Absolutely. |
| 09:54:14:00 | 9 | MR. ALIBERTI:  Same objection. |
| 09:54:14:00 | 10 | BY MR. SUGDEN: |
| 09:54:15:16 | 11 | Q    Did he ever tell you how much cash he put |
| 09:54:17:04 | 12 | into the company? |
| 09:54:18:25 | 13 | MR. ALIBERTI:  Same objection. |
| 09:54:22:00 | 14 | THE WITNESS:  Well, to be honest, I didn't |
| 09:54:23:16 | 15 | believe him, because if he told me he put in |
| 09:54:28:21 | 16 | $200,000, there would be a -- a loan on the books to |
| 09:54:36:21 | 17 | Gerry Medina for $400,000.  So I -- I just couldn't |
| 09:54:40:03 | 18 | rely on that -- on his statements where that was |
| 09:54:43:18 | 19 | concerned. |
| 09:54:43:18 | 20 | MR. ALIBERTI:  Move to strike as |
| 09:54:46:13 | 21 | nonresponsive.  Also calls for speculation. |
| 09:54:46:13 | 22 | BY MR. SUGDEN: |
| 09:54:49:01 | 23 | Q    As you sit here today do you have any |
| 09:54:50:19 | 24 | independent knowledge of Gerry Medina ever putting |
| 09:54:54:12 | 25 | cash into the company? |

59

| | | |
|---|---|---|
| 09:54:56:09 | 1 | A    No. |
| 09:54:56:09 | 2 | MR. ALIBERTI:  Same objection. |
| | 3 | BY MR. SUGDEN: |
| 09:54:58:06 | 4 | Q    And you testified that when he told you he |
| 09:54:59:27 | 5 | had put cash into the company, you didn't believe |
| 09:55:03:27 | 6 | him.  Can you explain why you didn't believe |
| 09:55:05:24 | 7 | Gerry Medina? |
| 09:55:05:24 | 8 | MR. ALIBERTI:  Same objection.  Calls for |
| 09:55:07:19 | 9 | speculation. |
| 09:55:09:21 | 10 | THE WITNESS:  Because I -- I -- I -- |
| 09:55:11:24 | 11 | Over the course of time I didn't find him |
| 09:55:15:01 | 12 | to be trustworthy. |
| 09:55:15:01 | 13 | BY MR. SUGDEN: |
| 09:55:26:24 | 14 | Q    Can you pro -- please provide me with |
| 09:55:28:27 | 15 | examples of incidents that led you to believe that |
| 09:55:32:03 | 16 | Gerry Medina was not trustworthy? |
| 09:55:34:09 | 17 | MR. ALIBERTI:  Same objection. |
| 09:55:36:09 | 18 | The question calls for a narrative. |
| 09:55:45:21 | 19 | THE WITNESS:  In every scenario where I -- |
| 09:55:47:24 | 20 | When -- when I was with the company we |
| 09:55:50:00 | 21 | were constantly in a cash crunch.  In every case |
| 09:55:54:03 | 22 | Gerry did what was best for him and not what was |
| 09:55:58:10 | 23 | best for the company.  And I explained that to him. |
| 09:56:06:01 | 24 | If -- |
| 09:56:06:01 | 25 | We had creditors or vendors that were |

| | | |
|---|---|---|
| 09:56:08:12 | 1 | screaming at accounting, calling us constantly, |
| 09:56:10:21 | 2 | constantly.  Everyone's calling looking for money, |
| 09:56:15:00 | 3 | and yet a responsible owner wouldn't have done the |
| 09:56:22:09 | 4 | things he did, and I -- I think I came to resent |
| 09:56:27:15 | 5 | him, actually. |
| | 6 | BY MR. SUGDEN: |
| 09:56:27:15 | 7 | Q    And what do you mean by the things he did? |
| 09:56:27:15 | 8 | What types of things would he do? |
| 09:56:30:09 | 9 | MR. ALIBERTI:  Same objection. |
| 09:56:30:09 | 10 | THE WITNESS:  If you've got people |
| 09:56:30:09 | 11 | screaming for $40,000 or American Express saying |
| 09:56:32:22 | 12 | we're about to turn off this card, which would -- |
| 09:56:36:18 | 13 | which would extremely hamper the company's ability |
| 09:56:39:07 | 14 | to -- to purchase inventory, if -- |
| 09:56:41:27 | 15 | When a choice came down to Gerry taking |
| 09:56:44:12 | 16 | money for himself out of the cash account or doing |
| 09:56:47:01 | 17 | what was best for the company, he took the money. |
| 09:56:52:12 | 18 | And when I -- I say he took the money, I'm |
| 09:56:55:00 | 19 | talking about the $17,000 or so a month to pay three |
| 09:57:02:09 | 20 | mortgages.  The company needed that money. |
| 09:57:02:09 | 21 | MR. ALIBERTI:  Move to strike as |
| 09:57:05:06 | 22 | nonresponsive. |
| 09:57:07:19 | 23 | BY MR. SUGDEN: |
| 09:57:10:13 | 24 | Q    Was that the amount that Gerry Medina |
| 09:57:13:06 | 25 | received each month to pay his personal expenses |

61

| | | |
|---|---|---|
| 09:57:16:21 | 1 | from the company? |
| 09:57:16:21 | 2 | MR. ALIBERTI:  Same objection. |
| 09:57:16:21 | 3 | THE WITNESS:  Yes. |
| 09:57:16:21 | 4 | BY MR. SUGDEN: |
| 09:57:16:21 | 5 | Q    $17,000 per month? |
| 09:57:19:21 | 6 | A    After I stepped in. |
| 09:57:19:21 | 7 | Q    Was that in addition to his salary? |
| 09:57:22:18 | 8 | A    Yes. |
| 09:57:22:18 | 9 | MR. ALIBERTI:  Same objection. |
| 09:57:22:18 | 10 | BY MR. SUGDEN: |
| 09:57:22:18 | 11 | Q    What was Mr. Medina's salary while you |
| 09:57:28:15 | 12 | worked there?  Do you recall? |
| 09:57:28:15 | 13 | MR. ALIBERTI:  Same objection. |
| 09:57:28:15 | 14 | THE WITNESS:  I believe it was $75,000, is |
| 09:57:31:15 | 15 | what he was paying himself. |
| 09:57:31:15 | 16 | BY MR. SUGDEN: |
| 09:57:37:12 | 17 | Q    And just so I have this straight.  He |
| 09:57:37:12 | 18 | received a salary of $75,000 per year, and in |
| 09:57:43:19 | 19 | addition he received 17,000 per month to pay his |
| 09:57:46:21 | 20 | personal expenses; is that correct? |
| 09:57:46:21 | 21 | A    That's correct. |
| 09:57:46:21 | 22 | MR. ALIBERTI:  Same objection. |
| 09:57:49:28 | 23 | BY MR. SUGDEN: |
| 09:58:10:12 | 24 | Q    Can you identify other events which led |
| 09:58:10:12 | 25 | you to believe that Mr. Medina could not be trusted? |

62

| | | |
|---|---|---|
| 09:58:16:06 | 1 | MR. ALIBERTI:  Same objection. |
| 09:58:16:06 | 2 | THE WITNESS:  The Torrey Ventures -- |
| 09:58:22:04 | 3 | Torrey Ventures checks to David. |
| 09:58:25:12 | 4 | We -- we had -- |
| 09:58:28:21 | 5 | We were running out of money.  The company |
| 09:58:28:21 | 6 | was running out of the money and it was becoming a |
| 09:58:31:24 | 7 | very desperate situation. |
| 09:58:38:12 | 8 | And Gerry disappeared for about a month in |
| 09:58:41:15 | 9 | November to apparently open a restaurant in Tampa. |
| 09:58:48:03 | 10 | And we were very strapped for cash.  I was |
| 09:58:51:13 | 11 | telling him I didn't think we'd make payroll.  We |
| 09:58:54:25 | 12 | had creditors calling non-stop, and then, lo and |
| 09:58:59:07 | 13 | behold -- |
| 09:58:59:09 | 14 | We're literally cutting checks to people |
| 09:58:59:07 | 15 | that we owe money. |
| 09:59:04:07 | 16 | And normally a controller would have |
| 09:59:04:06 | 17 | signature authority, so -- I didn't have that, so I |
| 09:59:04:06 | 18 | had to rely on Gerry to sign those checks. |
| 09:59:09:16 | 19 | David Ahumada -- |
| 09:59:09:18 | 20 | Gerry will not sign the checks and he |
| 09:59:12:00 | 21 | won't authorize David to sign the checks. |
| 09:59:13:06 | 22 | David Ahumada walks into my office, after |
| 09:59:15:03 | 23 | about five days of me just complaining constantly |
| 09:59:19:07 | 24 | we've got to -- we've got to pay these bills, we've |
| 09:59:21:12 | 25 | got to have these checks signed, he walks in with a |

63

| | | |
|---|---|---|
| 09:59:24:21 | 1 | check for himself for Torrey Ventures, and I believe |
| 09:59:26:27 | 2 | he was actually going to sign it himself. |
| 09:59:32:24 | 3 | And I mentioned that to Gerry, and -- and |
| 09:59:36:19 | 4 | I said, you know, we've got a million bills to pay |
| 09:59:39:04 | 5 | here and we're going to pay the slush fund? |
| 09:59:41:24 | 6 | And I believe Vernilda and Emily were both |
| 09:59:43:03 | 7 | there.  I -- I was screaming across the office.  I |
| 09:59:47:00 | 8 | think that was -- I just -- |
| 09:59:49:15 | 9 | After that, the fact that Gerry would |
| 09:59:50:27 | 10 | allow that, I knew that the company's best interests |
| 09:59:56:00 | 11 | were not his. |
| 09:59:57:07 | 12 | MR. ALIBERTI:  Move to strike as |
| 09:59:58:18 | 13 | nonresponsive. |
| 09:59:58:18 | 14 | BY MR. SUGDEN: |
| 10:00:01:04 | 15 | Q    And you testified that Gerry Medina |
| 10:00:03:27 | 16 | disappeared in November.  Do you recall if that was |
| 10:00:06:15 | 17 | before or after the U.S. marshals arrived? |
| 10:00:09:12 | 18 | A    It was before. |
| 10:00:12:24 | 19 | Q    Do you know if it was before or after |
| 10:00:14:10 | 20 | Gerry Medina had been served with the lawsuit from |
| 10:00:17:01 | 21 | Nortel? |
| 10:00:18:18 | 22 | MR. ALIBERTI:  Objection.  Calls for |
| 10:00:18:18 | 23 | speculation. |
| 10:00:21:12 | 24 | THE WITNESS:  I don't know. |
| 10:00:21:12 | 25 | He never told me he was served. |

64

| | | |
|---|---|---|
| 10:00:21:12 | 1 | BY MR. SUGDEN: |
| 10:00:23:00 | 2 | Q    Do you recall when in November it was that |
| 10:00:26:01 | 3 | Mr. Medina disappeared? |
| 10:00:27:19 | 4 | A    I remember we had an executive meeting the |
| 10:00:29:07 | 5 | beginning of November and Gerry said he was going to |
| 10:00:33:21 | 6 | be, I think, out the rest of the week.  And then |
| 10:00:38:16 | 7 | he -- he wouldn't show up.  He never called me.  He |
| 10:00:41:27 | 8 | would call Monica, his assistant, and then she would |
| 10:00:45:10 | 9 | relay it to me. |
| 10:00:48:12 | 10 | And I think in the month of November he |
| 10:00:51:09 | 11 | worked five -- four or five days. |
| 10:01:01:24 | 12 | Q    Okay.  We're out of tape.  He just needs |
| 10:01:05:28 | 13 | to switch tapes. |
| 10:01:05:28 | 14 | A    Okay. |
| 10:01:05:28 | 15 | MR. SUGDEN:  And we've gone for a while. |
| 10:01:05:28 | 16 | Why don't we take around a 10-minute break? |
| 10:01:14:06 | 17 | THE WITNESS:  All right. |
| 10:01:16:03 | 18 | THE VIDEOGRAPHER:  We're now going off the |
| 10:01:16:03 | 19 | record. |
| 10:01:16:04 | 20 | The time is 10:00. |
| 10:06:17:06 | 21 | (Off the record.) |
| 10:08:43:13 | 22 | MR. SUGDEN:  Okay. |
| 10:08:43:13 | 23 | We can go back on the record. |
| 10:08:45:12 | 24 | THE VIDEOGRAPHER:  Okay. |
| 10:08:48:21 | 25 | We're now back on the record. |

65

| | | |
|---|---|---|
| 10:08:48:22 | 1 | The time is 10:08. |
| 06:00:01:00 | 2 | BY MR. SUGDEN: |
| 10:08:52:22 | 3 | Q    Before the break we were talking about |
| 10:08:54:21 | 4 | problems with Platinum Networks' accounting |
| 10:08:58:21 | 5 | identified by Emily, and we talked about the fact |
| 10:09:03:27 | 6 | the company was paying his personal bills.  Were |
| 10:09:06:00 | 7 | there any other problems that Emily identified for |
| 10:09:08:04 | 8 | you with respect to Platinum Networks' accounting? |
| 10:09:11:03 | 9 | MR. ALIBERTI:  Same objection. |
| 10:09:13:03 | 10 | THE WITNESS:  Not that I recall. |
| 10:09:13:03 | 11 | BY MR. SUGDEN: |
| 10:09:15:06 | 12 | Q    Okay.  And other than what you've already |
| 10:09:17:12 | 13 | testified about today, did you personally discover |
| 10:09:19:18 | 14 | any additional problems with the accounting at |
| 10:09:24:01 | 15 | Platinum Networks? |
| 10:09:24:01 | 16 | MR. ALIBERTI:  Same objection. |
| 10:09:26:10 | 17 | THE WITNESS:  Yes. |
| 10:09:26:10 | 18 | BY MR. SUGDEN: |
| 10:09:28:10 | 19 | Q    Okay.  Can you please identify those |
| 10:09:28:10 | 20 | problems? |
| 10:09:28:12 | 21 | MR. ALIBERTI:  Same objection. |
| 10:09:33:00 | 22 | THE WITNESS:  Are we talking about the -- |
| 10:09:33:00 | 23 | specifically the accounting? |
| 10:09:36:16 | 24 | BY MR. SUGDEN: |
| 10:09:36:16 | 25 | Q    Why don't we first talk about accounting |

66

| | | |
|---|---|---|
| 10:09:36:16 | 1 | and then we can talk about other problems. |
| 10:09:39:03 | 2 | A    Okay. |
| 10:09:41:15 | 3 | MR. ALIBERTI:   Same objections. |
| 10:09:41:15 | 4 | BY MR. SUGDEN: |
| 10:09:41:15 | 5 | Q    And just to prevent a narrative, why don't |
| 10:09:43:28 | 6 | you just list them one by one, and then I'll go ask |
| 10:09:49:03 | 7 | follow-up questions on each one. |
| 10:09:49:03 | 8 | A    Okay. |
| 10:09:49:04 | 9 | First and foremost, there -- there was |
| 10:09:52:25 | 10 | nothing in those financial statements which was |
| 10:09:55:09 | 11 | reliable.   The -- |
| 10:10:00:09 | 12 | I mean, the whole point of the accounting |
| 10:10:02:27 | 13 | function is to track financial data to give an |
| 10:10:05:12 | 14 | accurate portrayal of what a company's doing, how |
| 10:10:10:18 | 15 | it's performing. |
| 10:10:15:28 | 16 | And it just becomes very difficult when |
| 10:10:19:28 | 17 | you're -- when -- when you and your staff are trying |
| 10:10:19:28 | 18 | the best they can to give an accurate portrayal, |
| 10:10:23:03 | 19 | especially when you have bankers coming in and they |
| 10:10:25:24 | 20 | are giving out lines of credit based on financial |
| 10:10:32:06 | 21 | statements. |
| 10:10:32:07 | 22 | It just became an uphill battle, because |
| 10:10:37:22 | 23 | with -- with an income statement at least you know |
| 10:10:37:22 | 24 | every month how much money you were taking in and |
| 10:10:40:21 | 25 | how much money you're paying out. |

67

| | | |
|---|---|---|
| 10:10:44:24 | 1 | But with the balance sheet if -- if that |
| 10:10:47:12 | 2 | goes out of balance years prior, you're going to |
| 10:10:53:07 | 3 | have to hire a team of accountants to come in and -- |
| 10:10:56:12 | 4 | and make that thing accurate. |
| 10:10:56:12 | 5 | And I tried. |
| 10:10:56:12 | 6 | The first step is to lock down cash. |
| 10:10:59:15 | 7 | That's the first -- |
| 10:10:59:16 | 8 | When I was an auditor right out of |
| 10:11:06:27 | 9 | college, the first thing they teach you is lock down |
| 10:11:09:22 | 10 | cash.  We couldn't even do that. |
| 10:11:09:22 | 11 | MR. ALIBERTI:  Move to strike as |
| 10:11:12:25 | 12 | nonresponsive. |
| 10:11:12:25 | 13 | BY MR. SUGDEN: |
| 10:11:16:03 | 14 | Q    And were you able to identify the reasons |
| 10:11:19:06 | 15 | why the financial statements were not reliable? |
| 10:11:22:13 | 16 | MR. ALIBERTI:  Same objection.  Calls for |
| 10:11:22:13 | 17 | speculation. |
| 10:11:28:15 | 18 | THE WITNESS:  Because there was a low |
| 10:11:28:15 | 19 | priority put on accurate representation of the |
| 10:11:32:12 | 20 | financial data. |
| | 21 | BY MR. SUGDEN: |
| 10:11:45:10 | 22 | Q    Gerry Medina made putting accurate data on |
| 10:11:48:12 | 23 | the financials a low priority; is that correct? |
| 10:11:51:21 | 24 | MR. ALIBERTI:  Same objection.  Calls for |
| 10:11:55:13 | 25 | speculation. |

68

| | | |
|---|---|---|
| 10:11:55:13 | 1 | THE WITNESS:  He had been for years. |
| 10:11:55:13 | 2 | BY MR. SUGDEN: |
| 10:12:04:00 | 3 | Q    What other problems did you personally |
| 10:12:06:28 | 4 | identify with respect to Platinum Networks' -- |
| 10:12:10:09 | 5 | MR. ALIBERTI:  Same objection. |
| 10:12:14:06 | 6 | BY MR. SUGDEN: |
| 10:12:14:06 | 7 | Q    -- accounting? |
| 10:12:14:06 | 8 | MR. ALIBERTI:  Sorry. |
| 10:12:14:06 | 9 | Same objections. |
| 10:12:14:06 | 10 | THE WITNESS:  Well, the second would be |
| 10:12:18:03 | 11 | that Gerry didn't understand basic accounting |
| 10:12:24:25 | 12 | principles, and when your owner -- |
| 10:12:29:00 | 13 | Understand, Gerry only has a high school |
| 10:12:29:00 | 14 | education, but for someone that had been in business |
| 10:12:33:00 | 15 | that long, he had absolutely no understanding of the |
| 10:12:33:00 | 16 | most basic accounting principles, and -- and in many |
| 10:12:35:00 | 17 | cases the basic -- most basic business principles, |
| 10:12:37:28 | 18 | first and foremost being you have to separate the |
| 10:12:45:04 | 19 | entity from the company. |
| | 20 | BY MR. SUGDEN: |
| 10:12:50:06 | 21 | Q    The entity from the company or -- |
| 10:12:52:04 | 22 | A    I'm sorry. |
| 10:12:53:07 | 23 | The entity from the owners. |
| 10:12:56:10 | 24 | You can always make a choice between |
| 10:12:57:12 | 25 | what's best for the company and what's best for the |

69

| | | |
|---|---|---|
| 10:13:00:15 | 1 | owner.  What's best for Bill Gates is he probably |
| 10:13:02:27 | 2 | sells the company and dissolves it and takes a |
| 10:13:06:18 | 3 | massive pile of cash from his competitors.  That's |
| 10:13:09:00 | 4 | not what's best for all the people that work there |
| 10:13:12:18 | 5 | and what's best for everyone that's got stock in the |
| 10:13:17:27 | 6 | company. |
| 10:13:17:28 | 7 | At Platinum Gerry did what was best for |
| 10:13:20:13 | 8 | Gerry.  He didn't understand that there's a bunch of |
| 10:13:23:06 | 9 | people that rely on him to put food on the table. |
| 10:13:25:27 | 10 | BY MR. SUGDEN: |
| 10:13:27:09 | 11 | Q    All right.  And is it your opinion that he |
| 10:13:29:12 | 12 | didn't understand these principles or he just chose |
| 10:13:32:09 | 13 | to ignore them? |
| 10:13:34:27 | 14 | MR. ALIBERTI:  Same objection. |
| 10:13:34:27 | 15 | THE WITNESS:  I'm speculating.  This is my |
| 10:13:37:25 | 16 | opinion.  I just think it was just greed. |
| 10:13:42:06 | 17 | BY MR. SUGDEN: |
| 10:13:45:16 | 18 | Q    Based on your dealings with Gerry Medina |
| 10:13:47:04 | 19 | it's your opinion that he was a greedy person; is |
| 10:13:48:24 | 20 | that correct? |
| 10:13:51:24 | 21 | MR. ALIBERTI:  Objection.  Lacks |
| 10:13:51:24 | 22 | foundation. |
| 10:13:51:24 | 23 | THE WITNESS:  My opinion, in comparison to |
| 10:13:55:00 | 24 | everyone I've ever dealt with in business, he's in |
| 10:14:00:01 | 25 | the top two greediest people I've ever known. |

70

|            |    |                                                            |
|------------|----|------------------------------------------------------------|
|            | 1  | BY MR. SUGDEN:                                              |
| 10:14:04:24 | 2  | Q.   Is he number 2 or number 1?                          |
| 10:14:07:25 | 3  | A    That's tough.                                         |
| 10:14:07:25 | 4  | MR. ALIBERTI:  Who's number 1?                             |
| 10:14:07:27 | 5  | THE WITNESS:  Well, my first job out of                    |
| 10:14:11:00 | 6  | college was working the savings and loan scandal in       |
| 10:14:14:10 | 7  | Texas, so, believe me, there's plenty of greed to go      |
| 10:14:17:24 | 8  | around out there.                                          |
| 10:14:19:15 | 9  | BY MR. SUGDEN:                                             |
| 10:14:21:04 | 10 | Q    What were the other -- other accounting              |
| 10:14:22:25 | 11 | problems that you personally identified while             |
| 10:14:24:18 | 12 | working for Platinum?                                      |
| 10:14:26:18 | 13 | MR. ALIBERTI:  Same objection.                             |
| 10:14:28:07 | 14 | THE WITNESS:  Those two that I mentioned                   |
| 10:14:28:07 | 15 | are quite broad in scope, so I would say from the         |
| 10:14:33:15 | 16 | accounting standpoint that -- that -- that's it in a       |
| 10:14:38:00 | 17 | nutshell.                                                  |
|            | 18 | BY MR. SUGDEN:                                             |
| 10:14:39:18 | 19 | Q    Okay.  And then the dealings with Torrey             |
| 10:14:43:09 | 20 | Ventures, you also -- although Pat McIntosh told you      |
| 10:14:47:27 | 21 | about the problems, you personally viewed documents      |
| 10:14:51:24 | 22 | and were able to discover that information on your        |
| 10:14:53:24 | 23 | own; is that correct?                                      |
| 10:14:57:03 | 24 | A    Uh-huh.                                               |
| 10:14:57:03 | 25 | MR. ALIBERTI:  Same objection.                             |

71

| | | |
|---|---|---|
| 10:14:57:03 | 1 | THE WITNESS:  Yes. |
| 10:14:57:03 | 2 | I'm sorry. |
| 10:14:57:03 | 3 | BY MR. SUGDEN: |
| 10:14:57:03 | 4 | Q    You weren't simply relying on what |
| 10:14:59:06 | 5 | Pat In -- Pat McIntosh told you, correct? |
| 10:15:01:27 | 6 | A    No. |
| 10:15:04:16 | 7 | MR. ALIBERTI:  Same objection. |
| 10:15:04:16 | 8 | THE WITNESS:  Based on what Pat McIntosh |
| 10:15:11:03 | 9 | told me, I brought it up to Gerry on a number of |
| 10:15:13:07 | 10 | occasions, and he told me -- Gerry encouraged me |
| 10:15:17:09 | 11 | to -- |
| 10:15:19:09 | 12 | He said those documents, they're all drawn |
| 10:15:23:21 | 13 | up by lawyers, they're all in your files, and, sure |
| 10:15:26:03 | 14 | enough, the files in my office and the files |
| 10:15:28:09 | 15 | adjacent to my office, which were all the accounting |
| 10:15:31:01 | 16 | records -- |
| 10:15:31:01 | 17 | I -- I think one day I just got tired |
| 10:15:37:18 | 18 | of -- |
| 10:15:37:19 | 19 | When he said, Russ, go look at the |
| 10:15:41:16 | 20 | records, naturally you think, oh, the guy doesn't |
| 10:15:45:06 | 21 | care.  I don't need to go look at the records. |
| 10:15:45:06 | 22 | I think finally one day I just said, you |
| 10:15:50:04 | 23 | know what?  I think I'm actually going to go look at |
| 10:15:53:10 | 24 | the records. |
| 10:15:53:10 | 25 | Q    And what did you discover when you looked |

72

| | | |
|---|---|---|
| 10:15:55:24 | 1 | at the records? |
| 10:15:55:24 | 2 | MR. ALIBERTI:  Same objection. |
| 10:15:55:24 | 3 | THE WITNESS:  Over the course of many |
| 10:16:00:18 | 4 | hours I figured out how Torrey Ventures worked. |
| 10:16:08:01 | 5 | BY MR. SUGDEN: |
| 10:16:12:27 | 6 | Q     So by personally looking at those |
| 10:16:15:10 | 7 | documents you discovered that Torrey Ventures was, |
| 10:16:20:12 | 8 | as you earlier testified, used to kind of avoid tax |
| 10:16:23:03 | 9 | liability and hide money; is that correct? |
| 10:16:26:00 | 10 | A     Yeah.  I thought it was money laundering. |
| 10:16:28:24 | 11 | That's just my term. |
| 10:16:31:06 | 12 | That's my opinion. |
| 10:16:43:12 | 13 | Q     Sure -- |
| 10:16:46:06 | 14 | And when I a few moments ago first asked |
| 10:16:48:16 | 15 | you to identify the accounting problems, you asked |
| 10:16:56:18 | 16 | the question identify other problems, as well?  And |
| 10:16:56:18 | 17 | I said let's first identify accounting problems. |
| 10:16:59:12 | 18 | Can you now explain the other problems that you |
| 10:17:02:06 | 19 | discovered while working for Platinum Networks? |
| 10:17:05:01 | 20 | MR. ALIBERTI:  Same objections. |
| 10:17:07:18 | 21 | THE WITNESS:  The lackadaisical attitude |
| 10:17:13:06 | 22 | of upper management, Gerry and David; the |
| 10:17:16:01 | 23 | infuriating practice of them -- the president of the |
| 10:17:21:15 | 24 | company going into the lunch room and playing video |
| 10:17:25:22 | 25 | games for hours on a Friday afternoon when we're in |

73

| | | |
|---|---|---|
| 10:17:29:09 | 1 | crunch time and the company -- and considering he |
| 10:17:33:16 | 2 | had a signature authority, he's making all the |
| 10:17:37:22 | 3 | decisions and -- and I can't find him. |
| 10:17:44:28 | 4 | BY MR. SUGDEN: |
| 10:17:49:12 | 5 | Q    What were some of the other problems that |
| 10:17:49:12 | 6 | you identified while working for Platinum? |
| 10:17:52:24 | 7 | MR. ALIBERTI:  Same objection. |
| 10:17:52:24 | 8 | THE WITNESS:  The sales manager wanted |
| 10:17:52:24 | 9 | to -- |
| 10:17:52:25 | 10 | Well, he said this is what we always did, |
| 10:17:57:06 | 11 | which is like throwing lots.  Like if -- if a sales |
| 10:18:01:13 | 12 | guy -- |
| 10:18:01:15 | 13 | Friday afternoons they would throw dice |
| 10:18:05:06 | 14 | for like prize money, and so they had asked me if I |
| 10:18:11:21 | 15 | could cut a check, have Gerry sign it, and use like |
| 10:18:15:15 | 16 | this pool of cash to, I guess, gamble with. |
| 10:18:18:27 | 17 | If -- if you met a certain sales goal, |
| 10:18:23:10 | 18 | then I guess you were eligible to part -- |
| 10:18:23:10 | 19 | participate in the -- in the gambling, or other -- |
| 10:18:28:21 | 20 | other bonuses and they wanted to do it off the |
| 10:18:28:21 | 21 | books. |
| 10:18:28:21 | 22 | And I said in an executive meeting there |
| 10:18:38:12 | 23 | was absolutely no way that that was going to happen, |
| 10:18:38:12 | 24 | at least not with my knowledge. |
| 10:18:38:13 | 25 | /// |

74

| | | |
|---|---|---|
| 10:18:38:12 | 1 | BY MR. SUGDEN: |
| 10:18:38:12 | 2 | Q    Who was that sales manager? |
| 10:18:40:19 | 3 | MR. ALIBERTI:  Same objection. |
| 10:18:45:07 | 4 | THE WITNESS:  It was Rick. |
| 10:18:46:04 | 5 | BY MR. SUGDEN: |
| 10:18:46:04 | 6 | Q    Santos? |
| 10:18:47:03 | 7 | A    Santos. |
| 10:18:51:19 | 8 | Q    Any other problems that you identified |
| 10:18:53:16 | 9 | while working for Platinum Networks? |
| 10:18:55:16 | 10 | MR. ALIBERTI:  Same objections. |
| 10:18:57:09 | 11 | THE WITNESS:  Yes. |
| 10:18:57:09 | 12 | BY MR. SUGDEN: |
| 10:18:59:24 | 13 | Q    What were they? |
| 10:19:01:28 | 14 | MR. ALIBERTI:  Same objection. |
| 10:19:07:10 | 15 | THE WITNESS:  I -- |
| 10:19:07:12 | 16 | Well, there's many, but I would say |
| 10:19:11:09 | 17 | specifically the bigger one I had was David Ahumada |
| 10:19:13:13 | 18 | was the operations manager.  The whole company was a |
| 10:19:19:07 | 19 | big ball of nepotism.  Everyone hired their friends |
| 10:19:25:07 | 20 | or cousins or family members. |
| 10:19:27:19 | 21 | Rick Ahumada who used -- |
| 10:19:28:24 | 22 | I guess Gerry got rid of him.  I guess |
| 10:19:33:15 | 23 | there was some bad dealings, is how it was explained |
| 10:19:34:25 | 24 | to me. |
| 10:19:38:03 | 25 | David Ahumada, a person utterly |

HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398

| | | |
|---|---|---|
| 10:19:43:03 | 1 | unqualified to be an operations manager.  He -- he |
| 10:19:45:22 | 2 | has no college degree.  I can't think of any company |
| 10:19:47:07 | 3 | that would have a -- a person with a high school |
| 10:19:50:09 | 4 | degree, who I believe managed a Guitar World, as |
| 10:19:54:24 | 5 | their chief operating officer.  It was -- it was |
| 10:20:00:18 | 6 | ludicrous to me. |
| 10:20:00:19 | 7 | David did not understand business at all, |
| 10:20:07:09 | 8 | and he was there because he was Gerry's friend. |
| 10:20:15:19 | 9 | BY MR. SUGDEN: |
| 10:20:19:13 | 10 | Q  Based on your dealings with David Ahumada, |
| 10:20:21:00 | 11 | do you have an opinion as to whether he's an honest |
| 10:20:24:07 | 12 | or dishonest person? |
| 10:20:25:27 | 13 | MR. ALIBERTI:  Calls for speculation. |
| 10:20:27:15 | 14 | THE WITNESS:  My opinion is he's as |
| 10:20:29:03 | 15 | dishonest as Gerry. |
| 10:20:31:24 | 16 | BY MR. SUGDEN: |
| 10:20:31:24 | 17 | Q  All right.  Can you provide me with |
| 10:20:41:06 | 18 | examples that support your opinion that |
| 10:20:42:27 | 19 | David Ahumada is as dishonest as Gerry Medina? |
| 10:20:47:00 | 20 | MR. ALIBERTI:  Same objections. |
| 10:20:47:00 | 21 | THE WITNESS:  When David thought I was in |
| 10:20:48:21 | 22 | the incrowd and that I was one of the guys, that's |
| 10:20:53:24 | 23 | when he -- |
| 10:20:57:22 | 24 | When I said what is Torrey Venture for, |
| 10:20:57:21 | 25 | very innocently that's when he told me it was so he |

76

| | |
|---|---|
| 10:21:01:10 | 1 | could avoid paying taxes.
| 10:21:03:04 | 2 | He then later denied that he ever said,
| 10:21:06:27 | 3 | and then even later was -- was trying to claim that
| 10:21:10:25 | 4 | it was for phone bills or unreimbursed business
| 10:21:14:04 | 5 | expenses.
| 10:21:14:06 | 6 | It was -- it was laughable.
| 10:21:17:10 | 7 | But the fact that we had a face-to-face
| 10:21:17:09 | 8 | meeting and that when he realized that I wasn't
| 10:21:21:15 | 9 | going to help him commit tax evasion, he -- he
| 10:21:23:16 | 10 | started lying.
| 10:21:25:21 | 11 | When the federal marshals showed up --
| 10:21:29:21 | 12 | This --
| 10:21:29:21 | 13 | Well, it would be hearsay.
| 10:21:31:27 | 14 | Dave --
| 10:21:34:00 | 15 | I think David told Gerry that I was
| 10:21:36:04 | 16 | spreading rumors that there was bank fraud going on.
| 10:21:38:06 | 17 | BY MR. SUGDEN:
| 10:21:38:06 | 18 | Q:   Why do you think that?
| 10:21:40:10 | 19 | A    'Cause Gerry called me out, and --
| 10:21:42:15 | 20 | When he --
| 10:21:44:18 | 21 | When he returned, called me out in front
| 10:21:46:21 | 22 | of the whole company and insinuated that -- that I
| 10:21:53:03 | 23 | was spreading rumors that they were committing bank
| 10:21:57:21 | 24 | fraud and that that's why the federal marshals were
| 10:22:00:06 | 25 | there.

77

10:22:02:13   1          And also to the point of why I think he's

10:22:08:15   2   untrustworthy is he told Gerry that, I guess when

10:22:13:15   3   the federal marshals took off -- showed up, that I

10:22:16:00   4   took off, when, in fact, I believe I was the last

10:22:18:18   5   person to leave.

10:22:21:03   6          I don't know how many more people were

10:22:23:12   7   there after he showed up, but not many.

10:22:27:06   8          It's Gerry's company.  He ran.  I stayed.

10:22:29:22   9   David accused me of walking out.

10:22:36:07   10     Q    He accused that to your face or he told

10:22:39:01   11   Gerry that you left?

10:22:41:15   12     A    I'm -- I'm saying that I believe he told

10:22:41:15   13   Gerry that, because Gerry made that accusation to

10:22:46:19   14   me, and him and David are very tight.

10:23:09:06   15     Q    Okay.  What other problems did you

10:23:11:24   16   identify while working for Platinum Networks?

10:23:14:09   17          MR. ALIBERTI:.  Same objection.

10:23:17:04   18          THE WITNESS:  You know, I'll leave it at

10:23:19:24   19   that.  There was --

10:23:23:09   20          It's -- it's hard, you know, to get

10:23:23:09   21   specific.  It's -- when something's a complete and

10:23:26:09   22   utter mess.

10:23:29:07   23          I mean, I could probably spend, if I got

10:23:29:06   24   the time to sit down and make a list --

10:23:35:09   25          You know, it got so bad, put it this way,

| | | |
|---|---|---|
| 10:23:35:09 | 1 | I had Gerry sign a waiver, which I still have.   I |
| 10:23:38:15 | 2 | couldn't -- |
| 10:23:38:15 | 3 | Q    I -- I think I've seen the waiver.   I |
| 10:23:41:21 | 4 | understand it was -- |
| 10:23:41:21 | 5 | A    I got so frightened.  My father was |
| 10:23:44:24 | 6 | calling me from St. Louis telling me that I should |
| 10:23:47:21 | 7 | just leave.  There was just -- |
| 10:23:47:22 | 8 | Based on the things that I was telling my |
| 10:23:51:00 | 9 | father, everyone was -- in my family was telling me |
| 10:23:54:03 | 10 | to walk away. |
| 10:23:57:12 | 11 | Q    And I understand the list is long.  I just |
| 10:24:00:19 | 12 | want to make sure I'm getting kind of your best |
| 10:24:05:00 | 13 | testimony as you sit here today. |
| 10:24:05:00 | 14 | If you can think of others let me know. |
| 10:24:05:00 | 15 | Otherwise, I can -- I can move on. |
| 10:24:08:22 | 16 | A    Everything I mentioned would -- |
| 10:24:11:28 | 17 | Put it this way.  Those are the kind of |
| 10:24:11:28 | 18 | things that would cause me to want to walk away, is |
| 10:24:15:15 | 19 | everything I've mentioned. |
| 10:24:20:07 | 20 | I mean, we can go on and on about the fact |
| 10:24:20:06 | 21 | that there's -- he wouldn't hire a service to come |
| 10:24:23:24 | 22 | in and clean out the trash baskets, but he'll pay |
| 10:24:27:09 | 23 | three mortgages.  I mean, it's -- |
| 10:24:31:12 | 24 | Q    Okay.  And did you finally quit working |
| 10:24:34:21 | 25 | for Platinum? |

79

| | | |
|---|---|---|
| 10:24:34:21 | 1 | A    No.  Gerry let me go.  The -- the line of |
| 10:24:45:04 | 2 | credit that he had, he asked me to fraudulently fill |
| 10:24:49:24 | 3 | out the accounting records so that he could get more |
| 10:24:54:19 | 4 | money.  I specifically refused in July.  I believe |
| 10:24:57:15 | 5 | I -- I -- I wrote it in that waiver, because I don't |
| 10:25:00:24 | 6 | like being asked to commit bank fraud. |
| 10:25:03:27 | 7 | And then he called me from Tampa when the |
| 10:25:07:03 | 8 | company was not going to make payroll on the week of |
| 10:25:10:15 | 9 | Christmas, and he was screaming at me that -- |
| 10:25:16:06 | 10 | I said Gerry, I can't get any more money |
| 10:25:18:12 | 11 | off the line. |
| 10:25:19:18 | 12 | And he was saying yes, you can, which is |
| 10:25:24:00 | 13 | basically he was showing me how I could fabricate |
| 10:25:28:18 | 14 | some of the accounting records, specifically cut a |
| 10:25:35:07 | 15 | check that we had no intention of signing or handing |
| 10:25:36:15 | 16 | to someone, which would make our liabilities go |
| 10:25:41:10 | 17 | down, which would then allow the bank, under false |
| 10:25:45:06 | 18 | pretenses, to allow us to get more money because our |
| 10:25:49:03 | 19 | liabilities had been paid down. |
| 10:25:51:28 | 20 | That's what he had asked me to do, which I |
| 10:25:53:06 | 21 | said I wouldn't do it.  I told him I was |
| 10:25:55:21 | 22 | uncomfortable doing it. |
| 10:25:58:27 | 23 | It was those kinds of suggestions that -- |
| 10:26:01:18 | 24 | it was just wearing on me and I -- and I -- |
| 10:26:04:25 | 25 | And I said we're not going to make |

80

| | | |
|---|---|---|
| 10:26:06:18 | 1 | payroll, Gerry. |
| 10:26:06:18 | 2 | And he was screaming at me we're having |
| 10:26:09:24 | 3 | real problems here because you won't do what I tell |
| 10:26:11:10 | 4 | you.  And he was -- he was angry. |
| 10:26:13:21 | 5 | And I just said -- |
| 10:26:15:12 | 6 | I remember specifically I said listen |
| 10:26:17:04 | 7 | Buddy, I'm not going to do that. |
| 10:26:18:24 | 8 | And he said, quote, I'm not your buddy, |
| 10:26:22:09 | 9 | I'm your boss, and you work for me. |
| 10:26:25:24 | 10 | MR. ALIBERTI:  I'm going to move to strike |
| 10:26:27:12 | 11 | as nonresponsive.  And I didn't get a chance to put |
| 10:26:31:00 | 12 | my objection on. |
| | 13 | BY MR. SUGDEN: |
| 10:26:31:00 | 14 | Q    And what did he say after he said I'm not |
| 10:26:33:03 | 15 | your buddy, I'm your boss? |
| 10:26:34:21 | 16 | MR. ALIBERTI:  Same objection. |
| 10:26:36:13 | 17 | THE WITNESS:  I think I just said Gerry, |
| 10:26:38:03 | 18 | relax. |
| 10:26:41:15 | 19 | We -- I think we made payroll.  We got a |
| 10:26:45:10 | 20 | big check. |
| 10:26:47:12 | 21 | Oh. |
| 10:26:47:12 | 22 | One of our big customers was a friend of |
| 10:26:49:13 | 23 | Gerry's.  He called them and they sent us some money |
| 10:26:51:15 | 24 | which allowed us to make payroll. |
| 10:26:53:18 | 25 | Q    Do you recall the name of that customer? |

81

| | | |
|---|---|---|
| 10:27:58:28 | 1 | BY MR. SUGDEN: |
| 10:27:58:28 | 2 |     Q    And did he call you in to have a meeting |
| 10:28:01:22 | 3 | when he let you go? |
| 10:28:01:22 | 4 |     A    Yeah, January 5th. |
| 10:28:05:09 | 5 |     Q    Okay.  And what did he say during that |
| 10:28:05:09 | 6 | meeting? |
| 10:28:05:09 | 7 |     MR. ALIBERTI:  Same objection. |
| 10:28:05:09 | 8 |     THE WITNESS:  He said that because their |
| 10:28:07:28 | 9 | sales manager had walked out, that they could no |
| 10:28:10:13 | 10 | longer afford to pay me, which is hilarious, because |
| 10:28:13:18 | 11 | the last person that you would let go is your |
| 10:28:17:12 | 12 | controller. |
| 10:28:20:06 | 13 | BY MR. SUGDEN: |
| 10:28:20:07 | 14 |     Q    And their -- |
| 10:28:20:06 | 15 |     I'm sorry. |
| 10:28:20:06 | 16 |     Their sales manager left, their |
| 10:28:23:01 | 17 | previous -- |
| 10:28:23:01 | 18 |     A.   Yeah, Steve. |
| 10:28:23:03 | 19 |     Q    -- sales manager? |
| 10:28:23:01 | 20 |     A    Stevo. |
| 10:28:23:03 | 21 |     Q    Is that Steve Valencia? |
| 10:28:28:09 | 22 |     A    Uh-huh. |
| 10:28:28:09 | 23 |     Q    And what -- |
| 10:28:28:10 | 24 |     Did Steve Valencia, did he quit or was he |
| 10:28:31:01 | 25 | fired?  Do you know? |

| | | |
|---|---|---|
| 10:28:33:27 | 1 | A    He quit. |
| 10:28:33:27 | 2 | Q    And so the only reason that Gerry Medina |
| 10:28:36:24 | 3 | provided you for his -- for your termination was |
| 10:28:39:18 | 4 | that because Steve Valencia left, he could not |
| 10:28:43:03 | 5 | afford to pay you; is that right? |
| 10:28:46:03 | 6 | A    That is right. |
| 10:28:46:03 | 7 | Q    And did you call his bluff? |
| 10:28:50:03 | 8 | MR. ALIBERTI:  Objection.  Vague, the |
| 10:28:50:03 | 9 | question. |
| 02:00:01:00 | 10 | BY MR. SUGDEN: |
| 10:28:50:03 | 11 | Q    Let me make it more -- |
| 10:28:53:01 | 12 | A    Yeah, I -- |
| 10:28:53:01 | 13 | Q    Let me make it more literal for the |
| 10:28:55:28 | 14 | record. |
| 10:28:55:28 | 15 | A    Yeah. |
| 10:28:58:28 | 16 | Okay. |
| 10:28:58:27 | 17 | Q    Did you disagree with the truthfulness of |
| 10:29:02:03 | 18 | his reason for terminating you? |
| 10:29:02:03 | 19 | A    Not to his face, but I had Monica to my |
| 10:29:05:00 | 20 | left, David to my right.  I think I said something |
| 10:29:11:27 | 21 | like have fun with the IRS, and then all of a sudden |
| 10:29:14:24 | 22 | he was like whoa, whoa, hey, and we had it out out |
| 10:29:17:24 | 23 | in the courtyard. |
| 10:29:17:24 | 24 | Q    You and Gerry? |
| 10:29:20:27 | 25 | A    Gerry. |

| | | |
|---|---|---|
| 10:29:20:28 | 1 | And with David and Monica.  They heard the |
| 10:29:24:03 | 2 | whole thing. |
| 10:29:24:03 | 3 | Q    And when you say you had it out, you had |
| 10:29:27:10 | 4 | what, an argument? |
| 10:29:27:10 | 5 | A    Not a -- not a physical, but a verbal |
| 10:29:30:18 | 6 | confrontation that lasted probably 10 or 15 minutes. |
| 10:29:33:28 | 7 | Q    What did he say in that verbal argument? |
| 10:29:33:28 | 8 | MR. ALIBERTI:  Same objections. |
| 10:29:33:28 | 9 | THE WITNESS:  He was very st -- stone |
| 10:29:39:00 | 10 | cold.  It was literally like he had been coached by |
| 10:29:39:00 | 11 | a lawyer.  This is what -- this is how you need to |
| 10:29:39:00 | 12 | get rid of Russ and these are the things you need to |
| 10:29:46:06 | 13 | say and this is your script and don't go off of it. |
| 10:29:46:06 | 14 | Like, it was -- it was eerie, because I |
| 10:29:50:21 | 15 | would be saying, you know, Gerry, let's -- let's |
| 10:29:50:21 | 16 | think about this.  Think of all the crap that you |
| 10:29:58:18 | 17 | pull. |
| 10:29:58:19 | 18 | And he would just -- very ice cold, and |
| 10:29:58:18 | 19 | he's like there's nothing I can do.  That's just |
| 10:29:58:18 | 20 | business. |
| 10:29:58:19 | 21 | Like, it was -- it was -- |
| 10:29:59:27 | 22 | Literally he had so been coached, in my |
| 10:30:02:27 | 23 | opinion, about that whole scenario. |
| 10:30:04:00 | 24 | And then when I said, you know, the new -- |
| 10:30:08:25 | 25 | the new IRS whistleblower laws say that someone that |

85

| | | |
|---|---|---|
| 10:30:13:25 | 1 | blows the whistle can claim, I think, 10 or |
| 10:30:16:00 | 2 | 20 percent. |
| 10:30:17:06 | 3 | If the government reclaimed $4 million, |
| 10:30:18:06 | 4 | the person that blew the whistle could -- could |
| 10:30:21:09 | 5 | potentially be rewarded, after the -- the verdict |
| 10:30:24:18 | 6 | comes in, a -- a part of those recouped taxes. |
| 10:30:30:07 | 7 | And at that point I said, Gerry, keep in |
| 10:30:34:12 | 8 | mind I wasn't trolling for jobs when I came here.  I |
| 10:30:38:00 | 9 | had a job.  And I asked all the right questions in |
| 10:30:41:21 | 10 | both of those interviews, and he made sure -- |
| 10:30:44:09 | 11 | assurances to me of morale and the -- the -- the |
| 10:30:49:12 | 12 | stability of that company, which were absolute |
| 10:30:53:10 | 13 | fabrications.  Absolute fabrications. |
| 10:30:56:09 | 14 | And I said I walked away from a great job |
| 10:30:59:03 | 15 | to take this job and now you're kicking me to the |
| 10:31:03:27 | 16 | curb. |
| 10:31:03:28 | 17 | And the thing is I should have left months |
| 10:31:08:01 | 18 | ago, but I -- the people that work there are great |
| 10:31:09:22 | 19 | people.  It's just -- it's sad that the -- their |
| 10:31:13:03 | 20 | leader is the kind of guy that would run out the |
| 10:31:16:12 | 21 | back door when -- that's -- that's his chance to |
| 10:31:19:24 | 22 | prove his mettle and to show that everything's okay. |
| 10:31:22:21 | 23 | When your leader runs out on -- in the |
| 10:31:26:03 | 24 | most dire situations this company's ever been in and |
| 10:31:29:13 | 25 | leaves everybody holding the bag, that says it all. |

86

| | | |
|---|---|---|
| 10:36:04:03 | 1 | A    Absolutely. |
| 10:36:04:03 | 2 | Q    How often would you talk to Pat while you |
| 10:36:06:13 | 3 | still worked there? |
| 10:36:07:19 | 4 | A    I'd say maybe twice a month. |
| 10:36:10:03 | 5 | Q    And were you calling him for business |
| 10:36:11:28 | 6 | reasons or personal reasons? |
| 10:36:13:04 | 7 | A    Oh, business, just because I was -- I was |
| 10:36:15:22 | 8 | clue -- |
| 10:36:15:24 | 9 | You know, I would look at some of the |
| 10:36:17:00 | 10 | stuff from prior years and I just wouldn't |
| 10:36:20:00 | 11 | understand it.  I wouldn't now how -- |
| 10:36:21:19 | 12 | And so it got to the point where I was |
| 10:36:22:27 | 13 | just saying, well, if I can't get it right, maybe at |
| 10:36:25:15 | 14 | least I can get it consistent. |
| 10:36:28:12 | 15 | So I would call him to say what did you |
| 10:36:30:00 | 16 | guys -- how did you -- what was -- what was your |
| 10:36:31:18 | 17 | accounting treatment in prior years for this? |
| 10:36:33:09 | 18 | And the other one was we were cutting |
| 10:36:34:27 | 19 | $5,000 a month checks to his ex-wife. |
| 10:36:38:04 | 20 | Q    Whose ex-wife? |
| 10:36:39:25 | 21 | A    Gerry's. |
| 10:36:42:16 | 22 | And she was going crazy and showing up at |
| 10:36:46:25 | 23 | the building when Gerry wasn't there, and she rammed |
| 10:36:51:12 | 24 | her Hummer into -- into one of our forklifts, and |
| 10:36:54:27 | 25 | they were trying to close the bay doors and she |

91

| | | |
|---|---|---|
| 10:36:56:21 | 1 | wouldn't get out. |
| 10:36:58:16 | 2 | I was taking phone calls from her. |
| 10:37:04:07 | 3 | MR. ALIBERTI:  Move to strike as |
| 10:37:04:07 | 4 | nonresponsive. |
| 10:37:04:09 | 5 | I didn't get a chance to interject with my |
| 10:37:07:03 | 6 | objection.  It's the same objection. |
| 10:37:07:03 | 7 | BY MR. SUGDEN: |
| 10:37:10:00 | 8 | Q    Okay.  Why was Platinum Networks paying |
| 10:37:13:09 | 9 | Gerry's ex-wife $5,000 per month?  Do you know? |
| 10:37:18:27 | 10 | MR. ALIBERTI:  Same objection.  Calls for |
| 10:37:18:27 | 11 | speculation. |
| 10:37:20:21 | 12 | THE WITNESS:  I think it was alimony. |
| 10:37:20:21 | 13 | BY MR. SUGDEN: |
| 10:37:20:22 | 14 | Q    Okay.  And how was it accounted for in |
| 10:37:23:27 | 15 | Platinum Networks books?  Do you know? |
| 10:37:23:27 | 16 | MR. ALIBERTI:  Same objection. |
| 10:37:26:09 | 17 | THE WITNESS:  That's a good one. |
| 10:37:28:00 | 18 | I -- I believe that -- |
| 10:37:34:00 | 19 | I -- I think that we were treating it |
| 10:37:34:00 | 20 | as -- |
| 10:37:36:21 | 21 | Because Gerry instructed me that it was a |
| 10:37:36:21 | 22 | buyout, not alimony, and I don't -- I didn't have |
| 10:37:42:24 | 23 | the -- |
| 10:37:44:25 | 24 | To be honest, I didn't believe him, but I |
| 10:37:44:24 | 25 | didn't have documents to say otherwise.  I didn't |

92

**HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398**

| | |
|---|---|
| 10:37:49:12 | 1 | have the divorce papers.
| 10:37:51:16 | 2 | So I believe we accounted it for as an
| 10:37:55:18 | 3 | expense to the business, but I think there was
| 10:38:00:00 | 4 | inconsistency in the way it was treated.  I think
| 10:38:02:04 | 5 | sometimes Pat might have treated it as a -- a $5,000
| 10:38:05:18 | 6 | withdrawal of cash from Gerry and other times it
| 10:38:07:24 | 7 | might have been expensed.
| 10:38:10:06 | 8 | MR. ALIBERTI:  Move to strike as
| 10:38:10:06 | 9 | nonresponsive.  Calls for speculation.
| 10:38:12:15 | 10 | BY MR. SUGDEN:
| 10:38:12:15 | 11 | Q    When you would call Pat McIntosh for
| 10:38:16:03 | 12 | assistance with respect to how certain things were
| 10:38:19:27 | 13 | treated, for example, was Pat McIntosh generally
| 10:38:19:27 | 14 | helpful?
| 10:38:22:12 | 15 | A    Oh, yeah.  Pat and I had a really great
| 10:38:24:24 | 16 | relationship because --
| 10:38:24:24 | 17 | MR. ALIBERTI:  Same objection.
| 10:38:29:00 | 18 | THE WITNESS:  Well --
| 10:38:29:00 | 19 | BY MR. SUGDEN:
| 10:38:29:00 | 20 | Q    Why did you -- why did you and Pat have a
| 10:38:29:00 | 21 | good relationship?
| 10:38:29:01 | 22 | MR. ALIBERTI:  Same objection.
| 10:38:31:18 | 23 | THE WITNESS:  We're both CPAs and I think
| 10:38:34:01 | 24 | we became closer as it -- as --
| 10:38:36:19 | 25 | It was validating for him to have another

93

| Time | Line | Text |
|---|---|---|
| 10:49:24:07 | 1 | 15 percent of his gross, then 5 percent of Walter's |
| 10:49:27:25 | 2 | gross, but the problem -- or I'm sorry.  5 percent |
| 10:49:31:06 | 3 | of anyone that worked for him, wal -- obviously |
| 10:49:33:25 | 4 | Walter being one of them. |
| 10:49:35:07 | 5 | But the problem was when the consulting |
| 10:49:36:18 | 6 | firm from Houston came in Stevo basically refused to |
| 10:49:41:24 | 7 | acknowledge that he worked for Rick, because Steve |
| 10:49:45:21 | 8 | was the top sales guy and Steve could pretty much |
| 10:49:51:12 | 9 | make his own terms, so, in other words, Rick wasn't |
| 10:49:59:21 | 10 | getting 5 percent of Steve's money. |
| 10:50:01:12 | 11 | Q    Okay.  And -- |
| 10:50:04:19 | 12 | But the policy was that sales -- when |
| 10:50:09:09 | 13 | salespersons were being paid by a commission, that |
| 10:50:10:28 | 14 | commission was a percentage of the gross profit; is |
| 10:50:15:24 | 15 | that correct? |
| 10:50:17:07 | 16 | A    Correct. |
| 10:50:17:07 | 17 | Gross profit, not gross revenue. |
| 10:50:20:15 | 18 | Q    Right. |
| 10:50:22:03 | 19 | And how was gross profit calculated?  Do |
| 10:50:25:09 | 20 | you know? |
| 10:50:25:09 | 21 | A    Yes.  I calculated that, as well.  I took |
| 10:50:30:00 | 22 | the daily -- the daily sales reports.  I would total |
| 10:50:34:24 | 23 | them at the end of the month, and, as best I could, |
| 10:50:39:21 | 24 | reconcile them with, you know, the sales account on |
| 10:50:45:13 | 25 | the financial statements and the general ledger. |

97

| | | |
|---|---|---|
| 10:50:47:03 | 1 | And then you could sort the data by |
| 10:50:52:27 | 2 | salesperson code.  I would do that. |
| 10:50:56:15 | 3 | Try as best I could to remove any returns, |
| 10:50:58:10 | 4 | and any accounts that were over 90 days, I would |
| 10:51:04:27 | 5 | remove those, as well, as best I could determine. |
| 10:51:09:00 | 6 | And then on that number I would multiply |
| 10:51:11:00 | 7 | the commission percentage and add that to their |
| 10:51:15:00 | 8 | check. |
| 10:51:15:00 | 9 | Q     And -- and I think my question was just a |
| 10:51:19:07 | 10 | little more basic, which -- and I'm -- |
| 10:51:23:12 | 11 | Maybe not. |
| 10:51:25:13 | 12 | But is it fair to say that the gross |
| 10:51:27:15 | 13 | profit is calculated by subtracting the cost of the |
| 10:51:32:27 | 14 | product from the sale -- |
| 10:51:32:27 | 15 | A     From the revenue. |
| 10:51:35:00 | 16 | Q     -- from the sales price? |
| 10:51:35:00 | 17 | A     That's right. |
| 10:51:42:07 | 18 | Q     Okay.  And so Platinum would have to |
| 10:51:45:10 | 19 | assign a cost amount for the products sold in order |
| 10:51:50:21 | 20 | to find out what the commission was on that product; |
| 10:51:53:04 | 21 | is that right? |
| 10:51:55:15 | 22 | A     Correct. |
| 10:51:55:15 | 23 | Q     And is it a principle of GAAP there will |
| 10:51:57:25 | 24 | always be a cost assigned to a product? |
| 10:52:00:01 | 25 | A     Yeah, it's the principle of historical |

98

| | | |
|---|---|---|
| 10:52:02:10 | 1 | cost.  This is what they didn't understand, which |
| 10:52:08:03 | 2 | is, on the books -- |
| 10:52:10:12 | 3 | Historical cost is the amount that you |
| 10:52:10:12 | 4 | paid for some -- for something, for an asset. |
| 10:52:15:04 | 5 | What they would do is if they -- if |
| 10:52:19:16 | 6 | they -- |
| 10:52:19:18 | 7 | Let's say they did like a lot purchase |
| 10:52:22:03 | 8 | and -- and let's say they actually got some stuff |
| 10:52:24:18 | 9 | for free. |
| 10:52:28:10 | 10 | This is the reason the inventory couldn't |
| 10:52:28:10 | 11 | be trusted. |
| 10:52:32:00 | 12 | Prior to that Gerry would say, you know, |
| 10:52:34:13 | 13 | our cost on that is zero, which means if you're |
| 10:52:37:03 | 14 | costing something for zero and you sell it for |
| 10:52:39:18 | 15 | $5,000, your gross profit is $5,000. |
| 10:52:42:22 | 16 | But Gerry would say that thing's -- that |
| 10:52:45:19 | 17 | thing -- |
| 10:52:45:21 | 18 | Okay.  Yeah, we paid zero for it, but it's |
| 10:52:48:07 | 19 | worth $3,000, or whatever.  Therefore, reducing the |
| 10:52:53:24 | 20 | gross profit that we would eventually pay the |
| 10:52:53:24 | 21 | commission on, but -- |
| 10:52:56:24 | 22 | So they would make up amounts that didn't |
| 10:52:59:13 | 23 | reconcile to the accounting records for what |
| 10:52:59:13 | 24 | something was worth. |
| 10:53:02:10 | 25 | And that's what -- when I -- when I said |

99

| | |
|---|---|
| 10:53:06:16 | 1 |
| 10:53:06:16 | 2 |
| 10:53:11:01 | 3 |
| 10:53:11:01 | 4 |
| 10:53:14:06 | 5 |
| 10:53:17:03 | 6 |
| 10:53:21:09 | 7 |
| 10:53:21:09 | 8 |
| 10:53:24:27 | 9 |
| 10:53:24:27 | 10 |
| 10:53:27:24 | 11 |
| 10:53:30:18 | 12 |
| 10:53:40:28 | 13 |
| 10:53:44:24 | 14 |
| 10:53:44:25 | 15 |
| 10:53:44:24 | 16 |
| 10:53:49:01 | 17 |
| 10:53:56:21 | 18 |
| 10:54:00:00 | 19 |
| 10:54:00:00 | 20 |
| 10:54:03:09 | 21 |
| 10:54:06:18 | 22 |
| 10:54:10:03 | 23 |
| 10:54:14:03 | 24 |
| 10:54:18:18 | 25 |

1  that they don't understand basic accounting

2  principles and how detrimental that was to their

3  records, they did it anyway.

4      Q    So even though some of the books would

5  show a 100 percent profit, Rick Santos wasn't

6  getting a percentage of the pure sales price?  It

7  would be arbitrarily assigned by Gerry; is that

8  right?

9      A    Yeah.

10         I don't know if I would emphasize the word

11  arbitrary.  I think Gerry had a good idea of what --

12  of what product was worth.

13         But, yeah, he would go crazy, when I would

14  hand him a --

15         When I would hand him the daily sales

16  report, if he saw a cost of zero in any of those

17  sales he would -- he would accuse me of keeping

18  inaccurate accounting records, which was hilarious,

19  and basically saying that I was doing my job wrong,

20  because I think he knew that that zero cost would

21  constitute more money out of his pocket he would be

22  paying the salespeople, so he always -- he went

23  ballistic when he saw something like that.

24      Q    And so would he tell you to put a certain

25  cost on that document that you showed him, for

| | | |
|---|---|---|
| 10:54:18:18 | 1 | example, or how would -- how would it go from being |
| 10:54:23:00 | 2 | a zero cost to having a cost? |
| 10:54:23:00 | 3 | MR. ALIBERTI:  Same objection. |
| 10:54:23:00 | 4 | THE WITNESS:  By just adjusting the gross |
| 10:54:26:18 | 5 | profit report when I paid them the commission every |
| 10:54:30:19 | 6 | time we did payroll.  We did not correct the books, |
| 10:54:30:19 | 7 | because I told him there's nothing -- you can't rely |
| 10:54:35:07 | 8 | on that inventory number on the books.  There's no |
| 10:54:35:07 | 9 | reason to change anything. |
| 10:54:37:00 | 10 | BY MR. SUGDEN: |
| 10:54:37:00 | 11 | Q     So the books would stay the same? |
| 10:54:47:06 | 12 | MR. ALIBERTI:  Same objection. |
| 10:54:47:06 | 13 | MR. SUGDEN:  I'll just start all over |
| 10:54:47:06 | 14 | again. |
| 10:54:48:06 | 15 | Q    So the books would stay the same, but |
| 10:54:50:04 | 16 | Gerry would tell you what costs should be assigned |
| 10:54:54:15 | 17 | in order to calculate the commission for the |
| 10:54:56:22 | 18 | salesperson -- |
| 10:54:56:22 | 19 | A     Correct. |
| 10:54:57:22 | 20 | Q     -- is that right? |
| 10:54:59:24 | 21 | MR. ALIBERTI:  Same objection. |
| 10:54:59:24 | 22 | THE WITNESS:  That's correct. |
| 23:00:01:00 | 23 | BY MR. SUGDEN: |
| 10:55:51:18 | 24 | Q     Did a third-party consulting firm or |
| 10:55:56:06 | 25 | consulting group ever come in to examine Platinum's |

101

| | | |
|---|---|---|
| 10:55:58:18 | 1 | books while you were working there? |
| 10:56:02:00 | 2 | A    Yes. |
| 10:56:02:00 | 3 | Q    That was that group from Houston? |
| 10:56:02:00 | 4 | A    Nope.  That was First Bank, who was |
| 10:56:05:07 | 5 | extending our line of credit. |
| 10:56:06:15 | 6 | Q    And did First Bank perform an audit on you |
| 10:56:10:09 | 7 | guys? |
| 10:56:11:22 | 8 | A    It's called -- |
| 10:56:11:24 | 9 | It's not an audit.  It's a review, which |
| 10:56:15:24 | 10 | is a lower scope engagement. |
| 10:56:19:22 | 11 | Q    And were you the contact person for |
| 10:56:21:10 | 12 | Platinum dealing with First Bank? |
| 10:56:24:15 | 13 | A    Yeah. |
| 10:56:24:15 | 14 | Q    And who at First Bank did you deal with? |
| 10:56:27:21 | 15 | Do you recall that person's name? |
| 10:56:27:21 | 16 | A    I don't. |
| 10:56:29:06 | 17 | Q    And did First Bank extend the line of |
| 10:56:32:12 | 18 | credit after they did this review? |
| 10:56:35:09 | 19 | A    Yes. |
| 10:56:36:24 | 20 | Q    Did First Bank identify any problems with |
| 10:56:38:21 | 21 | Platinum's books? |
| 10:56:40:09 | 22 | A    Yeah. |
| 10:56:40:09 | 23 | Yeah.  In fact, they wouldn't -- the whole |
| 10:56:43:13 | 24 | thing -- |
| 10:56:43:15 | 25 | MR. ALIBERTI:  Same objection. |

102

| | | |
|---|---|---|
| 10:00:01:00 | 1 | BY MR. SUGDEN: |
| 10:56:45:00 | 2 | Q    Go ahead. |
| 10:56:46:18 | 3 | A    The whole thing was contingent.  When I |
| 10:56:49:00 | 4 | sat down with the auditor and we looked at the |
| 10:56:50:21 | 5 | books, and he was pointing out, which was utterly |
| 10:56:58:22 | 6 | obvious to me, that the books couldn't be relied |
| 10:57:00:18 | 7 | upon and that the cash wasn't reconciled. |
| 10:57:02:10 | 8 | I mean, any CPA -- |
| 10:57:04:09 | 9 | We were both CPAs.  You know, we were |
| 10:57:07:27 | 10 | winking at each other like are you -- are you |
| 10:57:09:19 | 11 | kidding me? |
| 10:57:09:19 | 12 | And so their -- |
| 10:57:11:22 | 13 | What they did was they gave us a lesser |
| 10:57:15:12 | 14 | amount of money than they had initially negotiated |
| 10:57:20:15 | 15 | with the understanding that he would come back in 90 |
| 10:57:22:16 | 16 | days and that he said in order for him to give us |
| 10:57:26:19 | 17 | the stamp of approval, that cash would have to be |
| 10:57:30:16 | 18 | reconciled and the books would have to be cleaned |
| 10:57:32:21 | 19 | up. |
| 10:57:32:22 | 20 | I told him I thought I could do it. |
| 10:57:34:27 | 21 | And this was early on.  I mean, I think I |
| 10:57:38:03 | 22 | had been working there maybe a week or two weeks. |
| 10:57:40:16 | 23 | And then I had to keep extending the |
| 10:57:42:18 | 24 | deadline.  We couldn't get cash reconciled. |
| 10:57:47:18 | 25 | MR. ALIBERTI:  Move to strike as |

103

| | | |
|---|---|---|
| 10:57:47:18 | 1 | nonresponsive. |
| | 2 | BY MR. SUGDEN: |
| 10:57:49:21 | 3 | Q    And I assume they were never reconciled? |
| 10:57:51:27 | 4 | Is that correct? |
| 10:57:51:27 | 5 | MR. ALIBERTI:  Same objection. |
| 10:57:53:27 | 6 | THE WITNESS:  Not when I left. |
| 10:57:53:27 | 7 | BY MR. SUGDEN: |
| 10:57:58:21 | 8 | Q    Okay.  And so First Bank was waiting for |
| 10:58:05:06 | 9 | Platinum Networks to reconcile their books?  They |
| 10:58:05:06 | 10 | weren't doing -- doing that for them; is that |
| 10:58:10:01 | 11 | correct? |
| 10:58:10:01 | 12 | A    No.  They -- they -- |
| 10:58:10:01 | 13 | Q    They were -- |
| 10:58:12:15 | 14 | A    They were not assisting in any way.  They |
| 10:58:12:15 | 15 | were basically saying look, we are giving you |
| 10:58:15:00 | 16 | $600,000 here.  When we come back we are -- |
| 10:58:21:27 | 17 | You know, it's complicated, but the -- |
| 10:58:24:07 | 18 | the -- the -- the short of it is that they're |
| 10:58:26:22 | 19 | willing to give us more cash if -- if they can have |
| 10:58:29:27 | 20 | some assurances that those financial statements can |
| 10:58:32:12 | 21 | be trusted. |
| 10:58:34:27 | 22 | Q    Do you recall when that $600,000 extension |
| 10:58:38:15 | 23 | took place? |
| 10:58:41:00 | 24 | A    I believe it was May. |
| 10:58:41:00 | 25 | Q    May of 2004? |

104

| | | |
|---|---|---|
| 11:01:49:07 | 1 | THE WITNESS: -- a lot. |
| 11:01:49:07 | 2 | BY MR. SUGDEN: |
| 11:01:49:07 | 3 | Q    Are you able to provide an estimate as to |
| 11:01:52:25 | 4 | what you think the revenue would have been in 2004? |
| 11:01:55:24 | 5 | MR. ALIBERTI:  Same objection. |
| 11:02:00:03 | 6 | THE WITNESS:  Yeah, I'm -- I'm pretty |
| 11:02:04:06 | 7 | certain it would be in the one hundred fifty to two |
| 11:02:04:06 | 8 | hundred fifty thousand dollar range. |
| 11:02:06:00 | 9 | BY MR. SUGDEN: |
| 11:02:07:16 | 10 | Q    Revenue? |
| 11:02:07:16 | 11 | A    Revenue. |
| 11:02:09:06 | 12 | I'm sorry. |
| 11:02:10:24 | 13 | Revenue. |
| 11:02:10:24 | 14 | Revenue, I would say we were -- we were on |
| 11:02:16:15 | 15 | track to probably hit 2 million. |
| 11:02:36:19 | 16 | Q    Do you know who set up Torrey Ventures? |
| 11:02:39:27 | 17 | MR. ALIBERTI:  Objection.  Calls for |
| 11:02:39:27 | 18 | speculation. |
| 11:02:39:27 | 19 | THE WITNESS:  I don't. |
| 11:02:39:27 | 20 | BY MR. SUGDEN: |
| 11:02:53:12 | 21 | Q    Other than talking to Gerry Medina and |
| 11:02:57:25 | 22 | David Ahumada about Torrey Ventures, did you talk to |
| 11:02:59:18 | 23 | any other employees at Platinum Networks about |
| 11:03:02:00 | 24 | Plat -- about Torrey Ventures? |
| 11:03:03:24 | 25 | MR. ALIBERTI:  Same objection. |

108

| | | |
|---|---|---|
| 11:03:05:18 | 1 | THE WITNESS:  Yeah, I talked to Stevo.  I |
| 11:03:07:18 | 2 | talked to Rick.  Talked to Monica.  Talked to Emily. |
| 11:03:11:16 | 3 | Talked to Vernilda. |
| 11:03:11:16 | 4 | BY MR. SUGDEN: |
| 11:03:11:16 | 5 | Q  Did they all know what Torrey Ventures |
| 11:03:13:15 | 6 | was? |
| 11:03:13:15 | 7 | MR. ALIBERTI:  Same objections. |
| 11:03:15:12 | 8 | THE WITNESS:  It was -- it was a -- a |
| 11:03:15:12 | 9 | running joke. |
| 11:03:20:21 | 10 | BY MR. SUGDEN: |
| 11:03:32:09 | 11 | Q  In other words, everyone at -- all those |
| 11:03:32:09 | 12 | people you just identified knew that Torrey Ventures |
| 11:03:36:27 | 13 | was a dummy corporation? |
| 11:03:44:01 | 14 | A  It was a slush fund, yeah. |
| 11:03:48:01 | 15 | Q  I'm going to have the court reporter mark |
| 11:03:50:00 | 16 | as Exhibit 1 to your deposition an e-mail that we |
| 11:03:57:09 | 17 | have obtained through the course of discovery. |
| 12:44:36:24 | 18 | (Exhibit 1 marked for identification.) |
| 11:03:57:09 | 19 | Would you just take a moment and review |
| 11:04:01:15 | 20 | that e-mail and the second page? |
| 11:04:34:18 | 21 | A  Yeah.  I know it.  I wrote it. |
| 11:04:36:25 | 22 | Q  Okay. |
| 11:04:36:25 | 23 | Have you had a chance to review it? |
| 11:04:39:01 | 24 | A  Yeah, I know it very well. |
| 11:04:41:04 | 25 | Q  Okay.  And you recognize this document? |

109

| | | |
|---|---|---|
| 11:04:41:04 | 1 | A     Sure. |
| 11:04:43:09 | 2 | Q     Is this a true and correct copy of an |
| 11:04:45:12 | 3 | e-mail that you wrote to Gerry Medina on August 17, |
| 11:04:49:28 | 4 | 2004? |
| 11:04:49:28 | 5 | A     Yes. |
| 11:04:52:13 | 6 | Q     And earlier you testified about a waiver |
| 11:04:55:22 | 7 | or release that you wanted Gerry Medina to sign.  Is |
| 11:04:58:21 | 8 | this a true and correct copy of the release that you |
| 11:05:02:13 | 9 | wanted him to sign? |
| 11:05:02:13 | 10 | A     Yes. |
| 11:05:04:27 | 11 | Q     Did Mr. Medina sign this release waiver |
| 11:05:07:10 | 12 | for you?  Do you recall? |
| 11:05:07:10 | 13 | A     Initially he brought it back, and I |
| 11:05:09:21 | 14 | remember he tossed it in my inbox and said if I sign |
| 11:05:12:06 | 15 | this I am incrim -- incriminating myself. |
| 11:05:16:01 | 16 | And then there was -- there was a period |
| 11:05:16:00 | 17 | of time where I didn't show up for work on -- on one |
| 11:05:22:09 | 18 | afternoon -- or one morning in September and I think |
| 11:05:24:25 | 19 | he feared that I was out looking for another job. |
| 11:05:27:15 | 20 | And when I came into my office he had |
| 11:05:27:13 | 21 | signed it and put it in my inbox.  And I was |
| 11:05:30:27 | 22 | stunned. |
| 11:05:33:18 | 23 | Q     Do you still have in your possession a |
| 11:05:33:18 | 24 | cope of this -- |
| 11:05:36:06 | 25 | A     I have the original signed copy with my |

110

| | | |
|---|---|---|
| 11:05:39:21 | 1 | and his signature. |
| 11:05:42:01 | 2 | Q    -- release? |
| 11:05:51:06 | 3 | When Mr. Medina disappeared in |
| 11:05:56:21 | 4 | November 2004 you testified he went to Florida; is |
| 11:05:56:21 | 5 | that correct? |
| 11:05:56:21 | 6 | A    That's what I was told by Monica. |
| 11:05:59:18 | 7 | Q    Do you know why he was going to Florida? |
| 11:06:02:12 | 8 | MR. ALIBERTI:  Objection. |
| 11:06:05:06 | 9 | THE WITNESS:  Stevo -- |
| 11:06:05:06 | 10 | MR. ALIBERTI:  Speculation. |
| 11:06:05:06 | 11 | Can we -- can we please ask the witness |
| 11:06:05:06 | 12 | once I start objecting -- |
| 11:06:09:06 | 13 | I feel he is doing it on purpose. |
| 11:06:09:06 | 14 | You know, the court reporter has asked him |
| 11:06:13:15 | 15 | once to take a deep breath.  He's trying to get his |
| 11:06:13:15 | 16 | answers in before I can object. |
| 11:06:17:06 | 17 | MR. SUGDEN:  I don't think he's doing it |
| 11:06:17:06 | 18 | on purpose. |
| 11:06:17:06 | 19 | Q    But just make sure Joe can get his |
| 11:06:20:13 | 20 | objections.  Then you give your answer.  That way it |
| 11:06:23:09 | 21 | makes it easier for the court reporter. |
| 11:06:23:09 | 22 | A    You bet. |
| 11:06:30:21 | 23 | MR. ALIBERTI:  Objection.  Calls for |
| 11:06:30:21 | 24 | speculation.  Lacks foundation.  Hearsay. |
| 11:06:35:18 | 25 | /// |

111

BY MR. SUGDEN:

11:06:35:16   2       Q     Okay.

11:06:35:16   3       A     Steve related to me that Gerry was opening

11:06:35:16   4   a restaurant in Florida.

11:06:38:21   5       Q     All right.  Did he give you any other

11:06:42:00   6   details about why he was going down there?

11:06:45:06   7       A     No.

11:06:45:06   8             MR. ALIBERTI:  Objection.  Calls for

11:06:45:06   9   speculation.

11:06:45:06   10            THE WITNESS:  No.

11:06:45:06   11            And he -- it took him forever to admit

11:06:49:03   12   that.  He didn't want to admit that.

11:06:49:03   13            MR. ALIBERTI:  Move --

11:06:49:03   14   BY MR. SUGDEN:

11:06:55:28   15      Q     Steve --

11:06:55:28   16            MR. ALIBERTI:  Move to strike everything

11:06:55:28   17   after his no answer.

11:06:55:28  ·18   BY MR. SUGDEN:

11:06:55:28   19      Q     Steve didn't want to admit that or Gerry

11:06:55:28   20   didn't want to admit that?

11:06:55:28   21      A     Well, Gerry is very, to the most extreme

11:07:00:06   22   degree, very personal about his personal business

11:07:05:15   23   and he wouldn't tell me when he was going to leave.

11:07:05:15   24   He would -- he would be in contact with Monica.

11:07:05:15   25            And if I went to Monica and said, Monica,

112

| | | |
|---|---|---|
| 11:07:11:19 | 1 | where is Gerry, she specifically did not want to |
| 11:07:11:19 | 2 | tell me because I think she feared -- |
| 11:07:14:12 | 3 | Well, she knew Gerry didn't want me to |
| 11:07:17:09 | 4 | know. |
| 11:07:19:15 | 5 | Q    Okay.  I'll have the court reporter mark |
| 11:07:28:00 | 6 | as Exhibit 2 another e-mail document that we've |
| 11:07:35:15 | 7 | obtained in discovery. |
| 12:44:36:24 | 8 | (Exhibit 2 marked for identification.) |
| 11:07:37:13 | 9 | Would you just take a moment and read this |
| 11:07:39:19 | 10 | e-mail, and let me know when you're done. |
| 11:07:59:15 | 11 | A    Yeah, I remember it. |
| 11:08:00:15 | 12 | Q    Do you remember this document? |
| 11:08:02:24 | 13 | A    Yeah. |
| 11:08:02:24 | 14 | Q    And is -- |
| 11:08:03:27 | 15 | There's no -- |
| 11:08:04:28 | 16 | For some reason the hard copy of this |
| 11:08:07:03 | 17 | document doesn't have who the e-mail is from.  Did |
| 11:08:09:13 | 18 | you write this document? |
| 11:08:10:21 | 19 | A    Yes. |
| 11:08:11:27 | 20 | Q    So this is a true and correct copy of an |
| 11:08:15:15 | 21 | e-mail that you wrote to Gerry Medina on August 12, |
| 11:08:19:03 | 22 | 2004; is that correct? |
| 11:08:19:03 | 23 | A    That's right. |
| 11:08:21:18 | 24 | Q    And I see that you're identifying several |
| 11:08:24:03 | 25 | expenses.  Are these some of the expenses that you |

113

| | | |
|---|---|---|
| 11:08:26:21 | 1 | were testifying about earlier where you said that |
| 11:08:29:06 | 2 | Gerry was using his AMEX card for personal expenses? |
| 11:08:35:06 | 3 | A    Yes, that's exactly -- |
| 11:08:36:22 | 4 | MR. ALIBERTI:  Same objection. |
| 11:08:36:22 | 5 | THE WITNESS:  That's exactly what we were |
| 11:08:37:28 | 6 | talking about. |
| 11:08:39:09 | 7 | BY MR. SUGDEN: |
| 11:09:05:24 | 8 | Q    Have you ever heard of the Richard Martin |
| 11:09:10:00 | 9 | Corporation? |
| 11:09:11:09 | 10 | A    I've heard of it.  I don't know anything |
| 11:09:12:27 | 11 | about it. |
| 11:09:14:15 | 12 | Q    Do you -- |
| 11:09:14:15 | 13 | A    I just remember seeing it in the files. |
| 11:09:16:24 | 14 | Q    Okay.  And other than seeing it in the |
| 11:09:18:13 | 15 | files you have no recollection of it? |
| 11:09:20:04 | 16 | A    No. |
| 11:09:23:21 | 17 | Q    Okay.  Have you ever heard of RGA |
| 11:09:26:24 | 18 | Enterprises? |
| 11:09:29:25 | 19 | A    No. |
| 11:09:31:12 | 20 | Q    Have you ever heard of Sound Advice |
| 11:09:32:28 | 21 | Unlimited? |
| 11:09:34:15 | 22 | A    Huh-uh. |
| 11:09:37:16 | 23 | Q    Have you ever heard of Certified Sales of |
| 11:09:40:21 | 24 | San Diego? |
| 11:09:42:07 | 25 | A    Huh-uh. |

114

| | | |
|---|---|---|
| 11:15:14:06 | 1 | meetings. |
| 11:15:19:01 | 2 | After the U.S. marshals left, sometime |
| 11:15:19:01 | 3 | thereafter he called everyone into the main area; is |
| 11:15:22:09 | 4 | that correct? |
| 11:15:25:10 | 5 | A    Yes. |
| 11:15:25:10 | 6 | Q    And was -- was he making an announcement |
| 11:15:28:12 | 7 | as to why they were there, or was the purpose of |
| 11:15:31:24 | 8 | this company-wide meeting to address the U.S. |
| 11:15:35:06 | 9 | marshals' previous presence in the office? |
| 11:15:35:06 | 10 | A    Yeah, that was all that it was about.  He |
| 11:15:39:22 | 11 | was trying to reassure everybody that everything was |
| 11:15:39:22 | 12 | going to be okay and that he was going to pay a |
| 11:15:44:00 | 13 | little fine or something, or settle it, and it would |
| 11:15:44:00 | 14 | be over. |
| 11:15:48:19 | 15 | Q    Can you -- |
| 11:15:48:21 | 16 | Who -- |
| 11:15:48:21 | 17 | Other than Mr. Medina who spoke at that |
| 11:15:51:28 | 18 | meeting?  Do you recall? |
| 11:15:58:18 | 19 | A    I don't recall anyone else speaking. |
| 11:16:01:25 | 20 | Q    Okay.  And can you tell me, to the best of |
| 11:16:01:25 | 21 | your recollection, what Mr. Medina said? |
| 11:16:07:07 | 22 | A    The best of my recollection was we had |
| 11:16:07:07 | 23 | been under surveillance, that the judge who signed |
| 11:16:12:10 | 24 | the order to allow the marshals to come in had |
| 11:16:17:15 | 25 | rejected it a couple of times before they signed the |

118

| | | |
|---|---|---|
| 11:16:20:27 | 1 | eventual order, and that he knew it was coming, that |
| 11:16:26:00 | 2 | he -- they didn't tell him that they were coming |
| 11:16:27:28 | 3 | specifically that day, and that it was no big deal |
| 11:16:32:28 | 4 | and that we're going to make payroll and don't |
| 11:16:35:06 | 5 | anybody worry.  This is nothing. |
| 11:16:38:16 | 6 | Q    Okay.  Did he explain the substantive |
| 11:16:42:01 | 7 | reason for the lawsuit or why the U.S. marshals were |
| 11:16:46:12 | 8 | there? |
| 11:16:48:15 | 9 | A    He was. |
| 11:16:48:15 | 10 | Not really. |
| 11:16:49:19 | 11 | I mean, he said it was unauthorized use |
| 11:16:53:22 | 12 | and he was saying that we were completely innocent |
| 11:16:56:03 | 13 | and et cetera, et cetera. |
| 11:16:58:19 | 14 | Q    Did he say -- |
| 11:16:58:21 | 15 | Use of what?  Did he say? |
| 11:17:03:25 | 16 | A    I think he used the word software.  I'm |
| 11:17:05:06 | 17 | not positive. |
| 11:17:07:28 | 18 | Q    Okay.  Do you recall him saying anything |
| 11:17:09:10 | 19 | else in that meeting? |
| 11:17:09:10 | 20 | A    Not really. |
| 11:17:10:22 | 21 | Q    And did anyone have any questions for him |
| 11:17:12:06 | 22 | at that meeting? |
| 11:17:13:18 | 23 | A    No. |
| 11:17:13:18 | 24 | Q    How long was that meeting?  Do you recall? |
| 11:17:16:12 | 25 | A    Probably 10, 15 minutes. |

119

| | | |
|---|---|---|
| 11:20:16:21 | 1 | nonresponsive.  Also add my objection to that. |
| 09:00:01:00 | 2 | BY MR. SUGDEN: |
| 11:20:25:28 | 3 | Q    Did you ever ask Mr. Medina about this |
| 11:20:28:24 | 4 | software issue that the case is about? |
| 11:20:31:25 | 5 | A    No. |
| 11:20:34:22 | 6 | I mean, I -- I can't tell you.  When he |
| 11:20:37:28 | 7 | said it was the copyright problem, that just didn't |
| 11:20:41:03 | 8 | affect me or my department. |
| 11:20:44:04 | 9 | Like I said, from the very beginning I had |
| 11:20:44:03 | 10 | nothing to do with the inventory.  I didn't -- I |
| 11:20:51:27 | 11 | just -- I -- I had no say whatsoever in the gear |
| 11:20:55:07 | 12 | that we bought, and I left it up to Gerry.  I did |
| 11:20:59:04 | 13 | trust that he knew that end of the business.  So it |
| 11:21:02:15 | 14 | was a complete -- |
| 11:21:02:15 | 15 | I -- I couldn't have been more clueless |
| 11:21:05:28 | 16 | about the dealings of this lawsuit. |
| 11:21:05:28 | 17 | Q    All right.  Now, did you ever talk to |
| 11:21:09:04 | 18 | anybody at Platinum Networks about the substance of |
| 11:21:12:15 | 19 | this lawsuit? |
| 11:21:15:27 | 20 | A    Never once. |
| 11:21:19:22 | 21 | Q    Okay.  And before the lawsuit was filed |
| 11:21:19:22 | 22 | you never heard anyone talk about anyone at Platinum |
| 11:21:26:01 | 23 | Networks being in possession of some kind of |
| 11:21:29:09 | 24 | software, or pirate software, anything like that at |
| 11:21:34:01 | 25 | all? |

123

| | | |
|---|---|---|
| 11:21:34:01 | 1 | A    Never. |
| 11:21:34:01 | 2 | Q    And that just wasn't your area of |
| 11:21:38:12 | 3 | involvement with the company; is that right? |
| 11:21:38:12 | 4 | A    Yeah. |
| 11:21:59:09 | 5 | Q    Are you working today? |
| 11:22:00:09 | 6 | A    Uh-huh. |
| 11:22:00:09 | 7 | Q    Who do you work for? |
| 11:22:02:07 | 8 | A    It's a company called Control Solutions. |
| 11:22:04:10 | 9 | Q    Where -- |
| 11:22:04:10 | 10 | Are they located in San Diego? |
| 11:22:07:12 | 11 | A    They're a French-owned company.  Their |
| 11:22:10:12 | 12 | American base is in New Hampshire. |
| 11:22:12:16 | 13 | Q    And do -- and do you work out of your home |
| 11:22:14:25 | 14 | or in an office? |
| 11:22:14:25 | 15 | A    I'm actually flying up to -- |
| 11:22:16:03 | 16 | They're flying me up to San Francisco -- I |
| 11:22:18:15 | 17 | was recently hired -- for the orientation Friday, |
| 11:22:22:00 | 18 | but I will be working out of my home, yes. |
| 11:22:25:19 | 19 | Q    In San Diego? |
| 11:22:26:28 | 20 | A    Yes, in San Diego, but the jobs obviously |
| 11:22:29:16 | 21 | could be all over the world.  It's -- |
| 11:22:30:27 | 22 | Q    So you'll be traveling for this job? |
| 11:22:32:07 | 23 | A    Yeah. |
| 11:22:33:16 | 24 | Q    And when you travel, will they -- will |
| 11:22:36:03 | 25 | they be long business trips? |

124

| | | |
|---|---|---|
| 11:22:39:25 | 1 | A     Yes. |
| 11:22:39:25 | 2 | Well, they could be.  It's Sarbanes-Oxley |
| 11:22:43:18 | 3 | Compliance. |
| 11:22:46:03 | 4 | S-a-r-b-a-n-e-s dash O-x-l-e-y. |
| 11:22:53:01 | 5 | Q     Okay. |
| 11:22:54:19 | 6 | A     Compliance. |
| 11:22:55:24 | 7 | Q     Okay.  Do you know whether or not |
| 11:23:12:00 | 8 | Mr. Medina has a reputation in the industry as being |
| 11:23:15:28 | 9 | an honest or dishonest person? |
| 11:23:17:19 | 10 | MR. ALIBERTI:  Objection.  Calls for |
| 11:23:19:06 | 11 | speculation. |
| 11:23:19:06 | 12 | THE WITNESS:  Yes. |
| 11:23:19:06 | 13 | BY MR. SUGDEN: |
| 11:23:19:06 | 14 | Q     What is -- what is that reputation in the |
| 11:23:20:22 | 15 | community? |
| 11:23:22:12 | 16 | A     In my dealings, completely untrustworthy. |
| 11:23:25:15 | 17 | MR. ALIBERTI:  Move to strike as |
| 11:23:25:15 | 18 | nonresponsive. |
| 11:23:25:15 | 19 | BY MR. SUGDEN: |
| 11:23:27:03 | 20 | Q     How about David Ahumada? |
| 11:23:29:12 | 21 | A     I don't know his reputation in the -- the |
| 11:23:29:12 | 22 | industry. |
| 11:23:31:06 | 23 | Q     But based on your experience do you have |
| 11:23:32:27 | 24 | an opinion? |
| 11:23:34:16 | 25 | MR. ALIBERTI:  Calls for speculation. |

125

| | | |
|---|---|---|
| 11:23:34:16 | 1 | THE WITNESS:  If you're -- you're asking |
| 11:23:37:15 | 2 | me to speculate on someone else's opinion about |
| 11:23:37:15 | 3 | David in the industry, I really couldn't. |
| 11:23:39:12 | 4 | BY MR. SUGDEN: |
| 11:23:39:12 | 5 | Q.  No, I'm sorry.  I'm sorry. |
| 11:23:42:01 | 6 | What's your opinion of David Ahumada's |
| 11:23:43:27 | 7 | reputation for honesty? |
| 11:23:45:19 | 8 | A    My personal opinion is that he's extremely |
| 11:23:50:06 | 9 | dishonest. |
| 11:24:01:12 | 10 | Q    And other than through your accounting |
| 11:24:03:10 | 11 | duties, you don't have any understanding of the |
| 11:24:05:15 | 12 | types of products or software sold by Platinum; is |
| 11:24:07:10 | 13 | that correct? |
| 11:24:09:09 | 14 | A    I don't. |
| 11:24:27:18 | 15 | Q    Ever heard the term Genkey, G-e-n-k-e-y, |
| 11:24:33:12 | 16 | Software? |
| 11:24:35:13 | 17 | A    Huh-uh. |
| 11:24:39:15 | 18 | Q    Okay. |
| 11:24:42:06 | 19 | MR. ALIBERTI:  I think that's -- that's a |
| 11:24:42:06 | 20 | no? |
| 11:24:42:06 | 21 | THE WITNESS:  Oh, I'm sorry. |
| 11:24:44:06 | 22 | No. |
| 11:24:44:06 | 23 | BY MR. SUGDEN: |
| 11:24:49:12 | 24 | Q    And when Mr. Medina made that company-wide |
| 11:24:51:10 | 25 | announcement, he didn't ask anybody whether or not |

126

| | | |
|---|---|---|
| 11:24:55:12 | 1 | they had knowledge about some type of software that |
| 11:24:59:21 | 2 | may have been copied, or anything like that, |
| 11:24:59:21 | 3 | correct? |
| 11:25:01:27 | 4 | A    No.  The impression that I got in that |
| 11:25:04:00 | 5 | meeting was that it was -- it -- |
| 11:25:08:09 | 6 | Gerry and David knew about it, only those |
| 11:25:08:07 | 7 | two, and they were dealing with it, and there was |
| 11:25:12:27 | 8 | no -- it wasn't for anybody to worry about it. |
| 11:25:14:28 | 9 | MR. ALIBERTI:  Move to strike everything |
| 11:25:17:27 | 10 | after no. |
| 11:25:17:27 | 11 | BY MR. SUGDEN: |
| 11:25:17:27 | 12 | Q    Gerry Medina never had, for example, |
| 11:25:17:27 | 13 | interviews with employees where he was asking them |
| 11:25:22:21 | 14 | if they had any knowledge about the allegations from |
| 11:25:25:21 | 15 | Nortel? |
| 11:25:25:21 | 16 | MR. ALIBERTI:  Objection.  Calls for |
| 11:25:25:21 | 17 | speculation. |
| 11:25:29:09 | 18 | THE WITNESS:  Not -- not to my knowledge. |
| 11:25:31:12 | 19 | BY MR. SUGDEN: |
| 11:25:44:03 | 20 | Q    Have you ever heard of a gentleman named |
| 11:25:46:15 | 21 | David Perrin? |
| 11:25:46:15 | 22 | A    No. |
| 11:25:50:00 | 23 | Q    Have you ever heard of a gentleman named |
| 11:25:53:01 | 24 | Bruce Jensen? |
| 11:25:55:15 | 25 | A    Yes.  I think he was a customer or a |

127

| | | |
|---|---|---|
| 11:26:00:03 | 1 | vendor. |
| 11:26:00:03 | 2 | Ç-Ç+ |
| 11:26:00:04 | 3 | Boy, I don't know a whole lot about it.  I |
| 11:26:02:18 | 4 | just remember the name. |
| 11:26:08:18 | 5 | Q     Okay.  Other than -- |
| 11:26:19:07 | 6 | Strike that. |
| 11:26:29:28 | 7 | First Bank looked at Platinum Networks' |
| 11:26:32:13 | 8 | books to determine the amount of credit that would |
| 11:26:35:00 | 9 | be extended; is that right? |
| 11:26:37:21 | 10 | A     First Bank, yes. |
| 11:26:37:21 | 11 | Yes. |
| 11:26:40:01 | 12 | Q     They weren't looking at the books to |
| 11:26:45:16 | 13 | uncover problems or help fix the problems with |
| 11:26:48:07 | 14 | Platinum's books; is that correct? |
| 11:26:48:07 | 15 | A     No. |
| 11:26:51:03 | 16 | Q     And are you aware of an outside consultant |
| 11:26:53:25 | 17 | coming in to help solve or fix the problems with |
| 11:26:53:25 | 18 | Platinum Networks' books? |
| 11:26:56:12 | 19 | A     No. |
| 11:27:11:12 | 20 | Q     And Torrey Ventures didn't do any |
| 11:27:14:06 | 21 | consulting work for Platinum Networks, did they? |
| 11:27:19:24 | 22 | A     Do you mean like perform work? |
| 11:27:22:18 | 23 | Not.  Not that I ever saw. |
| 11:28:01:12 | 24 | Q     David Ahumada testified at his deposition |
| 11:28:01:12 | 25 | that he had never heard of Torrey Ventures.  Is that |

128

| | | |
|---|---|---|
| 11:28:07:09 | 1 | inconsistent with your understanding? |
| 11:28:07:09 | 2 | MR. ALIBERTI:  Objection.  Calls for |
| 11:28:07:09 | 3 | speculation.  Hearsay. |
| 11:28:10:10 | 4 | THE WITNESS:  I can tell you with more |
| 11:28:13:13 | 5 | certainty than I've had about anything, that is a |
| 11:28:16:10 | 6 | lie. |
| 11:28:16:10 | 7 | Oh, my gosh. |
| 11:28:22:06 | 8 | He perjured himself. |
| 11:28:25:01 | 9 | MR. ALIBERTI:  Move to strike everything |
| 11:28:28:09 | 10 | after yes or no as nonresponsive. |
| 11:28:28:09 | 11 | BY MR. SUGDEN: |
| 11:28:28:09 | 12 | Q    If people at Platinum Networks had |
| 11:28:31:12 | 13 | questions about the software or how the software |
| 11:28:37:16 | 14 | worked, who would they typically ask? |
| 11:28:40:21 | 15 | A    David. |
| 11:28:40:21 | 16 | Q    David? |
| 11:28:40:21 | 17 | A    David was -- |
| 11:28:40:22 | 18 | Yeah, David Ahumada. |
| 11:28:43:24 | 19 | Q    And if, for example, Mario Juarez had |
| 11:28:48:10 | 20 | questions about how the software worked, would he go |
| 11:28:48:10 | 21 | to David typically? |
| 11:28:48:10 | 22 | A    Yeah, although I will say Mario was really |
| 11:28:53:13 | 23 | good.  It's not outside the realm of possibility |
| 11:28:53:13 | 24 | that he would have been a go-to guy.  I just never |
| 11:28:58:18 | 25 | witnessed it firsthand. |

129

I DO SOLEMNLY DECLARE UNDER

PENALTY OF PERJURY THAT THE

FOREGOING IS MY DEPOSITION UNDER

OATH; THAT THESE ARE THE QUESTIONS

ASKED OF ME AND MY ANSWERS THERETO;

THAT I HAVE READ SAME AND HAVE MADE

THE NECESSARY CORRECTIONS,

ADDITIONS, OR CHANGES TO MY ANSWERS

THAT I DEEM NECESSARY.


IN WITNESS WHEREOF, I HEREBY

SUBSCRIBE MY NAME THIS __ZZ__ DAY OF

__July__ , 200_5_.



WITNESS SIGNATURE

148

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 610 Newport Center Drive, Suite 700, Newport Beach, CA 92660.

On January 11, 2006, I served the foregoing document described as **PLAINTIF'S PRETRIAL DISCLOSURES AS REQUIRED BY FRCP 26(A)(3) on** the following person(s) in the manner indicated:

### SEE ATTACHED SERVICE LIST

**[X]** (BY MAIL) I am familiar with the practice of Call, Jensen & Ferrell for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope, with postage fully prepaid, addressed as set forth herein, and such envelope was placed for collection and mailing at Call, Jensen & Ferrell, Newport Beach, California, following ordinary business practices.

[ ] (BY FEDERAL EXPRESS) I am familiar with the practice of Call, Jensen & Ferrell for collection and processing of correspondence for delivery by overnight courier. Correspondence so collected and processed is deposited in a box or other facility regularly maintained by Federal Express that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope designated by Federal Express with delivery fees paid or provided for, addressed as set forth herein, and such envelope was placed for delivery by Federal Express at Call, Jensen & Ferrell, Newport Beach, California, following ordinary business practices.

[ X ] (BY FACSIMILE TRANSMISSION) On this date, at the time indicated on the transmittal sheet, attached hereto, I transmitted from a facsimile transmission machine, which telephone number is (949) 717-3100, the document described above and an unsigned copy of this declaration to the person, and at the facsimile transmission telephone numbers, set forth herein. The above-described transmission was reported as complete and without error by a properly issued transmission report issued by the facsimile transmission machine upon which the said transmission was made immediately following the transmission.

[ X ] (FEDERAL) I declare that I am employed in the offices of a member of this Court at whose direction the service was made.

EXECUTED on January 11, 2006, at Newport Beach, California.

Mariam Yusuf

148532_1

i

1

## SERVICE LIST

2

3    Joseph M. Aliberti                    **Attorneys for Plaintiffs**
     Law Office of Joseph M. Aliberti
4    5000 Birch Street, East Tower
     Suite 405
5    Newport Beach, CA 92660
     Facsimile: (949) 724-1717
6    Phone: (949) 724-0550

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28